RON BENDER (SBN 143364)
*rb@lnbyb.com*
PHILIP A. GASTEIER (SBN 130043)
*pag@lnbyb.com*
JULIET Y. OH (SBN 211414)
*jyo@lnbyb.com*
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244

Proposed Counsel for Chapter 11 Debtor and
Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>APEX DIGITAL, INC., a California corporation,<br><br>　　　　　　Debtor. | Case No. 2:10-bk-44406-SB<br><br>Chapter 11<br><br>**DEBTOR'S EMERGENCY MOTION FOR USE OF CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>DATE:　　　August 23, 2010<br>TIME:　　　1:30 p.m.<br>PLACE:　　Courtroom "1539"<br>　　　　　　255 E. Temple Street<br>　　　　　　Los Angeles, California |

**TO  ALL  SECURED  CREDITORS;  THE  TWENTY  LARGEST  UNSECURED CREDITORS;  THE  OFFICE  OF  THE  UNITED  STATES  TRUSTEE;  AND  ALL PARTIES REQUESTING SPECIAL NOTICE:**

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES .................................................................. 9

I.  CASE BACKGROUND ........................................................................................................ 9

    A.  Background ............................................................................................................. 9

    B.  Events Leading To The filing Of The Debtor's Bankruptcy Case ..................... 11

    C.  Liabilities Of The Debtor .................................................................................... 16

    D.  Assets Of The Debtor .......................................................................................... 19

    E.  The Debtor's Need For Use Of Cash Collateral ................................................. 20

II.  DISCUSSION .................................................................................................................... 22

    A.  The Debtor Must Be Authorized To Use Cash Collateral to Operate,
        Maintain and Preserve Its Business ..................................................................... 22

    B.  Kith Electronics Is Adequately Protected By An Equity
        Cushion, The Debtor's Continued Use of Cash Collateral,
        And Replacement Lien .......................................................................................... 23

    C.  The Procedural Requirements Regarding Approval Of The Emergency
        Motion Have Been Satisfied ................................................................................. 27

III.  CONCLUSION .................................................................................................................. 28

# TABLE OF AUTHORITIES

*In re Dynaco Corporation,*
     162 B.R. 389 (Bankr. D.N.H. 1993) ................................................................ 23, 25, 26

*In re Immenhausen Corp.,*
     164 B.R. 347, 352 (Bankr. M.D.Fla. 1994) ............................................................ 25, 26

*In re Jug End in The Berkshires, Inc.,*
     46 B.R. 892 (Bankr. D.Mass. 1985) ............................................................................. 24

*In re McCombs Properties VI, Ltd.,*
     88 B.R. 261, 265 (Bankr. C.D.Cal. 1988) ...................................................... 23, 24, 25

*In re Mellor,*
     734 F.2d 1396, 1400 (9th Cir. 1984) ........................................................................... 23

*In re Newark Airport/Hotel Ltd. Partnership,*
     156 B.R. 444, 450 (Bankr. D.N.J. 1993) ............................................................... 25, 26

*In re Oak Glen R-Vee,*
     8 B.R. 213, 216 (Bankr. C.D.Cal. 1981) .............................................................. 22, 23

*In re O'Connor,*
     808 F.2d 1393, 1398 (10th Cir. 1987) .................................................................. 23, 26

*In re Planned Systems, Inc.,*
     78 B.R. 852, 862 (Bankr. S.D.Ohio 1987) ................................................................. 24

*Matter of Pursuit Athletic Footwear, Inc.,*
     193 B.R. 713 (Bankr. D.Del. 1996) ...................................................................... 25, 26

*In re Smithfield Estates, Inc.,*
     48 B.R. 910 (Bankr. D.R.I. 1985) ............................................................................... 24

*In re Stein,*
     19 B.R. 458, 459 (Bankr. E.D.Pa. 1982) .............................................................. 23, 25

*In re Triplett,*
     87 B.R. 25 (Bankr. W.D.Tex. 1988) ........................................................................... 25

*In re Tucson Industrial Partners,*
     129 B.R. 614 (9th Cir. BAP 1991) .............................................................................. 22

*United Savings Association v. Timbers of Inwood Forest Associates,*
     108 S.Ct. 626, 629 (1988) ........................................................................................... 24

11 U.S.C. § 101 ........................................................................................... 2, 9
11 U.S.C. § 361(1) ........................................................................................... 24
11 U.S.C. § 361(2) ........................................................................................... 24
11 U.S.C. § 363 ........................................................................................... 22
11 U.S.C. § 363(a) ........................................................................................... 22, 23
11 U.S.C. § 363(c) ........................................................................................... 2, 7
11 U.S.C. § 363(c)(1) ........................................................................................... 22
11 U.S.C. § 363(c)(2) ........................................................................................... 22, 23
11 U.S.C. § 362(c)(2)(A) ........................................................................................... 22
11 U.S.C. § 363(c)(2)(B) ........................................................................................... 7, 22
11 U.S.C. § 506(a) ........................................................................................... 24
11 U.S.C. § 506(a)(1) ........................................................................................... 24
11 U.S.C. § 506(c) ........................................................................................... 7
11 U.S.C. § 544 ........................................................................................... 7
11 U.S.C. § 545 ........................................................................................... 7
11 U.S.C. § 547 ........................................................................................... 7
11 U.S.C. § 548 ........................................................................................... 7
11 U.S.C. § 549 ........................................................................................... 7
11 U.S.C. § 1107 ........................................................................................... 2, 9
11 U.S.C. § 1107(a) ........................................................................................... 22
11 U.S.C. § 1108 ........................................................................................... 2, 9, 22

Rule 4001, Federal Rules of Bankruptcy Procedure ........................................... 2, 7
Rule 4001(b), Federal Rules of Bankruptcy Procedure ........................................ 27
Rule 4001(b)(2), Federal Rules of Bankruptcy Procedure ................................... 5
Rule 9014, Federal Rules of Bankruptcy Procedure ........................................... 2, 7

Local Bankruptcy Rule 2081-1(a)(9) ................................................................ 2, 7
Local Bankruptcy Rule 4001-2 ........................................................................ 2, 7
Local Bankruptcy Rule 9075-1 ........................................................................ 2, 7

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. (1977),
        1978 U.S. Code Cong. & Admin. News, p. 5787 ..................................... 24

**SUMMARY**

Pursuant to Local Bankruptcy Rules 2081-1(a)(9), 4001-2 and 9075-1, Section 363(c) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code") and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), Apex Metal, Inc., a California corporation, Chapter 11 debtor and debtor in possession herein (the "Debtor"), hereby moves, on an emergency basis (the "Motion"), for entry of an interim order authorizing the Debtor to use cash collateral on an emergency interim basis pending a final hearing in accordance with the Debtor's operating budget (the "Budget"), a copy of which is attached as Exhibit "D" to the annexed Declaration of Alice Hsu filed concurrently herewith (the "Hsu Declaration").  A further description of the Budget is set forth in the annexed Memorandum of Points and Authorities.

The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on August 17, 2010 (the "Petition Date").  The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor is a leading producer and seller of consumer electronic products, including high-definition LCD televisions, home entertainment media devices, digital set top boxes and green energy products (e.g., solar powered lights), which are carried and sold in hundreds of retail outlets nationwide.  The Debtor opened its doors in 1997, and has proven itself a leading market force in consumer electronics since that time.  Since its inception, the Debtor's mission has been and continues to be to provide quality consumer electronics products for the average American at competitive prices.

According to the Debtor's books and records, and as described more fully in the annexed Memorandum of Points and Authorities, the Debtor believes that there is one creditor which has a lien against substantially all of the Debtor's assets – Kith Electronics Limited ("Kith Electronics").  According to the Debtor's books and records, as of August 13, 2010, Kith Electronics was owed the principal amount of $12,067,734.80 plus attorney's fees in the amount

1  of $130,395.25.  The Debtor believes that Kith Electronics is the only creditor who has a valid,

2  perfected lien against the Debtor's cash collateral.[1]

3      The primary assets of the Debtor are comprised of the following:

4      •    Inventory relating to the Debtor's television distribution business, with a total

5          estimated value (at cost) of approximately $2,734,836.69[2];

6      •    Inventory relating to the Debtor's customer service and warranty services, with a

7          total estimated value (at cost) of approximately $319,221.18;

8      •    Inventory relating to the Debtor's green energy lighting business, with a total

9          estimated value (at cost) of approximately $49,476.01;

10      •    Accounts receivable relating to the Debtor's television distribution business, with

11          an estimated value of approximately $8,001,612.40 (taking into account historical

12          collection rates);

13      •    Accounts receivable relating to the Debtor's green energy lighting business, with

14

15      [1]  Wells Fargo Trade Capital, LLC ("Wells") and The HongKong and Shanghai Banking Corporation Limited ("HSBC") recorded financing statements against the Debtor with the California Secretary of State indicating that they assert security interests and liens upon certain receivables (or portion thereof) and assets relating thereto.  However, both of these financing statements relate to a factoring agreement between the Debtor and Wells, and a related assignment agreement between the Debtor and HSBC.  Both the factoring agreement and the related assignment agreement have been terminated and no amounts are owed to Wells and HSBC.  Accordingly, the Debtor contends that neither Wells nor HSBC has a valid security interest and lien against the Debtor's cash collateral or other assets.

    In addition, The CIT Group/Commercial Services, Inc. ("CIT") recorded a financing statement against the Debtor with the California Secretary of State indicating that it asserts a security interest and lien upon accounts receivable created on or prior to January 1, 2008.  However, the Debtor contends that its current assets do not include any of the accounts receivable covered by CIT's financing statement and that the Debtor owes no money to CIT.  Accordingly, the Debtor contends that CIT does not have a valid security interest lien against the Debtor's cash collateral or other assets.

    [2]  The Debtor has entered into a settlement agreement with Kith Consumer Product, Inc. ("Kith Consumer") (an affiliate of Kith Electronics), which will be subject to separate Court approval, pursuant to which the Debtor proposes to sell its inventory and receivables relating to its television distribution business for approximately the values set forth herein, and enter into a consulting agreement with Kith Consumer which will provide a future revenue stream to the Debtor. It is anticipated that Kith Consumer will acquire the rights to the "Apex Digital" trade name, the Debtor's rights to which have now expired. The Debtor will also retain its lighting business and other assets.  The Debtor will file a motion for approval of its agreement with Kith Consumer shortly.  The continuation of the existing operations under the proposed Budget is essential to preserve the value of the Debtor's assets pending the completion of the proposed transactions.

1    a total face value of approximately $1,420,003.51 (taking into account historical

2    collection rates); and

3    • Fixed assets and equipment, with an estimated fair market value of $160,000

4    (after accounting for depreciation).

5    In total, the Debtor estimates that the aggregate market value of the inventory, accounts

6 receivable, fixed assets and equipment which serve as collateral for Kith Electronics is

7 approximately $12,685,149.79.  As noted above, the Debtor's estimated market values for the

8 television inventory and receivables are substantially similar to the purchase prices attributed to

9 such television inventory and receivables in the Debtor's settlement/sale/consulting agreement

10 with Kith Consumer.

11    Given the estimated aggregate market value of Kith Electronics' key collateral of

12 $12,685,149.79, and with the current aggregate debt of $12,198,130.05 owing to Kith

13 Electronics, the Debtor submits that Kith Electronics appears to be an oversecured creditor

14 protected by an equity cushion, even without attributing any value to any other assets of the

15 Debtor, including the goodwill of the Debtor's business.

16    The Debtor and Kith Electronics have negotiated and entered into an interim cash

17 collateral stipulation (the "Stipulation"), a true and correct copy of which is attached as Exhibit

18 "E" to the Hsu Declaration.  Pursuant to the Stipulation, the Debtor is authorized to use cash

19 collateral through and including September 10, 2010 to pay the expenses set forth in the Budget,

20 subject to a permitted deviance of up to 10% of the total expenses (but not purchases) for any

21 week, with any unused portions to be carried over into the following week on a line-item by line-

22 item basis only.  The Stipulation provides for, among other things, adequate protection payments

23 to be made to Kith Electronics in the sum of $25,000 every four (4) weeks, beginning with the

24 week ending September 5, 2010.

25    Pursuant to this Emergency Motion, the Debtor seeks Court authority to use cash

26 collateral through September 10, 2010 in accordance with the Budget and upon the terms and

27 conditions set forth in the Stipulation.  To the extent any creditors other than Kith Electronics

28

allege that they have valid, perfected liens against the Debtor's cash collateral, the Debtor seeks authority to use cash collateral as against such creditors on an emergency basis pending a final hearing, in accordance with the Budget, subject to the same deviance of up to 10% of the total expenses (but not purchases) for any week, with any unused portions to be carried over into the following week on a line-item by line-item basis only.

The Budget reflects those ordinary expenses that the Debtor must pay in order to stay in business and preserve the going concern value of its business.  Needless to say, the Debtor must be able to use its cash to pay its post-petition operating expenses, including payroll, rent, utilities, etc., so that it can continue collecting on its outstanding accounts receivable (which are significant) and stay in business.  As noted above, the continuation of the existing operations under the proposed Budget is essential to preserve the value of the Debtor's assets pending the completion of the proposed transactions with Kith Consumer.  Without the ability to use cash collateral, the Debtor will be forced to shut down its business, will potentially lose its ability to collect significant accounts receivable, will lose the going concern value of its business, and will be unable to reorganize.

Given that the Kith Electronics appears to be an oversecured creditor protected by an equity cushion and the Debtor's ongoing operations, the Debtor submits that Kith Electronics will remain adequately protected despite the Debtor's use of cash collateral pursuant to the terms proposed herein and in the Stipulation.  As additional adequate protection, Kith Electronics (and any other creditors that have valid, perfected liens against the Debtor's assets) will receive replacement liens against the Debtor's assets, with such replacement liens to have the same extent, validity, and priority as the pre-petition liens held by such creditors.  In addition, Kith Electronics will receive adequate protection payments in the sum of $25,000 every four (4) weeks, beginning with the week ending September 5, 2010.

Pursuant to Bankruptcy Rule 4001(b)(2), while the Court cannot conduct a final hearing on this Emergency Motion earlier than 14 days after service of this Emergency Motion, the Court may conduct a preliminary hearing before such 14-day period expires to enable the Debtor to use

5

1  cash collateral as is necessary to avoid immediate and irreparable harm to the Debtor's estate

2  pending a final hearing.

3      Here, the Debtor cannot survive 14 days without any use of cash collateral.  The Debtor

4  must be able to pay expenses in accordance with the Budget (such as payroll which must be

5  funded by Tuesday, August 31, 2010) pending a final hearing in order to avoid immediate and

6  irreparable harm to the Debtor's business and its bankruptcy estate.

7      Pursuant to Local Bankruptcy Rule 4001-2(b), the Debtor submits that the interim relief

8  requested by the Debtor pertaining to the Debtor's use of cash collateral does not contain any of

9  the following provisions:

| **Provision** | **Paragraph** |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the debtor in possession of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | No |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the debtor is authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of contract. | No |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that provide disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the debtor with respect to a professional fee carve out | No |

6

| Provision | Paragraph |
|---|---|
| | |
| Provisions that prime any secured lien | No |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |
| Findings of fact on matters extraneous to the approval process. | No |

## ADDITIONAL INFORMATION

The relief sought in the Emergency Motion is based upon Local Bankruptcy Rules 2081-1(a)(9), 4001-2 and 9075-1, Section 363(c) of the Bankruptcy Code, and Bankruptcy Rules 4001 and 9014, this Emergency Motion, the annexed Memorandum of Points and Authorities, the Hsu Declaration and the Declaration of David Ji filed concurrently herewith in support of the Emergency Motion, the arguments and statements of counsel to be made at the hearing on the Emergency Motion, and any other evidence properly presented to the Court at or prior to the hearing on the Emergency Motion.

In order to provide maximum notice of this Emergency Motion, concurrently with the filing of this Emergency Motion with the Court (on August 18, 2010), the Debtor has served a copy of this Motion and all supportive papers (including notice of the hearing) upon the Office of the United States Trustee, all secured creditors and their counsel (if known), the Debtor's 20

largest unsecured creditors via overnight mail. These parties will receive delivery of the Emergency Motion and all supportive papers by not later than the morning of Thursday, August 19, 2010.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

1.    granting the Emergency Motion on an interim basis pending a final hearing thereon;

2.    approving the Stipulation in its entirety;

3.    authorizing the Debtor to use cash collateral on an interim basis, through September 10, 2010, pending a final hearing to pay the expenses set forth in the Budget, subject to a permitted deviance of up to 10% of the total expenses (but not purchases) for any week, with any unused portions to be carried over into the following week on a line-item by line-item basis only;

4.    setting a final hearing on the Emergency Motion; and

5.    granting such other and further relief as the Court deems just and proper.

Dated: August 18, 2010                    APEX DIGITAL, INC., a California corporation


                                          By:___/s/ Juliet Y. Oh_____
                                              RON BENDER
                                              PHILIP A. GASTEIER
                                              JULIET Y. OH
                                              LEVENE, NEALE, BENDER, YOO
                                                  & BRILL L.L.P.
                                              Proposed Attorneys for Chapter 11
                                              Debtor and Debtor in Possession

8

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**STATEMENT OF FACTS**

**A.    Background.**

1.        On August 17, 2010 (the "Petition Date"), Apex Digital, Inc. (the "Debtor"), the debtor and debtor in possession herein, filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code"). The Debtor is operating its business, managing its financial affairs and operating its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.        The Debtor is a privately held California corporation headquartered in Walnut, California. The Debtor opened its doors in 1997, and has proven itself a leading market force in consumer electronics since that time. Since its inception, the Debtor's mission has been and continues to be to provide quality consumer electronics products for the average American at competitive prices.

3.        From its start, the Debtor was one of the earliest companies to harness the then-emerging Chinese original equipment manufacturer ("OEM") Original Designed Manufacturer ("ODM") industry. An OEM manufactures products or components that are purchased by a company and retailed under the primary company's brand name. An ODM is a company which designs and manufactures a product which is specified and eventually branded by another firm for sale. Such companies allow the brand firm to produce (either as a supplement or solely) without having to engage in the organization or running of a factory. In late 1999, the Debtor decided to enter the DVD market. The Debtor struck immediate success in February 2002 when the retailer Circuit City bought 5,000 units and sold them almost immediately. Due to the Debtor's low price point and because at that time only the DVD player that the Debtor produced could also play MP3 music discs, the Debtor's sales soared.

4.      The Debtor quickly revolutionized the electronics industry by also moving into the LCD television business.  The Debtor soon persuaded Wal-Mart, KMart, Best Buy and other discount retailers to stock its products.  The Debtor's revenues jumped from $120 million in 2000 to approximately $700 million in 2003.  In fact, *Time Magazine* recognized the Debtor for its extensive global influence and success and named David Ji, the founder, President and Chief Executive Officer of the Debtor, as one of its fifteen "global influentials" of 2002.  A copy of the *Time Magazine* article is attached as Exhibit "1" to the Declaration of David Ji filed concurrently herewith (the "<u>Ji Declaration</u>").  While its sales grew, the Debtor continued to keep a slim profit margin and spent very little money on advertising.  Rather, the Debtor's success was based on aggressive pricing, desirable features, and new product designs capable of being realized in 3 to 6 months instead of the industry standard of two years.

5.      The Debtor continued its expansion into the television market in 2001, and in 2002, the Debtor entered into a purchase agreement with Sichuan Changhong Electronics Co., Ltd ("<u>Changhong</u>"), a state-owned television manufacturer in China.  The Debtor's successes continued.  By 2003, the Debtor commanded a 10% share of the United States DVD player market and its gross sales was approximately $700 million a year.  As more fully set forth below, while the Debtor's relationship with Changhong was initially profitable, it later became the major factor in its decline.

6.      The Debtor possesses a myriad of marketing channels through its extensive industry contacts.  The Debtor's business is presently concentrated in two markets – consumer electronics and, more recently, green energy in the form of solar powered lights.  With the former, the Debtor has focused on nationwide consumer sales of LCD high definition television and converter set top boxes, along with other consumer electronics product lines – all branded in its name through such large scale chains as Best Buy, Costco, Target and Wal-Mart, while likewise utilizing regional forces, *e.g.*, Office Depot.  The Debtor has also offered its products on the internet, through such outlets as Amazon and Tiger Direct.

7.      The Debtor is well known for its ability to bring new innovations to the mass consumer market.  The Debtor developed a new product line – portable consumer solar lighting for outdoor safety and landscaping – branded under an XEPA product line.  Although solar lights are relatively new, the Debtor recently filled an order of 48,000 units to Costco that generated approximately $1.65 million in gross sales.  The Debtor has been contacted by other large retailers to supply its solar lights and expects the same success with its solar lighting product line as it has enjoyed with DVD players, televisions and set top boxes.  In fact, because solar lights do not require as many licenses, the profit margins are higher and will most likely generate larger net profits for the Debtor.  In addition, the Debtor expects to introduce several new models of lights for different uses, ranging from solar motion detector lights to solar landscaping lights.

**B.      Events Leading To The Filing Of The Debtor's Chapter 11 Bankruptcy Case.**

8.      Despite its success, the Debtor started having financial problems in 2003.  Products such as DVD players and televisions require patent licenses, which many of the manufacturers sought out and obtained.  As the consumer electronics market developed, margins thinned for the Debtor as well as its competitors, and disputes and disagreements arose between the Debtor and its manufacturers as to which party was to bear the cost of various licenses.

9.      In addition to this setback, by April 2003, the Debtor had paid Changhong $250 million but Changhong claimed it was owed over $200 million more.  The Debtor strongly disputed this contention and relations between Changhong and the Debtor began to severely deteriorate.  In 2004, a widely publicized debacle began when Changhong caused Mr. Ji to be detained in China for over two years.

10.      While Changhong made a plethora of charges against Mr. Ji, he was never formally charged with a crime.  Mr. Ji was exonerated of all charges.  However, Mr. Ji was not able to leave China as his release was negotiated at the highest levels of government.  During this time, the Debtor effectively had no leadership.  The Debtor's sales dramatically declined from hundreds of millions of dollars to $10 million in gross revenue by 2007.  To obtain his release, Mr. Ji was forced to sign numerous documents drafted by Changhong's attorneys that were intended to sign

away all of the Debtor's legal claims against Changhong and assign all of the Debtor's assets to Changhong.  Mr. Ji was also forced to surrender many of his personal assets, including various interests in businesses, and to permit Changhong to obtain a lien against his personal residence and assets for over $400 million.  After two years of efforts on all fronts - including intervention efforts by President Bush, Governor Arnold Schwarzenegger and other American political leaders in 2007, Mr. Ji was finally able to negotiate his release (with the assistance of counsel) which, for political reasons, required concessions from the Debtor and Mr. Ji personally.  The terms of Mr. Ji's release were negotiated through a "Foundational Agreement" among Changhong, the Debtor and Mr. Ji, a true and correct of which is attached as Exhibit "2" to the Ji Declaration.  Mr. Ji returned to California in 2007.

11.    As set forth above and in the Foundational Agreement, Changhong was paid a substantial sum of money, and the Debtor was required to forfeit significant rights, including its ownership of the "Apex Digital" trademark.  A true and correct copy of the trademark assignment is attached as Exhibit "3" to the Ji Declaration.  Until recently, Changhong licensed the "Apex Digital" trademark back to the Debtor which it regularly renewed on an annual basis.  On or about July 9, 2010, the Debtor received a notice from Changhong that it would <u>not</u> renew the Debtor's license to use the "Apex Digital" trademark.  A true and correct copy of this letter, along with a certified translation is attached as Exhibit "4" to the Ji Declaration.  Accordingly, the Debtor's rights to use the "Apex Digital" trademark expired on July 24, 2010.  The Foundational Agreement also provides Changhong with an "option" to acquire 70% of the equity in the Debtor with no further capital contribution.

12.    During the period of Mr. Ji's detention in China, many of the Debtor's customers took note of the situation and simply stopped paying the Debtor in the hope that it would go out of business.

13.    The Debtor took immediate steps to deal with its financial decline.  The Debtor sold its real property located at 2626 Vista Industrial Parkway, Rancho Dominguez, California (the proceeds of which went entirely to Changhong) and the real property that housed its former

1    corporate headquarters and warehouse located at 2919 East Philadelphia Street, Ontario, California

2    91761.  In an effort to cut costs, the Debtor leased a modest office and warehouse space located in

3    Walnut, California and laid off over a hundred employees, leaving a bare-bones staff of fewer than

4    30 employees.

5            14.    After Mr. Ji's return to the United States in 2007, Mr. Ji was determined to rebuild

6    the Debtor, virtually from scratch.  The Debtor and Mr. Ji built new relationships with new

7    manufacturers in China.   At the same time, Mr. Ji reached out to American retailers and

8    reconnected with key customers such as Best Buy, Target, Costco and Walmart.   The Debtor

9    became well known for its set top boxes which became popular when the United States moved

10   from analog to digital television broadcast transmission in June 2009.  The Debtor again earned top

11   honors in sales of set top boxes in the government program.  In the two-plus years since Mr. Ji's

12   return, he has rebuilt the Debtor's operations and increased annual gross revenues, from

13   approximately $10 million dollars to approximately $120 million in year 2009.  However, because

14   margins have dramatically thinned in the television distribution business, the Debtor has not been

15   able to generate sufficient net revenue to satisfy its legacy debt.

16           15.    The Debtor's current problems arise from outstanding licensing fees due to various

17   license holders, such as MPEG-LA, LLC ("MPEG") and Thomson.  The Debtor believes that its

18   outstanding (disputed) unsecured royalty debt is approximately $32 million, a large portion of

19   which is related to the Debtor's distribution of LCD televisions.   Although the Debtor disputes

20   much of this debt for a variety of reasons, the Debtor has attempted to negotiate with the license

21   owners since 2007 to pay off the legacy debt and, in some cases, enter into new licensing

22   agreements.  Although the Debtor was successful in its negotiations with some of its creditors, like

23   Wi-Lan and Philips, it was unsuccessful with others, like MPEG.  Against this backdrop, and given

24   a string of recent adverse events noted below, it is now difficult for the Debtor to continue to

25   distribute televisions.

26           a.    ***MPEG***.  MPEG is an administrator of patent licenses, primarily audio and

27           video licenses, and licenses and collects royalties on behalf of numerous patent holders.

28

13

Various licensing disputes have arisen between MPEG and the Debtor since 2002. The parties have settled on at least two occasions and the Debtor has paid more than $20 million to MPEG from 1997 to 2009. Despite the Debtor's efforts to work with MPEG, MPEG filed a lawsuit in New York for breach of contract (a settlement agreement) which was ultimately re-filed and is currently presently in the Los Angeles Superior Court for the State of California (Case No. BC416816). On June 28, 2010, the Superior Court entered its Minute Order/Ruling on MPEG's Application For Right of Attain Order ("Minute Order"). A true and correct copy of the Minute Order is attached as Exhibit "5" to the Ji Declaration. Although MPEG claims that it is owed over $21 million, the Superior Court found that MPEG had failed to establish a "likelihood of success" for a majority of its asserted claim, and awarded a Writ of Attachment for less than $4 million.

    b.    ***Jiangsu Hongtu High Tech Co., Ltd.*** ("Hongtu"). Hongtu is also a state-owned Chinese manufacturer (like Changhong). On October 18, 2006, Hongtu obtained a Chinese arbitration award in the amount of $8 million. Although the Debtor questioned the propriety of Hongtu's judgment, the foreign judgment was confirmed by the United States District Court on August 5, 2009 (Case No. CV 08-3102-GW(PLAx)). A copy of the ruling in Motion/Petition To Confirm Foreign Arbitration Award is attached as Exhibit "6" to the Ji Declaration. Hongtu has recently begun aggressively pursuing its judgment. Specifically, on May 27, 2010, it served a notice of debtor examination on Alice Hsu (the Debtor's Chief Operating Officer). Ms. Hsu appeared for examination on June 15, 2010 and July 14, 2010, and produced documents as requested. A copy of Hongtu's proof of service on Alice Hsu and the District Court's Civil Minutes are attached as Exhibits "7" and "8," respectively, to the Ji Declaration.

    c.    ***Kith Default***. Kith Electronics Limited ("Kith Electronics") is the Debtor's senior secured creditor. Kith Electronics holds a blanket UCC-1 lien against substantially all of the Debtor's assets. Presumably concerned with the threat to the Debtor's ongoing business operations, and the risk that its collateral would be seized by MPEG or Hongtu,

14

on June 7, 2010, Kith Electronics served its Notice of Default on the Debtor.  A true and correct copy of the Notice of Default is attached as Exhibit "9" to the Ji Declaration.  On July 6, 2010, the Debtor received a further notice from Kith Electronics regarding the Debtor's default under the parties' Security Agreement, which indicated that Kith Electronics intended to seek judicial action against the Debtor and demanded that the Debtor segregate its collateral.  A true and correct copy of the July 6, 2010 notice is attached as Exhibit "10" to the Ji Declaration.

   d. ***Apex Digital Trade Name.***  As noted above, on or about July 9, 2010, the Debtor received notice that Changhong would not renew the Debtor's license to use the "Apex Digital" trade name, effectively barring the Debtor from using the "Apex Digital" trade name as of July 24, 2010 (<u>see</u>, Exhibit "4" to the Ji Declaration).  The Debtor believes that Changhong has granted the license to use the "Apex Digital" trademark (as of July 24, 2010) to one of Kith Electronics' affiliates.

   16. Given the recent expiration of the Debtor's license to use the "Apex Digital" trademark, which is associated with the Debtor's television and set top box products, the Debtor no longer has the financial wherewithal or ability to continue operating that part of its business related to the production, import and sale of televisions, set top boxes and related products (the "<u>Television Business</u>").  However, the Debtor has recently entered into an agreement with Kith Consumer Product, Inc. ("<u>Kith Consumer</u>"), an affiliate of Kith Electronics, which provides for (i) the transfer to Kith Consumer of the Debtor's inventory, accounts receivable and other related assets used in the Debtor's Television Business in exchange for the assumption by Kith Consumer of a certain portion of the debt owed by the Debtor to Kith Electronics, and (ii) Kith Consumer's retention of the Debtor as its consultant to provide, among other things, business and product development services and customer service and warranty services for certain consumer electronic products.[3]  It is anticipated that Kith Consumer will acquire the rights to the "Apex Digital" trade

---

  [3]  The Debtor will file a separate motion seeking Court approval of its agreement with Kith Consumer shortly.

name, the Debtor's rights to which have now expired.  The Debtor's agreement with Kith Consumer will enable the Debtor to utilize and monetize its pipeline connections as a consultant, notwithstanding its current inability to operate the Television Business.  The Debtor will continue to retain its lighting business and other assets.

17.    In short, the Debtor has filed this chapter 11 case for two primary reasons.  It has become increasingly apparent that the Debtor will not be able to resolve its legacy debt in a consensual and feasible manner.  Also, given the ongoing litigation against the Debtor, the recent loss of the Debtor's license to use the "Apex Digital" trademark, and Kith Electronics' declaration of default and related demands, it has become difficult, if not impossible, for the Debtor to continue operating its Television Business.  However, through its chapter 11 bankruptcy case, the Debtor seeks to modify its business plan to enable it to utilize and monetize its pipeline connections as a consultant to Kith Consumer (which the Debtor expects will provide it with a significant amount of revenue), focus on growing its green energy lighting product line, deal with the licensing disputes that have continued to plague the Debtor, and restructure the Debtor's legacy debt and obligations to Changhong in a cohesive and efficient manner.

**C.    Liabilities Of The Debtor.**

18.    There are four creditors which have recorded financing statements with the California Secretary of State against the Debtor asserting liens upon substantially all or a portion of the Debtor's assets, as described below.  A complete lien search of the official records of the California Secretary of State's Office is attached to the Declaration of Juliet Y. Oh which is being filed concurrently herewith.

a.    The CIT Group/Commercial Services, Inc. ("CIT").  The Debtor and CIT were parties to a Factoring Agreement dated as of December 17, 2001.  To secure the Debtor's obligations under such Factoring Agreement, the Debtor granted to CIT a lien and security interest upon certain accounts receivable and related assets as collateral for the Debtor's obligations to CIT.  On January 2, 2002, CIT recorded a financing statement with the California Secretary of State (file number 200200360899).  Pursuant to an

1    amendment to the financing statement filed by CIT on February 9, 2009 (file number

2    200971871537), CIT's collateral was limited only to accounts receivable created on or

3    prior to January 1, 2008, any merchandise represented thereby (delivered or undelivered)

4    and any proceeds thereof.  The Debtor's current assets do not include any of the accounts

5    receivable covered by CIT's financing statement and the Debtor owes no money to CIT.

6    Accordingly, the Debtor contends that CIT's financing statement is no longer valid.

7        b.    <u>Kith Electronics</u>.  Since approximately February, 2008, Kith Electronics has

8    provided financing to the Debtor to, among other things, purchase inventory.  To secure

9    these obligations, the Debtor granted to Kith Electronics a lien and security interest upon

10   substantially all of the Debtor's assets as collateral for the Debtor's obligations to Kith

11   Electronics.  A true and correct copy of the Security Agreement between the Debtor and

12   Kith Electronics is attached as Exhibit "11" to the Ji Declaration.  On August 12, 2008,

13   Kith Electronics recorded a financing statement with the California Secretary of State (file

14   number 20087168547339).  As of August 13, 2010, the outstanding principal amount owed

15   to Kith Electronics was $12,067,734.80 plus attorney's fees in the amount of $130,395.25.

16       c.    <u>Wells Fargo Trade Capital, LLC ("Wells")</u>.  The Debtor and Wells were

17   parties to a Factoring Agreement (Collection) dated as of 2009 (the "<u>Wells Factoring

18   Agreement</u>").  A true and correct copy of the Wells Factoring Agreement is attached as

19   Exhibit "12" to the Ji Declaration.  To secure the Debtor's obligations under the Wells

20   Factoring Agreement, the Debtor granted to Wells a lien and security interest upon the

21   Debtor's presently existing and thereafter created receivables, general licenses, permits,

22   property, tangible or intangible, at any time in Wells' possession or subject to Wells'

23   control as collateral for the Debtor's obligations to Wells.  On April 17, 2009, Wells

24   recorded a financing statement with the California Secretary of State (file number

25   20097193956958).  On or about January 21, 2010, the Debtor exercised its rights under

26   the Wells Factoring Agreement and terminated such agreement.  A true and correct copy

27   of the letter terminating the Wells Factoring Agreement is attached as Exhibit "13" to the

28

1    Ji Declaration.  Given the termination of the Wells Factoring Agreement and the Debtor's

2    belief that no money is owed to Wells, the Debtor contends that the financing statement

3    recorded by Wells is no longer valid.

4           d.     The HongKong and Shanghai Banking Corporation Limited ("HSBC").

5    The Debtor and HSBC were parties to that certain Assignment of Factoring Proceeds (No

6    Advances) Agreement dated as of February 9, 2009 (the "HSBC Assignment

7    Agreement"), which agreement relates to the Wells Factoring Agreement, specifically to

8    provide for the assignment to HSBC of 80% of the monies due or to become due to the

9    Debtor under the Wells Factoring Agreement.  A true and correct copy of the HSBC

10   Assignment Agreement is attached as Exhibit "14" to the Ji Declaration.  To secure the

11   Debtor's obligations under the HSBC Assignment Agreement, the Debtor granted to

12   HSBC a lien and security interest upon the 80% portion of all proceeds, monies, credit

13   balances and claims for monies due or to become due to the Debtor under the Wells

14   Factoring Agreement as collateral for the Debtor's obligations to HSBC.  On April 27,

15   2009, HSBC recorded a financing statement with the California Secretary of State (file

16   number 20097194770438).  As noted above, the Debtor terminated the Wells Factoring

17   Agreement on January 21, 2010 (see, Exhibit "13" to the Ji Declaration).  Given the

18   termination of the Wells Factoring Agreement and the Debtor's belief that no money is

19   owed to Wells, it follows that no money is owed to HSBC.  Accordingly, the Debtor

20   contends that the financing statement recorded by HSBC is no longer valid.

21       19.    In addition, as noted above, in connection with the state court litigation involving

22   the Debtor and MPEG, the Superior Court awarded to MPEG a pre-judgment Writ of Attachment

23   in the sum of $3,946,678.  It is the Debtor's understanding that, on or about July 31, 2010, MPEG

24   executed its Writ of Attachment and levied against funds contained in the Debtor's bank accounts

25   maintained at Hanmi Bank, in the total sum of $72,073 (the "Levied Funds").  It is further the

26   Debtor's understanding that Kith Electronics has asserted a third-party claim to the Levied Funds

27   and that the Levied Funds are being held by the Los Angeles County Sheriff pending a disposition

28

regarding Kith Electronics' third-party claim. The Debtor contends that any lien that MPEG may assert by virtue of the Levied Funds is disputed and avoidable under the Bankruptcy Code. The Debtor does not believe that any of its other assets have been attached pursuant to MPEG's Writ of Attachment.

20. Based on the foregoing, the Debtor believes that it is only Kith Electronics which may have a valid and enforceable lien on the Debtor's cash and assets.

21. In addition to the amount outstanding to Kith Electronics, the Debtor's books and records reflect liabilities totaling approximately $44 million. This includes Hongtu's judgment in the amount of $8 million, royalty liability of approximately $32 million (most of which is disputed by the Debtor), and other accrued expenses and liabilities totaling approximately $4 million.

**D.    Assets Of The Debtor.**

22. The primary assets of the Debtor are as follows:

a. As summarized in Exhibit "A" to the Declaration of Alice Hsu filed concurrently herewith (the "Hsu Declaration"), the current value of the inventory relating to the Debtor's Television Business, at cost, is approximately $2,734,836.69.[4]

b. As summarized in Exhibit "A" to the Hsu Declaration, the current value of the inventory relating to the Debtor's customer service and warranty services, at cost, is approximately $319,221.18;

c. As summarized in Exhibit "A" to the Hsu Declaration, the current value of the inventory relating to the Debtor's green energy lighting business, at cost, is approximately $49,476.01.

d. As summarized in Exhibit "B" to the Hsu Declaration, the aggregate face value of the accounts receivable relating to the Debtor's Television Business is approximately $8,422,749.90. Based on historical collection rates, the Debtor believes that

---

[4] As noted above, the Debtor has entered into a settlement agreement with Kith Consumer, pursuant to which the Debtor proposes to sell its inventory and receivables relating to the Television Business for approximately the values set forth herein.

1  approximately 95% of these accounts receivable are collectable, resulting in an estimated

2  current value of $8,001,612.40.

3          e.       As summarized in Exhibit "B" to the Hsu Declaration, the aggregate face

4  value of the accounts receivable relating to the Debtor's green energy lighting business is

5  approximately $1,494,740.54.  Based on historical collection rates, the Debtor believes that

6  approximately 95% of these accounts receivable are collectable, resulting in an estimated

7  current value of $1,420,003.51.

8          f.       As summarized in Exhibit "C" to the Hsu Declaration, the current market

9  value of the Debtor's fixed assets and equipment (after accounting for depreciation) is

10  approximately $160,000.

11      23.      In total, the Debtor estimates that the aggregate market value of the inventory,

12  accounts receivable, fixed assets and equipment which serve as collateral for Kith Electronics is

13  approximately $12,685,149.79.  As previously noted, the Debtor's estimated market values for the

14  television inventory and receivables are substantially similar to the purchase prices attributed to

15  such television inventory and receivables in the Debtor's settlement/sale/consulting agreement with

16  Kith Consumer.

17  **E.      The Debtor's Need For Use Of Cash Collateral.**

18      24.      In order for the Debtor to be able to stay in business and preserve the going concern

19  value of its business until its reorganization goals can be meaningfully achieved, the Debtor must

20  be able to use its current cash to pay the Debtor's post-petition operating expenses.  A copy of the

21  Debtor's proposed operating budget for the period from the week ending August 8, 2010 through

22  the week ending to October 31, 2010 (the "Budget") is attached as Exhibit "D" to the Hsu

23  Declaration annexed hereto.

24      25.      The Debtor and Kith Electronics have negotiated and entered into an interim cash

25  collateral stipulation (the "Stipulation"), a true and correct copy of which is attached as Exhibit "E"

26  to the Hsu Declaration.  Pursuant to the Stipulation, the Debtor is authorized to use cash collateral

27  through and including September 10, 2010 to pay the expenses set forth in the Budget, subject to a

28

1    permitted deviance of up to 10% of the total expenses (but not purchases) for any week, with any

2    unused portions to be carried over into the following week on a line-item by line-item basis only.

3    The Stipulation also provides for, among other things, adequate protection payments to be made to

4    Kith Electronics in the sum of $25,000 every four (4) weeks, beginning with the week ending

5    September 5, 2010.

6          26.    Pursuant to this Emergency Motion, the Debtor seeks Court authority to use cash

7    collateral through September 10, 2010 in accordance with the Budget and upon the terms and

8    conditions set forth in the Stipulation.  To the extent any creditors other than Kith Electronics

9    allege that they have valid, perfected liens against the Debtor's cash collateral, the Debtor seeks

10   authority to use cash collateral as against such creditors on an emergency basis pending a final

11   hearing, in accordance with the Budget, subject to the same deviance of up to 10% of the total

12   expenses (but not purchases) for any week, with any unused portions to be carried over into the

13   following week on a line-item by line-item basis only.

14         27.    The Budget reflects those ordinary expenses that the Debtor must pay in order to

15   stay in business and preserve the going concern value of its business.  Needless to say, the Debtor

16   must be able to use its cash to pay its post-petition operating expenses, including payroll, rent,

17   utilities, etc., so that it can continue collecting on its outstanding accounts receivable (which are

18   significant) and stay in business.  As noted above, the continuation of the existing operations under

19   the proposed Budget is essential to preserve the value of the Debtor's assets pending the

20   completion of the proposed transactions with Kith Consumer.  Without the ability to use cash

21   collateral, the Debtor will be forced to shut down its business, will potentially lose its ability to

22   collect significant accounts receivable, will lose the going concern value of its business, and will be

23   unable to reorganize.

24   / / /

25   / / /

26   / / /

27   / / /

28

21

## II.

## DISCUSSION

**A.    The Debtor Must Be Authorized To Use Cash Collateral To Operate, Maintain And Preserve Its Business.**

The Debtor's use of property of the estate is governed by Section 363 of the Bankruptcy Code.  Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under
>
> section. . .1108. . . of this title and unless the court orders otherwise,
>
> the trustee may enter into transactions, including the sale or lease of
>
> property of the estate, in the ordinary course of business, without
>
> notice or a hearing, and may use property of the estate in the ordinary
>
> course of business without notice or a hearing.

11 U.S.C. §363(c)(l).  A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363.  See 11 U.S.C. §1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest. . . ."  11 U.S.C. §363(a).  Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(l) if:

> (A)    each entity that has an interest in such cash collateral
> consents; or
>
> (B)    the court, after notice and a hearing, authorizes such use, sale
> or lease in accordance with the provisions of this section.

See 11 U. S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); In re Oak Glen R-Vee, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); In re Tucson Industrial Partners, 129 B.R. 614

1  (9th Cir. BAP 1991).  In addition, where the debtor is operating a business, it is extremely

2  important that the access to cash collateral be allowed in order to facilitate the goal of

3  reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash

4  collateral is necessary to operate a business."  In re Dynaco Corporation, 162 B.R. 389 (Bankr.

5  D.N.H. 1993), quoting  In re Stein, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

6      The only source of money available to the Debtor to use to operate its business is the

7  Debtor's current cash on hand and collections of its accounts receivable.  As a result, the Debtor

8  has no ability to continue to operate its business and maintain the going concern value of the

9  Debtor's business unless the Debtor has immediate access to and use of its cash collateral to pay

10  the Debtor's ordinary operating expenses, including, but not limited to, payroll, utilities, etc.  The

11  expenses the Debtor must be able to pay during the period from the week ending August 22,

12  2010 through the week ending October 31, 2010 are set forth in the Budget.  The Debtor's

13  inability to pay the expenses set forth in the Budget through and including September 10, 2010

14  (the expiration date of the Stipulation with Kith Electronics) would cause immediate and

15  irreparable harm to the Debtor and its business.  The inability of the Debtor to use its cash

16  collateral would result in the immediate shut down of the Debtor's business, loss of the going

17  concern value of the Debtor's business and assets, and terminate the estate's opportunity to

18  reorganize.

19  **B.      Kith Electronics Is Adequately Protected By An Equity Cushion, The Debtor's
20          Continued Use Of Cash Collateral, And Replacement Lien.**

21      To the extent that an entity has a valid security interest in the revenues generated by

22  property, those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy

23  Code.  Pursuant to Section 363(c)(2), the Court may authorize the debtor to use a secured

24  creditor's cash collateral if the secured creditor is adequately protected.  In re Mellor, 734 F.2d

25  1396, 1400 (9th Cir. 1984).  See also In re O'Connor, 808 F.2d 1393, 1398 (10th Cir. 1987); In

26  re McCombs Properties VI, Ltd., 88 B.R. 261, 265 (Bankr. C.D. Cal. l988) ("McCombs").

27

28

1    Pursuant to the Supreme Court case of <u>United Savings Association v. Timbers of Inwood</u>

2  <u>Forest Associates</u>, 108 S.Ct. 626, 629 (1988) ("<u>Timbers</u>") and subsequent case law, the property

3  interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the

4  Bankruptcy Code is only the value of the lien that secures the creditor's claim.  108 S.Ct. at 630.

5  <u>See also</u> <u>McCombs</u>, <u>Id.,</u> at 266.  Section 506(a) "limit[s] the secured status of a creditor (i.e., the

6  secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the

7  collateral."  <u>McCombs</u>, <u>Id.,</u> at 266.  Therefore, the law is clear that only the secured portions of

8  the Secured Creditors' claims are entitled to be adequately protected, AND, pursuant to Section

9  506(a)(1) of the Bankruptcy Code, any undersecured creditor is not entitled to any post-petition

10  interest, fees, costs, or the like on its claim.

11    The principle of adequate protection reconciles the competing interests of the debtor, who

12  needs time to reorganize free from harassing creditors, and the secured creditor, which is entitled

13  to constitutional protection for its bargained-for property interest.  <u>See</u>, H.R. Rep. No. 95-595,

14  95th Cong., 1st Sess. (1977), 1978 U.S. Code Cong. & Admin. News, p. 5787.  <u>In re Jug End In</u>

15  <u>The Berkshires, Inc.</u>, 46 B.R. 892 (Bankr.D.Mass.1985).  In <u>In re Planned Systems, Inc.</u>, 78 B.R.

16  852, 862 (Bankr. S.D. Ohio 1987), the Court noted that it is proof of a post-petition decline in the

17  value of the equipment as opposed to a mere lack of equity in the equipment, which would

18  support a finding of lack of adequate protection.  It further noted that the existence or non-

19  existence of equity should not be the *sine qua non* for adequate protection.  As the court in <u>In re</u>

20  <u>Smithfield Estates, Inc.</u>, 48 B.R. 910 (Bankr. D. R.I. 1985), observed:

21    "The weight of authority and in our view the better reasoned opinions,

22    hold that adequate protection relates to maintaining the status-quo

23    during the period after the filing of the petition and before

24    confirmation or rejection of the plan.  The secured creditor is entitled

25    to protection against any depreciation or diminution in the value of

26    the collateral as it existed and was available to satisfy the debt on the

27    date of the filing of the petition in bankruptcy."

28

1    Thus, while an equity cushion is generally considered *prima facie* evidence of adequate

2    protection, the absence of an equity cushion does not establish the converse, *i.e.,* that, as a matter

3    of law, the creditor is not adequately protected.    An (under)secured creditor's position is not

4    worse immediately after the bankruptcy filing than it was just prior thereto, and the provisions

5    for adequate protection may only protect the secured creditor from any impairment in the value

6    of its interest.    The concept of adequate protection was not designed or intended to place an

7    undersecured or minimally secured creditor in a better post-filing position than it was in before

8    the imposition of the automatic stay.    Additionally, in determining adequate protection, other

9    courts have determined that a debtor's continued business operations can constitute the adequate

10   protection of a secured creditor.    See, Matter of Pursuit Athletic Footwear, Inc., 193 B.R. 713

11   (Bankr. D. Del. 1996); In re Newark Airport/Hotel Ltd. Partnership, 156 B.R. 444, 450 (Bankr.

12   D.N.J. 1993); In re Dynaco, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); In re Immenhausen

13   Corp., 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

14   Here, and as discussed above, based just on the current estimated values of the Debtor's

15   inventory, accounts receivable, fixed assets and equipment, Kith Electronics appears to be

16   oversecured and protected by an equity cushion.

17   But, even if an equity cushion did not exist, the law is also clear that the preservation of

18   the value of a secured creditor's lien is sufficient to provide adequate protection to a secured

19   creditor when a debtor seeks to use cash collateral.    In re Triplett, 87 B.R. 25 (Bankr. W.D.Tex.

20   1988).    See also In re Stein, 19 B.R. 458 (Bankr. E.D.Pa. 1982).    In Stein, the Court found that,

21   as a general rule, a debtor may use cash collateral where such use would enhance or preserve the

22   value of the collateral, and allowed the debtor therein to use cash collateral even though the

23   secured party had no equity cushion for protection.    The Stein Court determined that the use of

24   cash collateral was necessary to the continued operations of the debtor, and that the creditor's

25   secured position could only be enhanced by the continued operation of the debtor's business.

26   See also In re McCombs, supra, where the court determined that the debtor's use of cash

27   collateral for needed repairs, renovations and operating expenses eliminated the risk of

28

1  diminution in the creditor's interest in the cash collateral and such use would more likely

2  increase cash collateral.  Therefore, Kith Electronics will be further adequately protected by the

3  continued operation of the Debtor's business.

4         In a similar situation, the Court in the Matter of Pursuit Athletic Footwear, Inc., 193 B.R.

5  713 (Bankr. D. Del. 1996), considered this issue and allowed the use of cash collateral, accepting

6  the debtor's argument that no additional adequate protection payments need be made:

7                if there is no actual diminution in the value of [the] collateral through the

8                date of the hearing, and [Debtor] can operate profitably post-petition,

9                [creditor] is adequately protected for the use of its cash collateral. 11

10               U.S.C. Section 361; In re Newark Airport/Hotel Ltd. Partnership, 156 B.R.

11               444, 450 (Bankr. D.N.J. 1993); In re Dynaco, 162 B.R. 389, 394-5 (Bankr.

12               D.N.H. 1993); In re Immenhausen Corp., 164 B.R. 347, 352 (Bankr. M.D.

13               Fla. 1994).

14  Additionally, in determining adequate protection, Courts have stressed the importance of

15  promoting a debtor's reorganization.  In In re O'Connor, supra, the Tenth Circuit stated:

16               "In this case, Debtors, in the midst of a Chapter ll proceeding, have

17               proposed to deal with cash collateral for the purpose of enhancing

18               the prospects of reorganization.  This quest is the ultimate goal of

19               Chapter 11.   Hence, the Debtor's efforts are not only to be

20               encouraged, but also their efforts during the administration of the

21               proceeding are to be measured in light of that quest.  Because the

22               ultimate benefit to be achieved by a successful reorganization

23               inures to all the creditors of the estate, a fair opportunity must be

24               given to the Debtors to achieve that end.  Thus, while interests of

25               the secured creditor whose property rights are of concern to the

26               court, the interests of all other creditors also have bearing upon the

27               question of whether use of cash collateral shall be permitted during

28

1    the early stages of administration."

2    808 F.2d at 1937.

3        Here, even if an equity cushion did not exist, the continuing operation of the Debtor's

4    business which maintains, if not increases, the value of Kith Electronics' collateral protects Kith

5    Electronics from any diminution in the value of its collateral that is caused by the Debtor's use of

6    cash collateral during this case.  As additional adequate protection, Kith Electronics (and any

7    other creditors that have valid, perfected liens against the Debtor's assets) will also have

8    replacement liens against the Debtor's assets, with such replacement liens to have the same

9    extent, validity, and priority as the pre-petition liens held by such creditors.  In addition, pursuant

10   to the Stipulation, Kith Electronics will receive adequate protection payments in the sum of

11   $25,000 every four (4) weeks, beginning with the week ending September 5, 2010.

12   **C.    The Procedural Requirements Regarding Approval Of The Emergency Motion**

13   **Have Been Satisfied.**

14       Bankruptcy Rule 4001(b) sets forth procedural requirements for obtaining use of cash

15   collateral.  There are three general procedural requirements.  First, the Emergency Motion must

16   contain a copy of the proposed form of order, which has been done by attaching the proposed

17   order as Exhibit "F" to the Hsu Declaration filed concurrently herewith.  Second, the Emergency

18   Motion must provide a concise statement of the relief requested, which was done above.  Third,

19   the Emergency Motion is required to be served on any entity with an interest in the Debtor's cash

20   collateral, any committee appointed or the twenty largest unsecured creditors if there is no

21   committee, and on such other parties as the Court directs.  No committee has been appointed in

22   the Debtor's case to date.  However, the Debtor has served a copy of the Emergency Motion and

23   all supportive papers upon the Office of the United States Trustee, all secured creditors and their

24   counsel (if known), and the Debtor's 20 largest unsecured creditors via overnight mail.  The

25   foregoing parties will receive delivery of the Emergency Motion and all supportive papers by not

26   later than the morning of Thursday, August 19, 2010.  Accordingly, the Emergency Motion

27   complies with the requirements of Bankruptcy Rule 4001(b).

28

# III.

## CONCLUSION

Based upon all of the foregoing, the Debtor respectfully requests that the Court enter an order:

1.     granting the Motion on an interim basis pending a final hearing thereon;

2.     approving the Stipulation in its entirety;

3.     authorizing the Debtor to use cash collateral on an interim basis, through September 10, 2010, pending a final hearing to pay the expenses set forth in the Budget, subject to a permitted deviance of up to 10% of the total expenses (but not purchases) for any week, with any unused portions to be carried over into the following week on a line-item by line-item basis only;

4.     setting a final hearing on the Emergency Motion; and

5.     granting such other and further relief as the Court deems just and proper.

Dated:  August 18, 2010                          APEX DIGITAL, INC., a California corporation


                                                 By:___/s/ Juliet Y. Oh_____
                                                      RON BENDER
                                                      PHILIP A. GASTEIER
                                                      JULIET Y. OH
                                                      LEVENE, NEALE, BENDER, YOO
                                                        & BRILL L.L.P.
                                                      Proposed Attorneys for Chapter 11
                                                      Debtor and Debtor in Possession

| In re: | | CHAPTER 11 |
|---|---|---|
| APEX DIGITAL, INC., | | |
| | Debtor(s). | CASE NO. 2:10-bk-44406-SB |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067.

A true and correct copy of the foregoing document described as: **DEBTOR'S EMERGENCY MOTION FOR USE OF CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF,** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 18, 2010,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Service information on attached page [X]

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL OR ATTORNEY SERVICE:** On **August 18, 2010,** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service and/or by attorney service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

*BY OVERNITE EXPRESS*
Hon. Peter H. Carroll
U. S. Bankruptcy Court/Los Angeles Div.
Edward R. Roybal Fed. Bldg. & Courthouse
255 E. Temple Street, Suite 1539
Los Angeles, CA 90012

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

Service information on attached page [ ]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 18, 2010 | TRISH MELENDEZ | |
|---|---|---|
| Date | Type Name | Signature |

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

Juliet Y Oh on behalf of Debtor Apex Digital, Inc.
jyo@lnbrb.com, jyo@lnbrb.com

David B Shemano on behalf of Interested Party Courtesy NEF
dshemano@pwkllp.com

United States Trustee (LA)
ustpregion16.la.ecf@usdoj.gov

**II.  SERVED BY U.S. MAIL**

[SEE ATTACHED SERVICE LISTS]

Apex Digital, Inc.
4722

The CIT Group/Commercial Services
300 South Grand Avenue
Los Angeles, CA 90071

Wells Fargo Trade Capital, LLC
333 South Grand Avenue, Suite 4150
Los Angeles, CA 90071

Alan S. Gutman, Esq.
9401 Wilshire Blvd., Suite 575
Beverly Hills, CA 90212

Kith Electronics Limited
1/F Hing Lung Commerical Building
68 Bonham Stand East, Hong Kong
CHINA

MPEG LA
6312 S Fiddlers Green Circle
Suite 400E
Greenwood Village, CO 80111

Counsel for MPEG LA
Michael H. Steinbuerg, Esq.
Sullivan & Cromwell LLP
1888 Century Park East, Suite 2100
Los Angeles, CA 90067

Apex Digital, Inc.
20 Largest
4722

Covington & Burling LLP
1201 Pennsylvania Ave. N.W.
Washington, DC 20004-2401

Regent USA Inc
1208 John Reed Court
City of Industry, CA 91745

Koninklijke Philips Electronics
1251 Avenue of the Americas
New York, NY 10020

Wintek Group, Inc.
13418 Wandering Ridge Way
Chino Hills, CA 91709

G & J Express Transport, Inc
9121 Blackley Street
Temple City, CA 91780

Disco Vision
2265 East 220th Street
Long Beach, CA 90810

Oracle Corporation
500 Oracle Parkway
Redwood City, CA 94065

MPEG LA
6312 S Fiddlers Green Circle
Suite 400E
Greenwood Village, CO 80111

Vizio
39 Tesla
Irvine, CA 92618

Jiangsu Qiao Yue Shu Ma You Xian
#1, Jing Jiu Road, Ding Mao Jing Ji
Kai Fa, Zhen Jiang City, Jiangsu
**CHINA**

Funai
7-1, 7-Chome, Nakagaito
Daito, Osaka 574-0013
**JAPAN**

Jiangsu Hongtu High Tech Co Ltd
83 Hu Bei Road
Nanijing P.R., Post Code 210009
**CHINA**

Shanghai World Trade Dev. Co., LTD
Unit 118, Suite 1016, Xin Ling Road
Wai Gao Qiao Bao Shui, Shanghai
**CHINA**

Wi-Lan V-Chip Corp.
41 Pullman Court
Toronto, Ontario
**CANADA**

Thomson Multimedia
46, Quai Alphonse Le Gallo
Boulogne
**FRANCE   92468**

Sichuan Digital Telemedia Co. Ltd.
Jiuzhopu Electric Bldg., 6th Floor
High-Tech Park, Nanshan, Shenzhen
**CHINA**

Apex Digital Inc. Ltd.
Unit 37031, 37/F West Tower Shun
Tak Centre 168-200 Connaught Rd Cen
**HONG KONG**