1  RON BENDER (SBN 143364)
   *rb@lnbyb.com*
2  PHILIP A. GASTEIER (SBN 130043)
   *pag@lnbyb.com*
3  JULIET Y. OH (SBN 211414)
   *jyo@lnbyb.com*
4  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
5  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
6  Telephone:  (310) 229-1234
   Facsimile:  (310) 229-1244
7
8  Proposed Counsel for Chapter 11 Debtor and
   Debtor in Possession
9

10              **UNITED STATES BANKRUPTCY COURT**

11               **CENTRAL DISTRICT OF CALIFORNIA**

12                   **LOS ANGELES DIVISION**

13

14  In re                          )   Case No. 2:10-bk-44406-SB
                                   )
15  APEX DIGITAL, INC., a California )   Chapter 11
    corporation,                   )
16                                 )
                                   )   **DECLARATION OF ALICE HSU IN**
17                 Debtor.         )   **SUPPORT OF DEBTOR'S EMERGENCY**
                                   )   **"FIRST DAY" MOTIONS**
18                                 )
                                   )   DATE:      August 23, 2010
19                                 )   TIME:      1:30 p.m.
                                   )   PLACE:     Courtroom "1539"
20                                 )              255 E. Temple Street
                                   )              Los Angeles, California
21                                 )
                                   )
22                                 )
                                   )
23  ─────────────────────────────

24       I, Alice Hsu, hereby declare as follows:

25       1.      I am over 18 years of age.  If called as a witness, I could and would competently

26  testify with respect to the matters set forth in this declaration from my own personal knowledge

27  or from knowledge gathered from others within the organization of Apex Digital, Inc., a

28

                                    1

California corporation, the debtor and debtor in possession herein (the "Debtor"), my review of relevant documents, or my opinion based upon my experience concerning the Debtor's operations.

**I.**

**THE DECLARANT**

2.    I am the Chief Operating Officer ("COO") of the Debtor.

3.    I have served as the COO of Apex Digital since April, 2008.  Prior to April, 2008, I served as, among other things, Controller for Apex.  Prior to Apex, I worked in the accounting and financial industries for over 10 years.  I was born in Taiwan, immigrated to the United States in 1987 and became a United States citizen in 2000.  I attended a university in Taiwan for 2 years, majoring in accounting and statistics, before immigrating to the United States.  I then earned my bachelors degree from California State University, Los Angeles, majoring in Computer Information Systems.

4.    As COO, I oversee all of the Debtor's financial planning, financial reporting, and cash management activities, as well as human resources, information systems, and distribution.  I have also been serving, and will continue to serve, as one of the point persons for the Debtor's efforts in this chapter 11 case.  As COO, I have worked extensively with the Debtor's books and records, including its financial statements and projections, business plan, business analyses and reports, royalty obligations, lease obligations, contracts and other legal documents, notes and correspondence, and the like.  On a regular basis, I have participated, witnessed or consulted in negotiations with lenders, vendors, and customers of the Debtor.  Based on all of the foregoing, I have developed an intimate familiarity with the Debtor's books and records which are maintained in the ordinary course of business under my supervision and control as custodian, its business and financial history, its operations, and its current business and financial situation, and with the financial and operations details of the Debtor's business operations.

5.    I submit this declaration in support of the relief that the Debtor has requested in the various emergency "first day" motions that have been filed in this case, and to assist the

Court and other interested parties in understanding the circumstances that led to the

commencement of the Debtor's chapter 11 case. I have reviewed the Debtor's first day motions,

and I believe that the relief sought in such motions will enable the Debtor to continue to operate

effectively during its transition to chapter 11, thereby avoiding or minimizing certain adverse

operational and financial consequences that might otherwise result from the commencement of

this case, and that the relief sought in such motions is essential to ensuring the uninterrupted

operation of the Debtor's business and the success of its case.

II.

**THE DEBTOR'S LIABILITIES**

6.      It is my understanding that the four creditors described below have recorded

financing statements with the California Secretary of State against the Debtor asserting liens

upon substantially all or a portion of the Debtor's assets.

a.      <u>The CIT Group/Commercial Services, Inc. ("CIT")</u>.  The Debtor and CIT

were parties to a Factoring Agreement dated as of December 17, 2001.  To secure the

Debtor's obligations under such Factoring Agreement, the Debtor granted to CIT a lien

and security interest upon certain accounts receivable and related assets as collateral for

the Debtor's obligations to CIT.  Thereafter, the Factoring Agreement with CIT was

terminated and CIT agreed that its collateral would be limited only to accounts receivable

created on or prior to January 1, 2008, any merchandise represented thereby (delivered or

undelivered) and any proceeds thereof.  Based on the Debtor's books and records, the

Debtor's current assets do not include any of the accounts receivable covered by CIT's

financing statement and the Debtor owes no money to CIT.

b.      <u>Kith Electronics Limited ("Kith Electronics")</u>.  Since approximately

February, 2008, Kith Electronics has provided financing to the Debtor to, among other

things, purchase inventory.  To secure these obligations, the Debtor granted to Kith

Electronics a lien and security interest upon substantially all of the Debtor's assets as

collateral for the Debtor's obligations to Kith Electronics.  A true and correct copy of the

3

Security Agreement between the Debtor and Kith Electronics is attached as Exhibit "11" to the Declaration of David Ji filed concurrently herewith (the "Ji Declaration"). Based on the Debtor's books and records, as of August 13, 2010, the outstanding principal amount owed to Kith Electronics was $12,067,734.80 plus attorney's fees in the amount of $130,395.25.

c.    Wells Fargo Trade Capital, LLC ("Wells"). The Debtor and Wells were parties to a Factoring Agreement (Collection) dated as of 2009 (the "Wells Factoring Agreement"). A true and correct copy of the Wells Factoring Agreement is attached as Exhibit "12" to the Ji Declaration. To secure the Debtor's obligations under the Wells Factoring Agreement, the Debtor granted to Wells a lien and security interest upon the Debtor's presently existing and thereafter created receivables, general licenses, permits, property, tangible or intangible, at any time in Wells' possession or subject to Wells' control as collateral for the Debtor's obligations to Wells. On or about January 21, 2010, the Debtor exercised its rights under the Wells Factoring Agreement and terminated such agreement. A true and correct copy of the letter I wrote on behalf of Apex terminating the Wells Factoring Agreement is attached as Exhibit "13" to the Ji Declaration. Based on the Debtor's books and records, no money is owed to Wells.

d.    The HongKong and Shanghai Banking Corporation Limited ("HSBC"). The Debtor and HSBC were parties to that certain Assignment of Factoring Proceeds (No Advances) Agreement dated as of February 9, 2009 (the "HSBC Assignment Agreement"), which agreement relates to the Wells Factoring Agreement, specifically to provide for the assignment to HSBC of 80% of the monies due or to become due to the Debtor under the Wells Factoring Agreement. A true and correct copy of the HSBC Assignment Agreement is attached as Exhibit "14" to the Ji Declaration. To secure the Debtor's obligations under the HSBC Assignment Agreement, the Debtor granted to HSBC a lien and security interest upon the 80% portion of all proceeds, monies, credit balances and claims for monies due or to become due to the Debtor under the Wells Factoring Agreement as collateral for the Debtor's obligations to HSBC. As previously

1    noted, the Debtor terminated the Wells Factoring Agreement on January 21, 2010 (see,

2    Exhibit "13" to the Ji Declaration).    Given the termination of the Wells Factoring

3    Agreement and the Debtor's belief that no money is owed to Wells, it follows that no

4    money is owed to HSBC.

5    7.    In addition, in connection with state court litigation involving the Debtor and

6    MPEG-LA, L.L.C., an administrator of patent licenses, primarily audio and video licenses

7    ("MPEG"), the Superior Court awarded to MPEG a pre-judgment Writ of Attachment in the sum

8    of $3,946,678.  It is my understanding that, on or about July 31, 2010, MPEG executed its Writ of

9    Attachment and levied against funds contained in the Debtor's bank accounts maintained at Hanmi

10    Bank, in the total sum of $72,073 (the "Levied Funds").  It is further my understanding that Kith

11    Electronics has asserted a third-party claim to the Levied Funds and that the Levied Funds are

12    being held by the Los Angeles County Sheriff pending a disposition regarding Kith Electronics'

13    third-party claim.   I do not believe that any of the Debtor's other assets have been attached

14    pursuant to MPEG's Writ of Attachment.

15    8.    Based on the foregoing, I believe that it is only Kith Electronics which may have a

16    valid and enforceable lien on the Debtor's cash and assets.

17    9.    In addition to the amount outstanding to Kith Electronics, the Debtor's books and

18    records reflect liabilities totaling approximately $44 million.  This includes a judgment for $8

19    million obtained by Jiangsu Hongtu High Tech Co., Ltd., a state-owned Chinese manufacturer,

20    royalty liability of approximately $32 million (most of which is disputed by the Debtor), and other

21    accrued expenses and liabilities totaling approximately $4 million.

22                                    **III.**

23                            **THE DEBTOR'S ASSETS**

24    10.    Television Inventory.  Based on the Debtor's books and records, the current value

25    of the inventory relating to the Debtor's Television Business, at cost, is approximately

26    $2,734,836.69.  A summary of the Debtor's inventory relating to the Television Business is

27    provided in Exhibit "A" hereto.  The Debtor recently entered into a settlement agreement with

28

5

Kith Consumer Product, Inc. ("Kith Consumer") (an affiliate of Kith Electronics), which I understand will be subject to separate Court approval, pursuant to which the Debtor proposes to sell its inventory and receivables relating to its television distribution business, and enter into a consulting agreement with Kith Consumer which will provide a future revenue stream to the Debtor.   The Debtor will also retain its lighting business and other assets.   The Debtor's settlement agreement with Kith Consumer provides for the sale of the Debtor's inventory relating to the Television Business for approximately the value set forth herein.

11.   Customer and Warranty Services Inventory.   Based on the Debtor's books and records, the current value of the inventory relating to the Debtor's customer and warranty services (for the Television Business or otherwise), at cost, is approximately $319,221.18.   A summary of the Debtor's inventory relating to the Debtor's customer and warranty services business is provided in Exhibit "A" hereto.

12.   Lighting Inventory.   Based on the Debtor's books and records, the current value of the inventory relating to the Debtor's green energy lighting business, at cost, is approximately $49,476.01.   A summary of the Debtor's inventory relating to the lighting business is provided in Exhibit "A" hereto.

13.   Television Receivables.   Based on the Debtor's books and records, the aggregate face value of the accounts receivable relating to the Debtor's Television Business is approximately $8,422,749.90.   A summary of the Debtor's accounts receivable relating to the Television Business is provided in Exhibit "B" hereto.   Based on historical collection rates, I believe that approximately 95% of these accounts receivable are collectable, resulting in an estimated current value of $8,001,612.40.   The Debtor's settlement agreement with Kith Consumer provides for the sale of the Debtor's accounts receivable relating to the Television Business for approximately the value set forth herein.

14.   Lighting Receivables.   Based on the Debtor's books and records, the aggregate face value of the accounts receivable relating to the Debtor's green energy lighting business is approximately $1,494,740.54.   A summary of the Debtor's accounts receivable relating to the

6

lighting business is provided in Exhibit "B" hereto.  Based on historical collection rates, I believe that approximately 95% of these accounts receivable are collectable, resulting in an estimated current value of $1,420,003.51.

15.    Fixed Assets and Equipment.  Based on the Debtor's books and records, the current market value of the Debtor's fixed assets and equipment (after accounting for depreciation) is approximately $160,000.   A summary of the Debtor's fixed assets and equipment is provided in Exhibit "C" hereto.

16.    Based on the Debtor's books and records, I believe that the aggregate market value of the Debtor's inventory, accounts receivable, fixed assets and equipment which serve as collateral for Kith Electronics is approximately $12,685,149.79.

**IV.**

**EMERGENCY MOTIONS**

17.    I believe strongly that the Debtor will suffer severe and irreparable harm if it does not promptly obtain relief requested in its emergency "first day" motions.   The facts and circumstances relating to the relief requested in these motions, and the urgency of that relief, are set forth in the following sections.

**V.**

**CASH COLLATERAL MOTION**

18.    In order for the Debtor to be able to stay in business and preserve the going concern value of its business until its reorganization goals can be meaningfully achieved, I believe the Debtor must be able to use its current cash to pay its post-petition operating expenses. A copy of the Debtor's proposed operating budget for the period from the week ending August 8, 2010 through the week ending to October 31, 2010 (the "Budget") is attached as Exhibit "D" hereto.  The Budget reflects those ordinary expenses that I believe the Debtor must pay in order to stay in business and preserve the going concern value of its business.

19.    The only source of money available to the Debtor to use to operate its business is the Debtor's current cash on hand and collections of its accounts receivable.  As a result, the

Debtor has no ability to continue to operate its business and maintain the going concern value of the Debtor's business unless the Debtor has immediate access to and use of its cash collateral to pay the Debtor's ordinary expenses set forth in the Budget. The continuation of the existing operations under the proposed Budget is essential to preserve the value of the Debtor's assets pending the completion of the proposed transactions with Kith Consumer. The Debtor's inability to pay the expenses set forth in the Budget would result in immediate and irreparable harm to the Debtor and its business as it would cause an immediate shut down of the Debtor's business, loss of the going concern value of the Debtor's business and assets, and terminate the estate's opportunity to reorganize.

20.     The Debtor and Kith Electronics have negotiated and entered into an interim cash collateral stipulation (the "Stipulation"), a true and correct copy of which is attached as Exhibit "E" hereto. Pursuant to the Stipulation, the Debtor is authorized to use cash collateral through and including September 10, 2010 to pay the expenses set forth in the Budget, subject to a permitted deviance of up to 10% of the total expenses (but not purchases) for any week, with any unused portions to be carried over into the following week on a line-item by line-item basis only. The Stipulation also provides for, among other things, adequate protection payments to be made to Kith Electronics in the sum of $25,000 every four (4) weeks, beginning with the week ending September 5, 2010.

21.     A proposed form of the order approving the Debtor's use of cash collateral on an interim basis pending a final hearing is attached as Exhibit "F" hereto.

## VI.

## EMPLOYEE WAGE MOTION

22.     The Debtor currently employs approximately nineteen (19) individuals who work out of the Debtor's corporate headquarters in Walnut, California (collectively, the "Employees"). Two of the Debtor's Employees (i.e., David Ji and I) are insiders and are not subject to the Debtor's emergency wage motion. All Employees are employed on a full-time basis. Of the Employees, 11 are salaried and 8 are paid on an hourly basis. A summary describing the non-

8

insider Employees, including their respective start dates, salaries (for each 2-week payroll period) and accrued vacation and related benefits is attached as Exhibit "G" hereto.

23.     All of the Employees listed in Exhibit "G" are still employed by the Debtor.

24.     All of the Employees are paid biweekly (*i.e.*, every two weeks) on Friday, one week in arrears.  So, for example, payroll due on Friday, September 3, 2010 will cover the period from Sunday, August 15, 2010 through and including Saturday, August 28, 2010.

25.     On September 3, 2010, the Debtor will owe wages and commissions, including vacation, sick and leave pay (collectively, "Wages")[1] to its non-insider Employees for the period from August 15, 2010 through and including August 28, 2010 – of which approximately 2 days (August 15-16) will constitute pre-petition obligations.  The Debtor estimates that the total amount of Wages payable to non-insider Employees on September 3, 2010, including all payroll taxes, will also be approximately $41,963.70 (approximately $5,994.81 of which will be for pre-petition obligations).

26.     The Debtor is not seeking authority to pay the pre-petition priority Wages of any Employees who are "insiders"; approval to pay insider compensation will be sought pursuant to Notices of Setting Insider Compensation which will be filed with the United States Trustee.

27.     The Debtor utilizes a payroll service, Automatic Data Processing, Inc. ("ADP"), to process the payment of Wages to the Employees.  In the normal course of its relationship with ADP, the funds necessary for the payment of Wages are transferred to ADP or otherwise made available approximately three (3) days prior to each payroll date.  ADP then ensures payment of Wages (either by check or direct deposit into the Employees' bank accounts) by the payroll date. Therefore, the Wages due on September 3, 2010 will have to be transferred to ADP or otherwise made available by no later than Tuesday, August 31, 2010.

---

[1] The Wages that the Debtor is seeking authority to pay include (i) all applicable federal and state withholding taxes and payroll taxes and (ii) all employer "matching" contributions that were owed, but not actually paid, as of the bankruptcy filing date to the employees' 401(k) plan, in accordance with the Debtor's pre-petition policies.

28.    The Debtor also provides its Employees with certain employment and benefit programs which I believe are comparable to the programs that are typically offered by other employers within the industry.  The specific programs offered by the Debtor are summarized below.

a.    ***Vacation Time***.  Vacation time for all regular full-time Employees begins accruing from their first month of service with the Debtor.  The Debtor's vacation policy provides that, upon the first full continuous year of employment, an Employee is eligible for ten (10) vacation days.  However, if the Employee is terminated during the first six months of employment, vacation time is not-prorated.  If the Employee is terminated during the second half of the first year, earned vacation time is pro-rated based on the total length of employment.  After completion of the fourth continuous year of employment, the employee is eligible for fifteen (15) vacation days.

b.    ***Medical, Vision, Dental Insurance Policies.***  The Debtor offers all regular full-time Employees company-subsidized medical, vision and dental insurance coverage.  The cost of coverage for an Employee's family members is the sole responsibility of such Employee.  The Debtor's monthly premiums for medical, vision and dental insurance coverage for its Employees is approximately $12,520.  As of the bankruptcy filing date, there are no pre-petition amounts due from the Debtor for such insurance policies.  The Debtor desires to continue having these insurance policies in effect and therefore, seeks authority to continue to honor these pre-petition policies post-petition.

c.    ***401(k) Retirement Benefits Plan.***  The Debtor has adopted a 401(k) Retirement Savings Plan (the "401(k) Plan") for certain eligible employees, which is intended to be a qualified retirement plan under the Internal Revenue Code.  The 401(k) Plan is administered under a trust fund arrangement.  The Employees generally contribute to the 401(k) Plan through salary deductions, which the Debtor facilitates.  The Debtor has no legal or equitable interest in any employee contributions that it may be holding in connection with the 401(k) Plan.  Prior to the Debtor's bankruptcy filing, the Debtor

matched employee contributions to the 401(k) Plan up to 4%.  However, as of the Petition Date, the Debtor will no longer be matching employee contributions to the 401(k) Plan. However, pursuant to this Motion, the Debtor requests authority to fund any "matching" contributions that were owed, but not actually made, as of the bankruptcy filing date.

        d.     ***Business Expense Reimbursement***.  The Debtor reimburses eligible employees for reasonable expenses incurred through business travel or for business entertainment.  The following business expenses are typically reimbursed: travel expenses, automobile expenses, lodging, tips, and business meals.  Employees must submit expense reports before they may receive reimbursement for their business expenses.  All cash advances must be accounted for, and expense receipts are required.

29.    In summary, pursuant to the Debtor's emergency employee wage motion, the Debtor seeks authority to (a) pay pre-petition priority Wages to non-insider Employees, including those which are due to be paid on September 3, 2010 as described above; (b) honor pre-petition priority Wages of non-insider Employees, including those outstanding checks for Wages that were issued to such Employees prior to the Petition Date but were not yet cashed as of the Petition Date or that were returned for insufficient funds due to the conversion of the Debtor's pre-petition bank accounts to debtor in possession accounts, and to issue replacement checks to the extent necessary to pay such Wages; and (c) continue to honor the Debtor's employment and benefit policies described above.

30.    Due to the uncertainty that the Debtor's bankruptcy filing has caused in connection with the Employees' long-term job security, I believe that if the Employees are not provided with immediate assurances that the Debtor's obligations to them will be honored, there is a significant risk that employee morale will suffer and the Employees will quit.  Without the Employees, I believe the Debtor's ability to continue operating and the value of its business as a going concern will be severely impaired, if not eviscerated altogether.  The Debtor must retain the Employees to remain in business and preserve the value of its assets.  I believe that all of the Debtor's non-insider Employees who are the subject of this Motion must continue to be

employed to maintain the Debtor's business operations, at least in the short term. The continuation of the Debtor's existing operations (which necessitates the continued employment of the Debtor's non-insider Employees) is essential to preserve the value of the Debtor's assets pending the completion of the proposed transactions with Kith Consumer.

31.    I believe that all of the non-insider Employees' claims for Wages are within the $11,725 limit established by 11 U.S.C. § 507(a)(4). Notwithstanding the foregoing, the Motion expressly provides that none of the non-insider Employees shall receive more than $11,725 on account of pre-petition priority claims for Wages.

32.    Based on the Budget, approval to pay and/or honor the Employees' Wages will not render the Debtor's bankruptcy estate administratively insolvent.

## VII.

## UTILITIES MOTION

33.    In connection with the operation of its business, the Debtor receives electricity, telephone, internet and similar utility services from a number of utility companies (each a "Utility Company," and collectively, the "Utility Companies"). The services provided by the Utility Companies are critical to the operation of the Debtor's business.

34.    Attached as Exhibit "H" hereto is a list which sets forth, on an account-by-account basis, the name and address of the Utility Company that is currently providing utility services to the Debtor, the type of utility services provided by the Utility Company, the account number with the Utility Company, and the average monthly payment historically paid by the Debtor on such account.

35.    The Debtor proposes that adequate "assurance of payment" be provided to the Utility Companies in the form of cash deposits in the amounts proposed in Exhibit "H" hereto. The total amount of the cash deposits proposed to be paid is $6,482.71. Generally, for each account that the Debtor has with a Utility Company, the Debtor is proposing to provide the Utility Company with a cash deposit in an amount equal to one average monthly payment based on payments historically made on the account. However, as set forth in Exhibit "H," there is one

Utility Company (Workgroup Hosting) for which the Debtor proposes to pay no cash deposit because the Debtor will no longer be utilizing services from such company.

36.    In addition to the foregoing cash deposits, the Debtor will bring the Utility Companies current on all post-petition debts owed to such Utility Companies.

## VIII.

## WARRANTIES MOTION

37.    In connection with the distribution of consumer electronic products, the Debtor provides consumers with a one-year parts and labor warranty.  The Debtor's customers represent some of the largest retailers of consumer electronics in the United States.  Because of their market position, I believe these customers hold considerable leverage over suppliers and are able to negotiate significant commitments from product suppliers.  I believe that the satisfaction of warranty claims, acceptance of product returns, and repairing of defective products are some of the terms the customers and consumers expect from suppliers like the Debtor.

38.    It is my belief that, if the Debtor (or any other supplier) does not honor its warranty claims and discount commitments, repair defective products, or accept product returns, these large retailer customers will likely move their product orders to competing suppliers with different brand names.  The Debtor's branded products would suffer reputational damage among end user consumers of the products because of the difficulty (if not inability) to have their "Apex Digital" television or other electronic product repaired, replaced or otherwise accepted as a return by the Debtor.  This would adversely impact, if not destroy, any possibility of finding replacement retailer-customers or sustaining such alternative retailer-customers if they were found.

39.    The Debtor's agreement with Kith Consumer, which is expected to provide the estate with a significant stream of revenue, is based on the Debtor's ability to utilize its Debtor's pipeline connections to the very same customers that rely upon the Debtor's warranty and discount retailer policies.  I believe that the Debtor must continue to honor its warranty claims and retailer discount commitments, repair defective products, and accept product returns to

preserve its relationships with these customers and maintain the reputation of the "Apex Digital" name and products.  Unless the Debtor can honor its warranties and retailer discount policies, there is considerable risk that the market for "Apex Digital" products will decrease, if not diminish altogether, thereby adversely impacting and perhaps foreclosing any opportunity to continue business operations (under the Debtor's agreement with Kith Consumer or otherwise) and successfully reorganize.

40.    As is to be expected, the filing of the Debtor's bankruptcy case will cause damage to the Debtor's reputation in the consumer electronic marketplace.  Both the Debtor's customers and end user consumers will understandably be concerned that the Debtor will not continue to honor its warranties and discounts and that the Debtor may decrease its commitment to quality control for its products due to its financial condition.  The Debtor's customers will also very likely question whether the Debtor will liquidate or move forward with a successful reorganization.  I believe that the most effective way to counter these perceptions and doubts, at least in the immediate term, is for the Debtor to continue to honor its warranties and retailer discount policies.

41.    The Debtor's ordinary business practice is to provide a one year parts and labor warranty on its products.  Consumers who wish to obtain warranty services generally send their "Apex Digital" product to the Debtor's distribution facility in Walnut, California.  If the product qualifies for warranty replacement, the Debtor will then send the consumer a new replacement product.  After processing a warranty replacement, the defective product is then sent back to its original factor/foreign exporter for a credit (or documented for credit with the original foreign exporter or manufacturer and the defective unit is scrapped).  Through the warranty replacement process, the Debtor suffers no net loss except for the cost of shipping the replacement product to the consumer and the cost of shipping the defective product back to the foreign exporter or manufacturer.

42.    The history of product returns to the Debtor has traditionally resulted in costs and expenses totaling $68,000 per month to the Debtor.  This is largely due to an approximately 5%

1    product return rate.  On average, approximately 5% of products sold are redeemed through the

2    Debtor's warranty program each year.  I estimate that the total costs and expenses of honoring

3    the warranty program obligations (including shipping, parts, labor, and replacement costs), net of

4    sales of returned products, do not exceed $400,000 annually.

5         43.    As an incentive for retailer-customers to purchase its products, the Debtor

6    periodically offers certain of its retailer-customers discounts on its products for promotional

7    purposes and to maintain competitive pricing.  For example, the Debtor may offer a limited time

8    discount of $10-20 per unit on a particular model of an "Apex Digital" television for sales made

9    within a limited time period.  The retailer-customer that sells that television will then be able to

10   submit the sales information directly to the Debtor for review by the Debtor.  Assuming the

11   discount is found to be applicable after the Debtor's review, the Debtor then issues a payment to

12   the retailer-customer for the applicable discount.  Historically, the Debtor does not pay out more

13   than $25,000 total per month (or $300,000 total per year) in discounts to its retailer-customers.  I

14   do not expect that more than approximately $78,640 in discounts will be properly submitted and

15   paid by the Debtor during the year following the Petition Date.

16   I declare under penalty of perjury that the foregoing is true and correct.

17        Executed this 17th day of August 2010 at Walnut, California.

18

19   _____
          ALICE HSU

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

8/13/2010

| Category | Quantity | Total Value | Avg Value |
| --- | --- | --- | --- |
| DT150 Total | 10 | 224.64 | 22.46 |
| DT250 Total | 358 | 6,683.55 | 18.67 |
| DT250A Total | 4,919 | 114,440.47 | 23.26 |
| DT502 Total | 1,003 | 22,047.57 | 21.98 |
| | | | |
| LD1919 Total | 380 | 71,631.49 | 188.50 |
| LD3249 Total | 41 | 10,757.56 | 262.38 |
| LD4086 Total | 1,654 | 567,917.44 | 343.36 |
| LD4088 Total | 4,649 | 1,629,826.37 | 350.58 |
| LDP706 Total | 4,397 | 311,307.60 | 70.80 |
| | | | |
| Grand Total | 17,411 | 2,734,836.69 | |

8/13/2010

| Category | Quantity | Total Value | Avg Value |
|----------|----------|-------------|-----------|
| Parts & Others | | 319,221.18 | |
| Light | 4,711 | 49,476.01 | |
| | | | |
| Grand Total | | 368,697.19 | |

# EXHIBIT "B"

**Apex Digital Inc.**
**Accounts Receivable Aging (Television)**
**(as of August 13, 2010)**

| Customer No. | Outstanding | Current | 1 to 30 | 31 to 60 | 61 Plus |
|---|---|---|---|---|---|
| 1 | 1,615.00 | 1,615.00 | - | - | - |
| 2 | 1,129,657.20 | 125,715.60 | 249,648.00 | - | 754,293.60 |
| 3 | 2,986,688.46 | 2,192,332.80 | 466,160.80 | 69,971.30 | 258,223.56 |
| 4 | 823,323.50 | 639,184.00 | 182,624.00 | - | 1,515.50 |
| 5 | 238.44 | - | 238.44 | - | - |
| 6 | 1,275.00 | - | 1,275.00 | - | - |
| 7 | 97,998.50 | 94,120.00 | (1,810.00) | 5,688.50 | - |
| 8 | 355.67 | - | - | - | 355.67 |
| 9 | 133,520.44 | - | - | - | 133,520.44 |
| 10 | 5,100.00 | - | - | - | 5,100.00 |
| 11 | (81,361.00) | - | - | - | (81,361.00) |
| 12 | 640.00 | - | - | - | 640.00 |
| 13 | (2,228.00) | - | - | - | (2,228.00) |
| 14 | 113,066.00 | 109,746.00 | (9,983.00) | (67.00) | 13,370.00 |
| 15 | 93,800.00 | 93,600.00 | 200.00 | - | - |
| 16 | (1,950.00) | (1,950.00) | - | - | - |
| 17 | (3,769.17) | - | - | - | (3,769.17) |
| 18 | 2,100.00 | 2,100.00 | - | - | - |
| 19 | (1,040.40) | - | (355.20) | (685.20) | - |
| 20 | 300,447.94 | 183,676.50 | - | - | 116,771.44 |
| 21 | 713,397.63 | - | (161,319.16) | 849,877.08 | 24,839.71 |
| 22 | 2,365.28 | 888.00 | 2,818.94 | (363.66) | (978.00) |
| 23 | (1,806.66) | - | - | - | (1,806.66) |
| 24 | 121,267.00 | - | (18,258.00) | (450.00) | 139,975.00 |
| 25 | 117,792.00 | 67,392.00 | 50,400.00 | - | - |
| 26 | 654.00 | 396.00 | (438.00) | 696.00 | - |
| 27 | (781.76) | - | - | - | (781.76) |
| 28 | 116,728.06 | - | - | - | 116,728.06 |
| 29 | 1,475,018.96 | - | (319.51) | - | 1,475,338.47 |
| 30 | 22,581.81 | - | (2,098.48) | 8.66 | 24,671.63 |
| 31 | 256,056.00 | 128,028.00 | 128,028.00 | - | - |
| | 8,422,749.90 | 3,636,843.90 | 886,811.83 | 924,675.68 | 2,974,418.49 |

**Apex Digital Inc.**
**Accounts Receivable Aging (Lighting)**
**as of August 13, 2010**

| Customer No. | Outstanding | Current | 1 to 30 | 31 to 60 | 61 Plus |
|---|---|---|---|---|---|
| A | 1,451,754.59 | 227.83 | (75,093.71) | 1,517,064.51 | 9,555.96 |
| B | 2,229.77 | 815.49 | 1,630.98 | (143.91) | (72.79) |
| C | 40,756.18 | - | - | - | 40,756.18 |
| | 1,494,740.54 | 1,043.32 | (73,462.73) | 1,516,920.60 | 50,239.35 |

# EXHIBIT "C"

**Apex Digital, Inc.**
**Fixed Assets**

| Asset # | Category | Description | Date in Service | Cost |
|---|---|---|---|---|
| 336 | Machinery & Equipment | | 5/21/03 | 12,280.35 |
| 337 | Machinery & Equipment | Forklift, Clamp, Battery & Charger | 3/6/2003 | 37,276.91 |
| 341 | Equipment.History7 | | 5/1/2000 | 309.00 |
| 345 | Equipment.History5 | | 4/12/2001 | 351.00 |
| 362 | Computer Software | Create Form | 9/12/2003 | 3,000.00 |
| 363 | Computer Software | Customization Fees | 9/17/2003 | 17,000.00 |
| 367 | Equipment.Heavy | Forklift Runners | 11/1/2003 | 2,159.11 |
| 368 | Computer Software | Data Coversion/CRP Testing-CS | 10/7/2003 | 56,000.00 |
| 369 | Machinery & Equipment | Steel Ramp | 11/30/2003 | 3,100.00 |
| 379 | Machinery & Equipment | | 4/24/2002 | 3,558.00 |
| 380 | Machinery & Equipment | | 5/29/2002 | 5,800.00 |
| 381 | Machinery & Equipment | | 5/29/2002 | 2,500.00 |
| 382 | Machinery & Equipment | | 6/5/2002 | 7,353.00 |
| 383 | Machinery & Equipment | | 6/9/2002 | 5,764.00 |
| 384 | Machinery & Equipment | | 6/25/2002 | 7,518.00 |
| 398 | Equipment.History5 | | 6/1/1999 | 60.00 |
| 402 | Fixtures & Furniture | Chair | 8/1/2002 | 2,400.00 |
| 403 | Fixtures & Furniture | Chair | 8/16/2002 | 2,590.00 |
| 404 | Fixtures & Furniture | Round table | 8/30/2002 | 2,105.00 |
| 405 | Machinery & Equipment | Fax machine | 4/18/2003 | 1,244.75 |
| 406 | Machinery & Equipment | Fax machine | 4/18/2003 | 1,244.75 |
| 410 | Computer Hardware | notebooks computer for sales dept | 3/5/2003 | 2,836.08 |
| 411 | Computer Hardware | Microlink enterprise (Server) | 5/13/2003 | 2,634.49 |
| 445 | Computer Software | | 8/23/2004 | 5,574.64 |
| 446 | Computer Hardware | ADP | 8/23/2004 | 16,509.07 |
| 447 | Computer Software | Clippership user licenses | 7/27/2004 | 117,801.25 |
| 448 | Computer Hardware | APPLE MACINTOSH | 9/27/2004 | 11,461.92 |
| 452 | Equipment | NEC NEAX 2000 IPS | 11/10/2004 | 70,000.00 |
| 456 | Computer Software | Barracuda Spam Firewall (BSF300a) & Barracu | 5/26/2005 | 6,265.20 |
| 457 | Machinery & Equipment | | 9/25/2001 | 3,565.00 |
| 460 | Computer Hardware | MS MBL EXCH SRV ENT 2007 | 4/30/2007 | 4,032.31 |
| 461 | Computer Hardware | HP DL380 G5 2X 5160 4MB 4GB + HP 72GB 3 | 6/30/2007 | 7,168.04 |
| 462 | Computer Hardware | Intel Core 2 Duo T7300 (2.00GHz) 4M L2 Cach | 8/31/2007 | 1,566.97 |
| 463 | Improvement | 301 Brea Canyon Rd showroom modification | 11/1/2007 | 3,400.00 |
| 464 | Improvement | 302 Brea Canyon Rd showroom modification | 11/1/2007 | 561.00 |
| 465 | Improvement | 303 Brea Canyon Rd showroom modification | 11/1/2007 | 3,400.00 |
| 466 | Machinery & Equipment | Canon EOS Digital Rebel #CNDRXTI1855B | 2/11/2008 | 621.89 |
| 467 | Machinery & Equipment | Xerox color phaser | 4/3/2008 | 702.54 |
| 468 | Computer Hardware | Oracle database servers | 4/15/2007 | 11,460.00 |
| 469 | Computer Hardware | Dell desktop computers | 5/4/2008 | 2,062.88 |
| 470 | Computer Hardware | Dell laptop computer | 5/4/2008 | 1,096.38 |
| 471 | Computer Software | Adobe Creative Suite CS3 | 5/4/2008 | 642.99 |
| 472 | Computer Hardware | Dell desktop computer | 5/4/2008 | 678.08 |
| 473 | Machinery & Equipment | Forklift battery | 11/26/2008 | 5,358.38 |
| 474 | Machinery & Equipment | Display Color Analyzer CA210 | 3/31/2009 | 5,951.30 |
| 475 | Machinery & Equipment | Measuring Probe CA-PU12 | 3/31/2009 | 4,349.19 |
| 476 | Machinery & Equipment | Telephone Parts CCWox Key | 3/31/2009 | 866.00 |
| 477 | Machinery & Equipment | Digital Power Meter | 4/30/2009 | 2,446.88 |
| 478 | Machinery & Equipment | Apple Cinema Display Monitor | 5/29/2009 | 998.16 |
| 479 | Machinery & Equipment | Epson Stylus Photo Printer R2880 | 5/29/2009 | 764.70 |
| 480 | Computer Hardware | MAC Pro Z0G1 | 8/1/2009 | 4,063.01 |
| 481 | Machinery & Equipment | Tektronix 2245A Scope | 8/18/2009 | 713.38 |
| 482 | Computer Hardware | Dell desktop Vostro 220 | 8/1/2009 | 520.61 |

23

**Apex Digital, Inc.**
**Fixed Assets**

| Asset # | Category | Description | Date in Service | Cost |
|---|---|---|---|---|
| 483 | Fixtures & Furniture | Shell reception desk | 9/1/2009 | 1,520.04 |
| 484 | Computer Hardware | Dell desktops Vostro 220 | 9/1/2009 | 1,088.46 |
| 485 | Auto & Trucks | Toyota Sienna 2010 | 12/14/2009 | 28,932.82 |
| 486 | Computer Hardware | Desktop Computers | 12/18/2009 | 2,485.69 |
| 487 | Machinery & Equipment | Canon EF 24-105mm len | 12/1/2009 | 1,178.98 |
| 488 | Computer Hardware | Cisco 24-port Gigabit Network Switch | 2/1/2010 | 1,426.75 |
| 489 | Computer Hardware | Overland Storage NEO 200S Series LTO-3 24 ( | 2/1/2010 | 4,947.53 |
| 490 | Computer Software | Symantec Backup Exec for Windows Servers | 2/26/2010 | 530.26 |
| 491 | Computer Software | Symantec Backup Exec for Windows for Vmwar | 2/26/2010 | 2,349.08 |
| 492 | Computer Software | Vmware vCenter Server Foundation | 2/26/2010 | 1,388.81 |
| 493 | Machinery & Equipment | Gefen 1x10 HDMI Splitter | 2/1/2010 | 2,761.31 |
| 494 | Computer Hardware | SonicWALL NSA 2400 Security Appliance | 2/1/2010 | 3,814.45 |
| 495 | Computer Hardware | BLc3000 Server | 2/26/2010 | 16,157.40 |
| 496 | Computer Software | Symantec Backup Exec for Oracle | 2/26/2010 | 731.56 |
| 497 | Computer Software | Vmware vSphere Enterprise | 2/26/2010 | 10,683.24 |
| 498 | Computer Hardware | SonicWALL 01-SSC-5952 SSL-VPN 2000 | 3/1/2010 | 1,848.43 |
| 499 | Computer Hardware | SonicWALL SSL-VPN 2000 network gateway | 3/1/2010 | 781.08 |
| 500 | Computer Hardware | Smart UPS 3000VA XL | 4/7/2010 | 1,361.58 |
| 501 | Computer Hardware | HP BL460c G6 Blade Server | 4/7/2010 | 2,651.18 |
| 502 | Computer Hardware | Cisco SGE2000 Network Switch | 4/7/2010 | 1,452.38 |
| 503 | Computer Hardware | StorageWorks X1400 Network Storage Server | 4/7/2010 | 4,983.25 |
| 504 | Machinery & Equipment | NEC Phone System: NEAX 2000 IPS UCB | 5/1/2010 | 28,437.67 |
| 505 | Computer Hardware | Acer Aspire laptop | 5/1/2010 | 726.55 |
| 506 | Machinery & Equipment | Kooler Genius Water Dispenser | 6/2/2010 | 899.00 |
| 507 | Computer Hardware | HP Pavilion Desktop Computer | 6/1/2010 | 912.99 |

|  |  | Total Cost |  | 597,736.70 |
|---|---|---|---|---|
|  |  | Depreciation |  | 441,068.98 |
|  |  | Book Value as of 6/30/10 |  | 156,667.72 |

# EXHIBIT "D"

**APEX Digital, Inc.**
**Projected Cash Flow**
**As of 08/13/2010**

| Week Ending/Month | 8/8/2010 | 8/15/2010 | 8/22/2010 | 8/29/2010 | 9/5/2010 | 9/12/2010 | 9/19/2010 | 9/26/2010 | 10/3/2010 | 10/10/2010 | 10/17/2010 | 10/24/2010 | 10/31/2010 | 13 Week |
| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | $19,977 | $19,977 | $1,007,820 | $1,527,050 | $2,043,555 | $2,840,825 | $4,005,469 | $4,168,813 | $4,172,650 | $4,090,401 | $4,052,072 | $3,958,990 | $3,414,897 | $19,977 |
| | | | | | | | | | | | | | | |
| Collection of AR – lighting | - | 620,460 | 533,000 | 302,756 | - | - | - | - | 697 | - | 1,938 | 4,573 | 697 | 1,464,121 |
| Services | | | | | | | | | | 100,000 | | | | 100,000 |
| Collection of AR – TV | - | 403,731 | 57,926 | 240,608 | 896,045 | 1,255,159 | 227,725 | 66,196 | - | - | - | - | - | 3,147,390 |
| Others | - | | | | | | | | | | | | | |
| **Total Receipts** | - | 1,024,191 | 590,926 | 543,364 | 896,045 | 1,255,159 | 227,725 | 66,196 | 697 | 100,000 | 1,938 | 4,573 | 697 | 4,711,511 |
| | | | | | | | | | | | | | | |
| **Purchases** | | | | | | | | | | | | | | |
| Vendors | - | 477 | 477 | 1,670 | 2,862 | 504 | 504 | 37,021 | 596 | 3,048 | 30,409 | 526,716 | 35,830 | 640,114 |
| Freight In | - | | | | 3,200 | | | | | 6,400 | 3,200 | 3,200 | 3,200 | 19,200 |
| Broker's Fee & Duties | - | | | | | 4,825 | | | | 32,406 | 1,626 | 4,877 | 1,740 | 45,474 |
| Others | - | | | | | | | | | | | | | |
| **Total Purchases** | - | 477 | 477 | 1,670 | 2,862 | 8,529 | 504 | 37,021 | 596 | 41,854 | 35,235 | 534,793 | 40,770 | 704,788 |
| **Operating Expenses** | | | | | | | | | | | | | | |
| Advertising / Promotion | - | | | | | - | | | | | | | | |
| Alarm / Security | - | | 99 | | | | 99 | | | | | 99 | | 297 |
| Auto Expenses / Travel | | 1,000 | 1,000 | 1,200 | 1,800 | 1,200 | 1,200 | 1,200 | 1,400 | 1,000 | 1,000 | 1,500 | 1,500 | 15,000 |
| Commission | 0 | 2,753 | | | | 31,023 | | | | 47,899 | | | | 81,675 |
| Computer - Tech Support / Parts | 0 | | | | 4,400 | | | | | 4,400 | | | | 8,800 |
| Credit Card payments | 0 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,500 | 1,000 | 12,500 |
| Development R & D | | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 1,500 |
| EDI & Internet | 0 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 900 |
| Freight In & Out | 0 | 625 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 11,625 |
| Insurance | | | | 5,539 | | | 6,249 | | 5,000 | | | | 6,249 | 23,037 |
| Legal Fee | | 2,000 | | | | 2,000 | | 2,000 | | | 2,000 | | 2,000 | 10,000 |
| License & Registration | 0 | 125 | 125 | | 125 | | 125 | | 125 | 125 | | 125 | | 875 |
| Office Expenses/Supplies/Postages | 0 | 250 | 250 | | 250 | | 250 | | 250 | 250 | 250 | 250 | 250 | 2,250 |
| Outside Service | 0 | 20,000 | 250 | 250 | 250 | 20,000 | 250 | 250 | 250 | 20,000 | 250 | 250 | 250 | 62,250 |
| Payroll Services | | | 98 | | 98 | | 75 | | 75 | | 75 | | 75 | 496 |
| Professional / Consultant Fee | | 5,000 | 6,438 | 5,000 | | 5,000 | | 11,438 | | 6,438 | 5,000 | | 5,000 | 49,314 |
| Rent - Building | 0 | | | | 18,063 | | | | | 18,063 | | | | 36,126 |
| Rent - Equipment & Auto | | 2,200 | | | | | 2,200 | | | | | 2,200 | | 6,600 |
| Repair & Maintenance | 0 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 1,500 |
| Salary & Wages / Retirement | | | 55,000 | | 55,000 | | 45,000 | | 45,000 | | 45,000 | | 45,000 | 290,000 |
| Taxes | | | 4,290 | | 4,290 | | 3,510 | | 3,150 | | 3,510 | | 3,510 | 22,260 |
| Telephone | 0 | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 1,875 |
| Trade Show | 0 | 219 | 219 | | | | 219 | | | | | | | 656 |
| Warehouse | 0 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 1,125 |
| Utilities | | | 750 | | | | | 750 | | | | | | 1,500 |
| Others | 0 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 1,500 |
| **Total Operating Expenses** | - | 35,872 | 71,219 | 14,689 | 68,913 | 79,986 | 61,877 | 23,338 | 57,350 | 96,475 | 59,785 | 13,873 | 60,285 | 643,661 |
| | | | | | | | | | | | | | | |
| **Restructuring** | | | | | | | | | | | | | | |
| Adequate Protection Payment | | | | - | 25,000 | | | | 25,000 | | | - | 25,000 | 75,000 |
| Public Relations | | | | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | | | | | | 10,000 |
| Utility Deposit | | - | - | 8,500 | | | | | | | | | - | 8,500 |
| U.S. Trustee Fees | - | - | - | | - | | | | | | | | | |
| **Total Restructuring** | - | | | 10,500 | 27,000 | 2,000 | 2,000 | 2,000 | 25,000 | - | | | 25,000 | 93,500 |
| | | | | | | | | | | | | | | |
| **Total Disbursements** | - | 36,349 | 71,696 | 26,859 | 98,775 | 90,515 | 64,381 | 62,359 | 82,946 | 138,329 | 95,020 | 548,666 | 126,055 | 1,441,949 |
| | | | | | | | | | | | | | | |
| **Ending Cash Balance** | $19,977 | $1,007,820 | $1,527,050 | $2,043,555 | $2,840,825 | $4,005,469 | $4,168,813 | $4,172,650 | $4,090,401 | $4,052,072 | $3,958,990 | $3,414,897 | $3,289,539 | $3,289,539 |

# EXHIBIT "E"

1  RON BENDER (SBN 143364)
   *rb@lnbyb.com*
2  PHILIP A. GASTEIER (SBN 130043)
   *pag@lnbyb.com*
3  JULIET Y. OH (SBN 211414)
   *jyo@lnbyb.com*
4  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
5  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
6  Telephone:  (310) 229-1234
   Facsimile:  (310) 229-1244
7

8  Proposed Counsel for Chapter 11 Debtor and
   Debtor in Possession
9

10

11                 **UNITED STATES BANKRUPTCY COURT**

12                 **CENTRAL DISTRICT OF CALIFORNIA**

13                     **LOS ANGELES DIVISION**

14

15  In re:                              )  Case No. 2:10-bk-44406-SB
                                        )
16  APEX DIGITAL, INC., a California    )  Chapter 11
    corporation,                        )
17                                      )  **STIPULATION REGARDING INTERIM**
                                        )  **USE OF CASH COLLATERAL**
18              Debtor.                 )
                                        )  DATE:     August 23, 2010
19                                      )  TIME:     1:30 p.m.
                                        )  PLACE:    Courtroom "1539"
20                                      )            255 E. Temple Street
                                        )            Los Angeles, California
21                                      )
                                        )
22                                      )
                                        )
23  _____)

24

25          This Stipulation Regarding Interim Use of Cash Collateral (the "**Stipulation**") is

26  entered into by and between secured creditor Kith Electronics Limited, a company organized

27  under the laws of Hong Kong ("**KEL**"), and Apex Digital, Inc., debtor and debtor in possession

28  in the above-captioned chapter 11 bankruptcy case (the "**Debtor**"), by and through their

1    respective counsel of record, and is made with reference to the following facts:

2    **<u>RECITALS</u>**

3        A.    The Debtor is a leading producer and seller of consumer electronic products,

4    including high-definition LCD televisions, home entertainment media devices, digital set top

5    boxes and lighting products (<u>e.g.</u>, solar powered lights), which are carried and sold in hundreds

6    of retail outlets nationwide.

7        B.    The Debtor is indebted to KEL as of August 13, 2010 in the principal amount of

8    $12,067,734.80 plus attorney's fees in the amount of $130,395.25, subject to amendment to

9    include additional attorney's fees which may be incurred (the "**Debt**"), the amount of which

10   Debt the parties acknowledge will be subject to adjustment in the event any prior payments

11   made by Apex to KEL which have been previously credited to Apex in arriving at the amount of

12   the Debt become uncollectible or in the event KEL is required to return any such payments

13   previously credited.

14       C.    The Debt is secured pursuant to that certain Security Agreement dated as of

15   September, 2008 (as amended and modified, if applicable) by and between Apex and KEL and

16   any other related documentation (collectively, the "**Loan Documentation**")**,** and thereby

17   secured by a valid, perfected first priority security interest and lien against all of Apex's assets

18   including Apex's current and future accounts receivable and inventory.  A true and correct copy

19   of the Security Agreement is attached hereto as Exhibit "2".

20       D.    Pursuant to the Security Agreement, the Debtor granted to KEL a continuing

21   valid, first priority security interest in all present and future "**Collateral**," as defined in Exhibit

22   "B" to the Security Agreement, owned or thereafter acquired by the Debtor to secure payment

23   and performance of the Debtor's obligations under the Loan Documents.   The Collateral

24   includes, among other things, all of the Debtor's accounts and accounts receivable, inventory

25   and deposit accounts, and all of the proceeds derived from the foregoing assets.

26       E.    On August 12, 2008, KEL recorded a financing statement with the California

27   Secretary of State (Filing No. 08-7168547339) to perfect its security interest in the Collateral

28

1   (the "**Financing Statement**").  A true and correct copy of the Financing Statement is attached

2   hereto as Exhibit "3."

3         F.      The Debtor and KEL agree that, as of August 13, 2010, Events of Default exist

4   under the Loan Documentation and that the Debtor owed the Debt in the principal amount of

5   $12,067,734.80 plus attorney's fees in the amount of $130,395.25 (subject to amendment to

6   include additional attorney's fees which may be incurred).  KEL asserts that interest on the

7   Debt will continue to accrue on and after the Petition Date (defined below).

8         G.      On August 17, 2010 (the "**Petition Date**"), the Debtor filed a voluntary petition

9   under Chapter 11 of 11 U.S.C. § 101 <u>et</u> <u>seq.</u> (as amended, the "**Bankruptcy Code**").  The

10   Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy

11   estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

12         H.      By virtue of KEL's security interest in the Collateral as set forth above, KEL has

13   an interest in "Cash Collateral" within the meaning of section 363(a) of the Bankruptcy Code.

14   In this regard, Debtor acknowledges and agrees that any cash or cash equivalent (or other

15   proceeds) received by Debtor after the Petition Date constitute proceeds of the Collateral and

16   are, therefore, part of KEL's Cash Collateral within the meaning of section 363(a) of the Code

17   to the same extent KEL has a security interest in such Collateral pre-petition.

18         I.      The Debtor has requested that KEL agree, and KEL has in fact agreed, to the

19   Debtor's use of cash collateral on an interim basis pending a final hearing, under the terms and

20   conditions set forth in this Stipulation.

21         J.      KEL has stated that there is no assurance that KEL will agree to any use of its

22   Cash Collateral beyond this initial period.  If KEL does agree to any further use of its Cash

23   Collateral, it may require more terms and conditions than are set forth in this Stipulation.

24         K.      Nothing contained in this Stipulation shall, or is intended to, affect or change the

25   ownership rights of the respective parties in the Collateral.

26         NOW, THEREFORE, for and in consideration of the mutual promises stated herein, and

27   without waiving its due on transfer and due on encumbrance rights, but subject to approval of

28   the Bankruptcy Court, the following is hereby stipulated and agreed to by and among the

1   parties:

2                               **AGREEMENT**

3          1.      Recitals.  The recitals are incorporated herein by this reference.  The parties

4   agree that the matters set forth in the recitals are true and correct.

5          2.      Use of Cash Collateral.  Subject to the other provisions of this Stipulation,

6   including the extension provision at paragraph 27 below, the parties hereto agree that effective

7   from the Petition Date until the earlier of (i) September 10, 2010, (ii) the entry of an order

8   dismissing the Debtor's bankruptcy case, or (iii) the termination of this Stipulation as set forth

9   in paragraph 15 below, the Debtor may use its cash which constitutes KEL's Collateral ("**Cash**

10  **Collateral**"), on the following terms and conditions:

11                 a.      Subject to further order of the Bankruptcy Court, or as otherwise

12         consented to by KEL in writing, Cash Collateral may be used by the Debtor for only the

13         items identified in the budget ("**Budget**") stipulated to and incorporated hereat by

14         reference and attached hereto as Exhibit "1."  The Debtor shall be authorized to use Cash

15         Collateral in accordance with the Budget, subject to a permitted deviance of up to 10%

16         of the total expenses (but not purchases) for any week with any unused portions to be

17         carried over into the following week on a line-item by line-item basis only.  In

18         connection with its use of Cash Collateral, the Debtor shall first use that portion of the

19         Cash Collateral that is attributable to the Debtor's lighting business (e.g., collection of

20         accounts receivable relating to the lighting business) ("**Lighting A/R**") and exhaust such

21         source of Cash Collateral prior to using any portion of the Cash Collateral that is

22         attributable to the Debtor's television business (e.g., collection of accounts receivable

23         relating to the television business) ("**Television A/R**").  Debtor is only authorized to use

24         Cash Collateral attributable to the Television A/R on the following terms:  If the

25         Lighting A/R is insufficient to pay the amounts set forth in the Budget in Weeks 3 and/or

26         4, the Television A/R may be used in Weeks 3 and 4 up to the amounts set forth in the

27         Budget for those weeks, subject to the permitted deviance of up to 10% of the total

28         expenses (but not purchases) for such weeks.  In the event that Debtor uses any

4

Television A/R in excess of $25,000 total per week in Weeks 3 and 4 (the "**Excess Amounts**"), Debtor shall remit such Excess Amounts into the Television AR Account (as defined below) as soon as the cash becomes available to do so, and to the extent Debtor's ability to pay the operating expenses set forth in the Budget is not compromised, but in no event later than September 10, 2010, unless otherwise ordered by the Court. Debtor is not otherwise authorized to use the Cash Collateral attributable to the Television A/R.

b.    The Debtor shall have the right to use Cash Collateral during the period covered by this Stipulation as specifically set forth herein to pay expenses which are not contained in the Budget or in amounts which are greater than as set forth in the Budget (subject to the permitted 10% deviance) with the prior written consent of KEL without the need for any further Bankruptcy Court order. If KEL does not consent, the Debtor reserves the right to seek authority to pay such expenses on an emergency or otherwise expedited basis.

c.    Unless the Court orders otherwise or as otherwise set forth in the Budget or herein, KEL expressly does not consent to Debtor's use of KEL's Cash Collateral for payment of any fees or expenses incurred by Debtor's bankruptcy counsel or Debtor's other professionals, or for any fees or expenses (including professional fees and expenses) incurred by any official Committee which may be appointed in connection with the Debtor's bankruptcy case.

3.    <u>Segregation of Television A/R</u>:  Debtor shall deposit all receipts and income obtained by Debtor in connection with the Television A/R, including all funds currently maintained in the Debtor's Hanmi Bank accounts (which funds the parties hereto agree are derived exclusively from the collection of Television A/R) once such funds are unfrozen and made available to the Debtor and its estate, but excluding the $18,027.09 of cash contained in the Debtor's non-Hanmi Bank accounts as of the Petition Date, into a segregated debtor-in-possession account (the "**Television AR Account**").  The funds in the Television AR Account shall not be used or otherwise spent by the Debtor, except as expressly permitted pursuant to

1  Paragraph 2.b hereof, or as otherwise authorized by written agreement of the parties or Court

2  order.  No other funds shall be placed into or disbursed from the Television AR Account.

3      4.    Reporting to KEL.  The Debtor shall provide KEL with weekly cash flow

4  reports, a written Budget reconciliation report in form and detail acceptable to KEL, which

5  report compares Debtor's actual receipts, income, expenditures and cash flow versus the

6  amounts for receipts, income expenditures and cash flow originally projected by Debtor in the

7  Budget, on a line-item by line-item basis, and copies of the Monthly Operating Reports as filed

8  with the Bankruptcy Court and the Office of the United States Trustee.

9      5.    Access to the Debtor's Books and Records.  In addition, on no less than five (5)

10  business days' notice following a written request from KEL, the Debtor shall provide, make

11  available, and otherwise permit access to such financial and operating information as

12  representatives of KEL shall reasonably request from time to time and which can reasonably be

13  made available by Debtor (taking into account such things as the Debtor's manpower, time,

14  cost, scope of the request, etc.), including, without limitation, all books and records relating to

15  the Collateral.

16      6.    Replacement Lien.  As adequate protection for the Cash Collateral used by

17  Debtor from and after the commencement of this bankruptcy case, and only to the extent that the

18  Cash Collateral is used (subject to the uses as permitted by this Stipulation), KEL shall be

19  granted a replacement lien (the "**Replacement Lien**") on, and security interest in, any and all

20  assets of Debtor of any kind or nature whatsoever, now owned or hereinafter acquired

21  (excluding any causes of action arising under Sections 105, 506(c), 542, 543, 544, 545, 547,

22  548, 550, 551, 552, and 553 of the Bankruptcy Code, and all proceeds, rents, products, or profits

23  thereof (the "**Post-Petition Collateral**").

24      a.    The Replacement Lien and security interest shall have the same priority,

25  extent and validity as KEL's liens and security interests existing prepetition in the Cash

26  Collateral used by the Debtor.  The Replacement Lien and security interest granted

27  herein are valid, enforceable and fully perfected, and no filing or recordation or any

28  other act in accordance with any applicable local, state or federal law is necessary to

6

create or perfect such lien and security interest; provided, however, that upon request of KEL, the Debtor shall execute such security and perfection documentation as may be reasonably required to create or perfect such liens under applicable nonbankruptcy law, including without limitation, UCC-1 financing statements and notices to depository banks.

      b.     The Replacement Lien does **not** extend to avoidance actions.

      c.     The Replacement Lien shall at all times not be subject to priming or subordination and shall be senior and superior to any and all other mortgages, liens, claims and security interests existing on the Petition Date (except for creditors, if any, with valid, binding, enforceable, unavoidable and perfected liens and security interests on the Post-Petition Collateral existing on the Petition Date that were senior in priority to the security interests of KEL immediately prior to the Petition Date). In the event it is determined that there is a creditor with valid, binding, enforceable, unavoidable and perfected lien and security interest on the Collateral that is senior in priority to the security interest and lien of KEL, the Replacement Lien shall be secured by a second priority lien in all Post-Petition Collateral that is subject to valid, binding, enforceable, unavoidable and perfected mortgages, liens and security interests existing in the Post-Petition Collateral at the time of the Petition Date.   KEL shall not be required to consent to use of its Cash Collateral if the Court in the Bankruptcy Case grants any mortgages, security interests or liens, including liens created under Section 364(d) of the Code, which are senior to or on a parity with KEL's pre-petition security interests or liens.

      7.    Adequate Protection Payments:  As adequate protection for any diminution in the value of the interests of KEL in the Collateral (including Cash Collateral) on account of Debtor's use of KEL's Cash Collateral, and other decline, if any, in value arising out of the automatic stay or the Debtor's use, sale, depreciation or disposition of the Collateral, including Cash Collateral, KEL shall receive additional adequate protection in the form of  payments

1 made to KEL every four weeks, commencing in Week 5 in the amount of $25,000 for each

2 payment.

3      8.    <u>Protection as to Actual Use</u>:  If any party in interest objects to this Stipulation

4 and such objection is sustained, or if the Bankruptcy Court does not approve this Stipulation,

5 KEL shall be fully protected as set forth herein to the extent of Debtor's actual use of KEL's

6 Cash Collateral prior to entry of a Court Order curtailing or otherwise modifying the provisions

7 of this Stipulation.

8      9.    <u>No Limitation on Remedies</u>:  Nothing contained in this Stipulation shall limit,

9 impair or in any way affect (i) KEL's right at any time to seek relief from the automatic stay to

10 enforce any of its remedies under the Loan Documents or Financing Statement or applicable

11 law; and (ii) KEL's rights under Section 507(b) of the Bankruptcy Code in the event that the

12 adequate protection provided to KEL hereunder is insufficient to compensate for the diminution

13 in value of the interest of KEL in the Collateral during the Bankruptcy Case or any successor

14 case.

15      10.    <u>No Waiver</u>.  Nothing contained in this Stipulation and the Order thereon shall be

16 deemed or construed to waive, reduce or otherwise diminish the rights of KEL under the Loan

17 Documents, Financing Statement, or the Bankruptcy Code.   Nothing contained in this

18 Stipulation and the Order thereon shall be deemed or construed to waive, reduce, or otherwise

19 diminish the rights, claims and defenses of the Debtor under the Loan Documents, Financing

20 Statement, or the Bankruptcy Code.

21      11.    <u>No Impact on Right to Seek Other or Different Relief</u>.  Nothing contained in this

22 Stipulation and the Order thereon shall be deemed or construed to waive, reduce or otherwise

23 diminish the rights of KEL to seek additional or different adequate protection of its interests

24 under the Loan Documents and Financing Statement, or to take any other action in this

25 Bankruptcy Case, including, but not limited to, seeking relief from the automatic stay or

26 dismissal or conversion of this case at any time.  The Debtor reserves all of its rights, claims and

27 defenses with respect to any additional or different relief requested, or any action taken, by KEL

28 in this Bankruptcy Case.

12.    <u>No Admission Regarding Adequate Protection</u>.    Nothing contained in this Stipulation and the Order thereon shall be deemed or construed to be an admission by either party that KEL is or is not adequately protected.

13.    <u>Notices to KEL</u>.    Performance due to KEL hereunder, including without limitation, notices, financial reports, and requests for approval of budget modifications, shall be made to KEL at the following address:

Kith Electronics Limited
Attn:  King Chun Hui
1/F Hing Lung Commercial Building
68 Bonham Strand East
Hong Kong
Tel:  852 2544 8778
Fax:  852-2544-8778
Email:  andrewhui@kith.hk

In addition, copies of all notices or other communications hereunder shall be sent to KEL's counsel at the following address:

Kathy Bazoian Phelps, Esq.
Danning, Gill, Diamond & Kollitz, LLP
2029 Century Park East, Third Floor
Los Angeles, California 90067
Tel:  (310) 277-0077
Fax: (310) 277-5735
Email:  KPhelps@dgdk.com

14.    <u>Default</u>.    If the Debtor fails to perform fully and timely any provision, term or condition of this Stipulation, the Debtor shall be in default under this Stipulation.  In the event that KEL asserts a default by the Debtor, it shall give written notice to the Debtor of its assertion, and the Debtor shall have five (5) business days after receipt of such notice from KEL to cure any such default ("**Cure Period**").  The Debtor may use Cash Collateral during the Cure Period, and the Debtor shall have the right to schedule an emergency hearing during the Cure Period to seek continuing Court authority to use Cash Collateral.  Notice of any default, or any other notices required to be given hereunder, shall be provided to the Debtor by facsimile,

9

1  personal or overnight delivery at the following addresses, or at such other address(es) as Debtor

2  may give to KEL in writing:

3

4                            Apex Digital, Inc.
                  Attn:  David Ji, Chief Executive Officer
5                        301 Brea Canyon Road
                         Walnut, California 91789
6                          Tel:  (909) 923-8686
                           Fax:  (909) 923-8675
7                     Email:  dji@apexdigitalinc.com

8

9        In addition, copies of all notices or other communications hereunder shall be sent by

10  facsimile to counsel for the Debtor at the following address:

11

12                        Philip A. Gasteier, Esq.
                           Juliet Y. Oh, Esq.
13                 Levene Neale Bender Yoo & Brill LLP
                  10250 Constellation Blvd., Suite 1700
14                       Los Angeles, CA  90067
                           Tel:  (310) 229-1234
15                         Fax:  (310) 229-1244
                  Emails:  pag@lnbyb.com; jyo@lnbyb.com
16

17       15.    <u>Termination</u>.    This Stipulation (including KEL's consent to use of Cash

18  Collateral) shall terminate at the earliest of the following: (i) upon the expiration of the Cure

19  Period without a timely cure of the asserted default; (ii) upon grant of relief from stay to KEL;

20  (iii) conversion, dismissal or closing of this case, for any reason whatsoever; or (iv) September

21  10, 2010, unless such date is extended pursuant to paragraph 27 of this Stipulation.

22       16.    <u>Time Is Of The Essence</u>.  In consideration of the facts and circumstances under

23  which the Stipulation is executed, and the terms, conditions and provisions of this Stipulation,

24  the parties expressly acknowledge and agree that time is of the essence and that all deadlines

25  and time periods provided for under the Stipulation are absolute and final.

26       17.    <u>Headings</u>.    The headings set forth herein are inserted for convenience of the

27  parties only, and shall not be used to interpret or construe or in any way affect the meaning of

28  the terms and provisions of this Stipulation.

18.   <u>Representations and Warranties</u>.  The parties hereto further represent and warrant to one another as follows:

a.   Each party hereto has received independent legal advice of attorneys of that party's choice with respect to the advisability of executing this Stipulation, and prior to the execution of this Stipulation by each party, that party's attorney reviewed the Stipulation and discussed the Stipulation with the party.

b.   Except as expressly stated in this Stipulation, no party hereto has made any statement or representation to any other party hereto regarding any facts relied upon by said party in entering into this Stipulation, and each party hereto specifically does not rely upon any statement, representation or promise of any other party hereto in executing this Stipulation, except as expressly stated in this Stipulation.

c.   Each party and its attorneys have made such investigation of the facts pertaining to this Stipulation, and all other matters pertaining thereto, as they deem necessary.

d.   The terms of this Stipulation are contractual and not a mere recital.

e.   This Stipulation has been carefully read by, the contents hereof are known and understood by, and it is signed freely by each party executing this Stipulation, and each party executing this Stipulation in a representative capacity is empowered to do so.

f.   Each of the parties hereto has the full right and authority to enter into this Stipulation, subject only to the provisions of paragraph 26 with respect to Bankruptcy Court approval, and the attorney executing this Stipulation on behalf of his or her client has the full right and authority to commit and bind his or her client to this Stipulation.

19.   <u>Binding on Successors</u>.   This Stipulation shall be binding on KEL and the Debtor, and any and all assigns and/or successors-in-interest to any of these persons or entities, including but not limited to, any trustee in a Chapter 11 or 7 proceeding if the case is converted, provided that KEL's consent to the use of Cash Collateral is subject to earlier termination as set forth in Paragraph 15.

20.    Use of Number and Gender.    Whenever the context requires, the masculine gender shall include the feminine or neuter, and a singular number shall include the plural, and vice versa.

21.    Neutral Construction.    This Stipulation is the product of negotiation among the parties hereto and represents the jointly conceived, bargained-for, and agreed-upon language mutually determined by the parties to express their intentions of entering into this Stipulation. Any ambiguity or uncertainty in this Stipulation shall be deemed to be caused by, or attributable to, all parties hereto collectively.    In any action to enforce or interpret this Stipulation, the Stipulation shall be construed in a neutral manner, and no term or provision of this Stipulation, or this Stipulation as a whole, shall be construed more or less favorably to any one party, group or groups of parties, to this Stipulation.

22.    Integration.    Except as expressly provided in this Stipulation, this Stipulation is the final written expression and complete and exclusive statement of all the agreements, conditions, promises and covenants among the parties with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements, negotiations, representations, understandings and discussions among the parties and/or their respective counsel with respect to the subject matter conveyed hereby.    Any amendment or modification of this Stipulation, in order to be legally binding, must be in writing specifically referring to the Stipulation and signed by duly authorized representatives of all parties hereto.

23.    No Agreement to Provide Financial Accommodation.    No provision of this Stipulation shall in any way impose upon KEL any duty or obligation to provide any financing or financial accommodation to the Debtor, or any other party, to collect, sell, lease or otherwise dispose of any of KEL's collateral, to proceed against any party, person, individual or entity, to proceed against or exhaust any security held by KEL or any other party, person, individual or entity, or to otherwise pursue any action, right or remedy whatsoever in KEL's power.

1    24.    <u>No Benefit to Non-Parties</u>.  Nothing contained in this Stipulation is intended, nor

2  shall it be construed or deemed to, confer any rights, powers or privileges on any person, firm,

3  partnership, corporation or other entity not an express party hereto or a successor-in-interest

4  thereof, including, without limitation, any and all sureties and guarantors with respect to any

5  indebtedness owed by the Debtor to KEL, or otherwise.  KEL reserves all of its rights under

6  law, equity or otherwise with respect to such non-parties and/or non-successors-in-interest.

7    25.    <u>Counterpart Signatures</u>.  This Stipulation may be signed in counterpart.

8    26.    <u>Bankruptcy Court Order</u>.  This Stipulation shall be submitted forthwith to the

9  Bankruptcy Court for approval and, in that regard, the Debtor shall give such notice and

10  opportunity to be heard as is required under Federal Rule of Bankruptcy Procedure 4001 or

11  other applicable law.

12    27.    <u>Extensions</u>.  This Stipulation can be further extended by the parties in writing

13  without further order of the Bankruptcy Court.

14    IN WITNESS WHEREOF, the parties hereto execute this Stipulation Regarding Use of

15  Cash Collateral, by and through their respective counsel, as of the date set forth opposite their

16  respective signatures.

17
18  DATED: August 17, 2010          KITH ELECTRONICS LIMITED

19                                 By: _____

20                                 Kathy Bazoian Phelps
                                   Danning, Gill, Diamond & Kollitz, LLP
21                                 Attorneys for Secured Creditor, Kith
                                   Electronics Limited
22
23  DATED: August 17, 2010          APEX DIGITAL, INC.

24                                 By: _____

25                                 Philip A. Gasteier
                                   Juliet Y. Oh
26                                 Levene, Neale, Bender, Yoo & Brill L.L.P.
                                   Proposed Attorneys for Debtor and Debtor
27                                 in Possession, Apex Digital, Inc.

28

13

# EXHIBIT "1"

**APEX Digital, Inc.**
**Projected Cash Flow**
**As of 08/13/2010**

| Week Ending/Month | 8/8/2010 | 8/15/2010 | 8/22/2010 | 8/29/2010 | 9/5/2010 | 9/12/2010 | 9/19/2010 | 9/26/2010 | 10/3/2010 | 10/10/2010 | 10/17/2010 | 10/24/2010 | 10/31/2010 | 13 Week |
| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | $19,977 | $19,977 | $1,007,820 | $1,527,050 | $2,043,555 | $2,840,825 | $4,005,469 | $4,168,813 | $4,172,650 | $4,090,401 | $4,052,072 | $3,958,990 | $3,414,897 | $19,977 |
| | | | | | | | | | | | | | | |
| Collection of AR – lighting | - | 620,460 | 533,000 | 302,756 | - | - | - | - | 697 | - | 1,938 | 4,573 | 697 | 1,464,121 |
| Services | | | | | | | | | | 100,000 | | | | 100,000 |
| Collection of AR – TV | - | 403,731 | 57,926 | 240,608 | 896,045 | 1,255,159 | 227,725 | 66,196 | - | - | - | - | - | 3,147,390 |
| Others | | | | | | | | | | | | | | - |
| **Total Receipts** | - | 1,024,191 | 590,926 | 543,364 | 896,045 | 1,255,159 | 227,725 | 66,196 | 697 | 100,000 | 1,938 | 4,573 | 697 | 4,711,511 |
| | | | | | | | | | | | | | | |
| **Purchases** | | | | | | | | | | | | | | |
| Vendors | | 477 | 477 | 1,670 | 2,862 | 504 | 504 | 37,021 | 596 | 3,048 | 30,409 | 526,716 | 35,830 | 640,114 |
| Freight In | | - | - | - | - | 3,200 | - | - | - | 6,400 | 3,200 | 3,200 | 3,200 | 19,200 |
| Broker's Fee & Duties | | - | - | - | - | 4,825 | - | - | - | 32,406 | 1,626 | 4,877 | 1,740 | 45,474 |
| Others | - | | | | | | | | | | | | | - |
| **Total Purchases** | - | 477 | 477 | 1,670 | 2,862 | 8,529 | 504 | 37,021 | 596 | 41,854 | 35,235 | 534,793 | 40,770 | 704,788 |
| **Operating Expenses** | | | | | | | | | | | | | | |
| Advertising / Promotion | - | | | | | - | | | | | | | | - |
| Alarm / Security | - | | 99 | | | | 99 | | | | | 99 | | 297 |
| Auto Expenses / Travel | | 1,000 | 1,000 | 1,200 | 1,800 | 1,200 | 1,200 | 1,200 | 1,400 | 1,000 | 1,000 | 1,500 | 1,500 | 15,000 |
| Commission | 0 | 2,753 | - | - | - | 31,023 | - | - | - | 47,899 | - | - | - | 81,675 |
| Computer - Tech Support / Parts | 0 | - | - | - | 4,400 | - | - | - | 4,400 | - | - | - | - | 8,800 |
| Credit Card payments | 0 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,500 | 1,000 | 12,500 |
| Development R & D | | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 1,500 |
| EDI & Internet | 0 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 900 |
| Freight In & Out | 0 | 625 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 11,625 |
| Insurance | | - | - | 5,539 | - | - | - | 6,249 | 5,000 | - | - | - | 6,249 | 23,037 |
| Legal Fee | | 2,000 | - | - | - | 2,000 | - | 2,000 | - | - | - | 2,000 | 2,000 | 10,000 |
| License & Registration | 0 | 125 | 125 | - | 125 | - | 125 | - | 125 | 125 | - | 125 | - | 875 |
| Office Expenses/Supplies/Postages | 0 | 250 | 250 | - | 250 | - | 250 | - | 250 | 250 | 250 | 250 | 250 | 2,250 |
| Outside Service | 0 | 20,000 | 250 | 250 | 250 | 20,000 | 250 | 250 | 250 | 20,000 | 250 | 250 | 250 | 62,250 |
| Payroll Services | | - | 98 | - | 98 | - | 75 | - | 75 | - | 75 | - | 75 | 496 |
| Professional / Consultant Fee | | 5,000 | 6,438 | 5,000 | - | 5,000 | - | 11,438 | - | 6,438 | 5,000 | - | 5,000 | 49,314 |
| Rent - Building | 0 | - | - | - | 18,063 | - | - | - | - | 18,063 | - | - | - | 36,126 |
| Rent - Equipment & Auto | | 2,200 | - | - | - | - | 2,200 | - | - | - | - | 2,200 | - | 6,600 |
| Repair & Maintenance | 0 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 1,500 |
| Salary & Wages / Retirement | | - | 55,000 | - | 55,000 | - | 45,000 | - | 45,000 | - | 45,000 | - | 45,000 | 290,000 |
| Taxes | | - | 4,290 | - | 4,290 | - | 3,510 | - | 3,150 | - | 3,510 | - | 3,510 | 22,260 |
| Telephone | 0 | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 1,875 |
| Trade Show | 0 | 219 | 219 | - | - | - | 219 | - | - | - | - | - | - | 656 |
| Warehouse | 0 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 94 | 1,125 |
| Utilities | | - | 750 | - | - | - | - | 750 | - | - | - | - | - | 1,500 |
| Others | 0 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 1,500 |
| **Total Operating Expenses** | - | 35,872 | 71,219 | 14,689 | 68,913 | 79,986 | 61,877 | 23,338 | 57,350 | 96,475 | 59,785 | 13,873 | 60,285 | 643,661 |
| | | | | | | | | | | | | | | |
| **Restructuring** | | | | | | | | | | | | | | |
| Adequate Protection Payment | | | | - | 25,000 | | | | 25,000 | | | - | 25,000 | 75,000 |
| Public Relations | | | | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | | | | | | 10,000 |
| Utility Deposit | - | - | - | 8,500 | - | - | - | - | - | - | - | - | - | 8,500 |
| U.S. Trustee Fees | - | - | - | - | - | - | - | - | - | | | | | - |
| **Total Restructuring** | - | - | - | 10,500 | 27,000 | 2,000 | 2,000 | 2,000 | 25,000 | - | - | - | 25,000 | 93,500 |
| | | | | | | | | | | | | | | |
| **Total Disbursements** | - | 36,349 | 71,696 | 26,859 | 98,775 | 90,515 | 64,381 | 62,359 | 82,946 | 138,329 | 95,020 | 548,666 | 126,055 | 1,441,949 |
| | | | | | | | | | | | | | | |
| **Ending Cash Balance** | $19,977 | $1,007,820 | $1,527,050 | $2,043,555 | $2,840,825 | $4,005,469 | $4,168,813 | $4,172,650 | $4,090,401 | $4,052,072 | $3,958,990 | $3,414,897 | $3,289,539 | $3,289,539 |

# EXHIBIT "2"

## SECURITY AGREEMENT
### All Assets

This SECURITY AGREEMENT (the "Agreement"), dated as of September __, 2008 is executed by and between APEX DIGITAL, INC., a California corporation ("Owner"), with principal business address at 301 Brea Canyon Road, Walnut, CA 91789 and KITH ELECTRONICS LIMITED, a company organized under the laws of Hong Kong, with principal business address at 1/F Hing Lung Commercial Building, 68 Bonham Strand East, Hong Kong ("Secured Party").

WHEREAS, Secured Party distributes consumer electronic products, accessories and various other products ("Products");

WHEREAS, Owner sells Products;

WHEREAS, Secured Party shall transfer title to the Products to Owner, and wishes to secure its interest in all assets of Owner as consideration for advancing Products to Owner for sale;

WHEREAS, in addition to this Agreement, Owner has agreed to establish a bank account jointly controlled by Secured Party and Owner, in order to receive monies from the sales of Products;

THEREFORE, for valuable consideration, the receipt and adequacy of which are acknowledged, Owner and Secured Party agree as follows:

1.    **Definitions**. For purposes of this Agreement, capitalized terms not otherwise defined in this Agreement shall have the meanings provided below or in the Commercial Code.

1.1    **Agreement** - means this Security Agreement, any concurrent or subsequent rider to this Security Agreement and any extensions, supplements, amendments or modifications to this Security Agreement and/or to any such rider.

1.2    **Bankruptcy Code** - means the U.S. Bankruptcy Code as now enacted or hereafter amended.

1.3    **Business Day** - means any day other than a day on which commercial banks are authorized or required by law to close in the State of California.

1.4    **Commercial Code** - means the Uniform Commercial Code, as now enacted or hereafter amended, applicable in the State of California.

1.5    **Credit Documents** - means this Agreement, all other agreements and documents now or hereafter executed by Owner, Guarantor or any other Person and delivered to Secured Party at Secured Party's request in connection with the credit extended to Owner and all extensions, renewals, modifications or replacements thereof.

1.6    **Exhibit** - means any Exhibit attached hereto and incorporated herein.

1.7    **Governmental Authorities** - means: (i) the United States; (ii) the state, county, city or other political subdivision in which any of the Collateral is located; (iii) all other

1

DOCSSFO-12525665.3

governmental or quasi-governmental authorities, boards, bureaus, agencies, commissions, departments, administrative tribunals, instrumentalities and authorities; and (iv) all judicial authorities and public utilities having or exercising jurisdiction over Owner, the Guarantor or the Collateral. The term "Governmental Authority" means any one of the Governmental Authorities.

1.8 **Governmental Permits** - means all permits, approvals, licenses and authorizations now or hereafter issued by any Governmental Authorities for or in connection with the conduct of Owner's business or the ownership or use by Owner of the Collateral, its other assets or its properties.

1.9 **Governmental Requirements** - means all existing and future laws, ordinances, rules, regulations, orders or requirements of all Governmental Authorities applicable to Owner, any Guarantor, the Collateral or any of Owner's or any Guarantor's other assets or properties.

1.10 **Guarantor** - means, collectively, the Person or Persons, if any, now or hereafter guaranteeing payment of the credit or payment or performance of the Secured Obligations (or pledging collateral therefor).

1.11 **Guaranty** - means every guaranty agreement of any kind (including third-party pledge agreements) now or hereafter executed by any Guarantor, and all extensions, renewals, modifications and replacement thereof.

1.12 **Insolvency Proceeding** - means any proceeding commenced by or against any person or entity, including Owner, under any provision of the United States Bankruptcy Code, as amended, or under any other bankruptcy or insolvency law, including, but not limited to, assignments for the benefit of creditors, formal or informal moratoriums, compositions or extensions with some or all creditors.

1.13 **Judicial Officer or Assignee** - means any trustee, receiver, controller, custodian, assignee for the benefit of creditors or any other person or entity having powers or duties like or similar to the powers and duties of a trustee, receiver, controller, or assignee for the benefit of creditors.

1.14 **Secured Party** - means KITH ELECTRONICS LIMITED.

1.15 **Secured Party Expenses** - means all costs and expenses incurred by Secured Party in connection with: (i) this Agreement or other Credit Documents; (ii) the transactions contemplated hereby or thereby; (iii) the enforcement of any rights hereunder or thereunder; (iv) the recordation or filing of any documents; (v) Secured Party's Attorneys' Fees; (vi) the creation, perfection or enforcement of the lien on any item of Collateral; and (vii) any expenses incurred in any proceedings in the U.S. Bankruptcy Courts in connection with any of the foregoing.

1.16 **Reserved.**

1.17 **Owner's Books** - means all of Owner's books and records including, but not limited to: minute books; ledgers, and records indicating, summarizing or evidencing Owner's assets, liabilities, the Collateral, the Secured Obligations, and all information relating thereto; records indicating, summarizing or evidencing Owner's business operations or financial condition; and all computer programs, disc or tape files, printouts, runs, and other computer prepared information and the equipment containing such information.

2

**1.18  Permitted Liens** - means any and all of the following:  (i) liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings; (ii) prior settlement with Phillips; and (iii) any other liens and encumbrances agreed to in writing by Secured Party.

**1.19  Person** - means any natural person or any entity, including any corporation, partnership, joint venture, trust, limited liability company, unincorporated organization or trustee, or Governmental Authority.

**1.20  Secured Obligations** - means all debts, obligations and liabilities of Owner to Secured Party under or in connection with this Agreement and any of the other Credit Documents, regardless whether such Secured Obligations are currently existing, or hereafter created or arising, whether liquidated or unliquidated, including Attorneys' Fees. Notwithstanding anything to the contrary contained in the Credit Documents, the term "Secured Obligations" shall not include any debts that are or may hereafter constitute "consumer credit" which is subject to the disclosure requirements of the federal Truth-In Lending Act (15 U.S.C. Section 1601, et seq.) or any similar state law in effect from time to time, unless Secured Party and Owner shall otherwise agree in a separate written agreement.

**2.    Security Interest.**  Owner hereby grants to Secured Party a continuing valid, first priority, security interest in all present and future Collateral, defined in **Exhibit B**, now owned or hereafter acquired to secure payment and performance of the Secured Obligations.

**3.    Security Documents.**  Secured Party may file all financing statements and confirmation statements and other documents as necessary to perfect and maintain perfected Secured Party's security interest.  Owner shall execute and deliver to Secured Party all documents which Secured Party may reasonably request: (i) to perfect, and maintain perfected, Secured Party's security interests in the Collateral or, (ii) to maintain or recognize the priority and enforceability of the Secured Party's lien on the Collateral, and (iii) to implement the terms of this Agreement. If requested by Secured Party, Owner will have such documents executed by relevant third parties and delivered to Secured Party.

**4.    Representations and Warranties.**  Until the Secured Obligations are satisfied in full, Owner makes the following representations and warranties:

**4.1   Owner.**  Owner's full and correct name and address are indicated in **Exhibit A**.  If Owner is an entity, Owner: (i) is duly organized, validly existing and in good standing under the laws of the state specified in **Exhibit A**; (ii) is qualified to do business and is in good standing in each jurisdiction in which the ownership of its assets or the conduct of its business requires qualification as a foreign entity; and (iii) conducts business under the trade name(s), if any, specified in **Exhibit A**, and no other trade name(s).

**4.2   Title to Assets.**  Owner has and at all times will have:  (i) legal and equitable title to the Collateral, free of all liens and other interests, except Permitted Liens; and (ii) the right to grant the security interest in the Collateral.

**4.3   No Offsets or Defenses.**  Each account, right to payment, instrument, document, chattel paper and other item of Collateral is (or will be when arising or issued) the valid and legally enforceable obligation, subject to no defense or set off (other than those arising in the ordinary course of business) of the obligor named therein.

3

DOCSSFO-12525665.3

**4.4** __Authority.__ This Agreement has been duly authorized and, upon execution and delivery, will constitute the legal, valid and binding agreement and obligation of Owner, enforceable in accordance with its terms.

**4.5** __No Conflicts__. The execution, delivery and performance by Owner of this Agreement and the grant of the lien herein do not: (i) violate any Governmental Requirements applicable to Owner; (ii) constitute a breach of any provision of the organizational papers of Owner; or (iii) constitute an event of default under any agreement of Owner.

**4.6** __Lawsuits; Compliance; Taxes.__ There is no material lawsuit, tax claim or adjustment or other dispute pending or threatened against Owner or the Collateral. Owner is in compliance with all Governmental Requirements and has satisfied, prior to delinquency, all taxes due or payable by Owner or assessed against the Collateral.

**4.7** __Continuing and Cumulative Warranties.__ The warranties and representations set forth in this Section shall be true and correct in all material respects at the time of execution of this Agreement and shall constitute continuing representations and warranties as long as any of the Secured Obligations remain unpaid or unperformed. The warranties and representations shall be cumulative and in addition to any other warranties and representations which Owner shall give to Secured Party, now or hereafter.

**5.** __Covenants__. Owner agrees, until the Secured Obligations are satisfied in full:

**5.1** __Transfer or Release of Assets__. Owner shall not transfer or sell any Collateral except in the ordinary course of business and except for the transfer of obsolete or non-serviceable goods.

**5.2** __Lien Free__. Owner shall keep the Collateral free of all liens and interests, except Permitted Liens.

**5.3** __Fixtures.__ Owner shall not permit any Collateral to be affixed to any real property without first assuring that Secured Party's lien will be senior to any other interest then or thereafter held by any lienholder on, or owner of, the real property.

**5.4** __Maintenance of Collateral__. Owner shall not: (i) misuse or permit misuse of any Collateral; or (ii) use or permit use of any Collateral for any unlawful purpose, or in any negligent manner or outside the ordinary course of Owner's business. Owner shall keep all tangible Collateral in good order and repair, normal depreciation excepted.

**5.5** __Records__. As regards any Collateral, Owner shall: (i) maintain a standard and modern system of accounting in accordance with generally accepted accounting principles, or such other accounting principles as agreed to by Secured Party, consistently applied; and (ii) not modify or change its method of accounting. Owner's Books shall be accurate and complete. On Secured Party's request, Owner shall deliver to Secured Party copies of Owner's Books.

**5.6** __Inspection__. Owner shall permit Secured Party and any of Secured Party's representatives, on demand, during business hours, to have access to and to inspect the Collateral (wherever located) and to examine and copy Owner's Books pertaining to the Collateral. Owner shall deliver to Secured Party such reports and information concerning the Collateral as Secured Party may reasonably request.

4

voluntary or involuntary Insolvency Proceeding; (iv) is the subject of any involuntary lien; (iv) is the subject of any receivership; or (v) is the subject of any receivership or similar proceeding.

    **6.6**    **Event of Default under Credit Documents.**    There is an Event of Default under any of the other Credit Documents.

    **7.**    **Secured Party's Rights and Remedies; Waiver.**

    **7.1**    **Remedies.**    If an Event of Default occurs and is not cured by Owner or waived by Secured Party, Secured Party shall have all rights and remedies of a secured party under the Commercial Code and as otherwise provided at law or in equity. Secured Party shall provide such notices as are required under the Commercial Code. Secured Party may dispose of any item of Collateral in a manner permitted by the Commercial Code. All proceeds from the Collateral shall be applied or disbursed as permitted under the Commercial Code.

    **7.2**    **Waivers.**    Owner waives: (i) all rights, remedies and benefits under California Civil Code Sections 1479 and 2822(a); and (ii) all rights to require marshalling of assets or liens or all rights to require Secured Party to exercise any other right or power or to pursue any other remedy which Secured Party may have.

    **7.3**    **Judicial Action.**    If Secured Party, at its option, seeks to take possession of any or all of the Collateral by court process, Owner irrevocably and unconditionally agrees that a receiver may be appointed by a court for such purpose without regard to the adequacy of the security for the Secured Obligations and such receiver may, at Secured Party's option, collect or dispose of all or part of the Collateral.

    **8.**    **Liability for Deficiency.**    Owner shall remain liable for any deficiency remaining on the Secured Obligations after disposition of all or any of the Collateral and Secured Party's application of the proceeds thereof to the Secured Obligations.

    **9.**    **Actions.**    Owner authorizes Secured Party, without notice or demand and without affecting its liability hereunder, and without consent of Owner, to: (i) take and hold additional security for the payment of the Secured Obligations with the consent of the party providing such security; and (ii) accept guarantors for the payment of the Secured Obligations.

    **10.**    **Power of Attorney.**    Owner irrevocably appoints Secured Party, with full power of substitution, as its attorney-in-fact, coupled with an interest, with full power, in Secured Party's own name or in the name of Owner: (i) in the event of a default to sign, record and file all documents referred to in this Agreement; and (ii) after an Event of Default: (a) to endorse any checks, notes and other instruments or documents evidencing the Collateral, or proceeds thereof; (b) to discharge claims, demands, liens, or taxes affecting any of the Collateral; (c) to settle, and give releases of, any insurance claim that relates to any of the Collateral, obtain payment of claim, and make all determinations with respect to any such policy of insurance, and endorse Owner's name on any proceeds of such policies of insurance; or (d) to instruct any Person having control of any books or records relating to the Collateral to give Secured Party full rights of access thereto. Secured Party shall have the right to exercise the power of attorney granted in this Section directly or to delegate all or part of such power. Secured Party shall not be obligated to act on behalf of Owner as attorney-in-fact.

    **11.**    **Miscellaneous.**

    **11.1**    **Notices.**    Any notice, demand or request required hereunder shall be given in writing (at the addresses set forth in **Exhibit A**) by any of the following means: (i) personal

6

5.7 **Delivery**. On Secured Party's request (before or after an Event of Default), Owner shall deliver to Secured Party any instrument, document or chattel paper constituting Collateral, duly endorsed or assigned by Owner.

5.8 **Taxes**. Owner shall pay all taxes relating to the Collateral when due.

5.9 **Insurance**. Owner shall maintain reasonable insurance on all Collateral for all risks.

5.10 **Compliance with Applicable Laws.** Owner shall comply with and keep in effect all Governmental Permits relating to it and the Collateral. Owner shall comply with and shall cause the Collateral to comply with: (i) all Governmental Requirements; (ii) all requirements and orders of all judicial authorities which have jurisdiction over it or the Collateral; and (iii) all covenants, conditions, restrictions and other documents relating to Owner or the Collateral.

5.11 **Notifications.** Owner shall promptly notify Secured Party of any material decline in value of, or loss of, or damage to, any Collateral.

5.12 **Expenses.** Owner agrees to reimburse Secured Party for any and all Secured Party Expenses, and hereby authorizes and approves all advances and payments by Secured Party for items constituting Secured Party Expenses.

5.13 **Existence**. If Owner is an entity: (i) Owner will maintain its existence in good standing under the law of the state of its organization, (ii) will maintain its qualification as a foreign entity in each jurisdiction in which the nature of its business requires such qualification, and (iii) will not merge with any other entity without the consent of Secured Party.

5.14 **Further Assurances**. Upon Secured Party's request, Owner, at Owner's expense, shall: (i) work with Secured Party to execute and deliver such further documents and notices reasonably necessary in connection with this Agreement; (ii) take reasonable action requested by Secured Party to carry out the intent of this Agreement and the other Credit Documents; and (iii) provide such reports and information available to Owner concerning the business, financial condition and business of Owner.

6. **Events of Default**. The occurrence of any one or more of the following events shall constitute an "Event of Default" under this Agreement, at the option of Secured Party:

6.1 **Breach**. There is a breach of any provision of this Agreement or discovery that any material representations or warranty provided to Secured Party by, or on behalf of Owner, was materially misleading at the time given.

6.2 **Lien Priority.** Secured Party shall cease to have a valid and perfected first priority lien on any of the Collateral subject only to Permitted Liens, if any,

6.3 **Material Impairment.** There is a material impairment of the value of the Collateral.

6.4 **Seizure of Collateral.** Any portion of the Collateral is subject to attachment, seizure or a writ or distress warrant, or is levied upon or comes into possession of any Judicial Officer or Assignee.

6.5 **Insolvency or Attachment**. If Owner: (i) fails to pay its debts as they become due (ii) commences dissolution or termination of its business; (iii) is the subject of any

5

DOCSSFO-12525665.3

service; (ii) electronic communication, whether by telex, telegram or telecopying or other form of electronic communications; (iii) overnight courier; or (iv) registered or certified, first class U.S. mail, return receipt requested, or to such other addresses as Secured Party or Owner may specify from time to time in writing.

Any notice, demand or request sent pursuant to either subsection (i) or (ii), above, shall be deemed received upon such personal service or upon dispatch by electronic means. Any notice, demand or request sent pursuant to subsection (iii), above, shall be deemed received on the Business Day immediately following deposit with the overnight courier, and, if sent pursuant to subsection (iv), above, shall be deemed received forty-eight (48) hours following deposit into the U.S. mail.

    **11.2**  **Choice of Law.**  This Agreement shall be determined under, governed by and construed in accordance with California law.  The parties agree that all actions or proceedings arising in connection with this Agreement shall be litigated only in the state courts located in the County of Los Angeles, State of California, or the federal courts located in the Central District of California.  Owner waives any right Owner may have to assert the doctrine of *forum non conveniens* or to object to such venue and hereby consents to any court-ordered relief.

    **11.3**  **Successors and Assigns; Assignment.**  This Agreement shall be binding and deemed effective when executed by Owner and accepted and executed by Secured Party.  This Agreement shall be binding on Secured Party's and Owner's successors and assigns.  Owner agrees that it may not assign this Agreement without Secured Party's prior written consent. Secured Party may assign, in whole or in part, all of its right, title and interest in and to this Agreement at any time without the consent of Owner.  In connection with any assignment, Secured Party may disclose all documents and information that Secured Party has or may hereafter have relating to Owner.  No consent to an assignment by Secured Party shall release Owner or any Guarantor from their obligations to Secured Party.

    **11.4**  **Severability; Waivers.**  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any provision.  No waiver by Secured Party of any of its rights or remedies in connection with this Agreement shall be effective unless such waiver is in writing and signed by Secured Party.  No act or omission by Secured Party to exercise a right as to any event shall be construed as continuing, or as a waiver or release of, any subsequent right, remedy or recourse as to a subsequent event.

    **11.5**  **Attorneys' Fees.**  On demand, Owner shall reimburse Secured Party for all costs and expenses including, without limitation, reasonable attorneys' fees, costs and disbursements (and fees and disbursements of Secured Party's in-house counsel) (collectively "Attorneys' Fees") expended or incurred by Secured Party in any way in connection with the amendment and/or enforcement of this Agreement and Secured Party's rights hereunder and the Collateral whether or not suit is brought.  Attorneys' Fees shall include, without limitation, attorneys' fees and costs incurred in any State, Federal or Bankruptcy Court, and in any Insolvency Proceeding of any kind in any way related to this Agreement, or any item of Collateral and/or Secured Party's lien thereon.

    **11.6**  **Headings.**  Article and section headings are for reference only and shall not affect the interpretation or meaning of any provisions of this Agreement.

7

**11.7** **Integration; Amendment.** No modification or amendment to this Agreement, or novation of the obligations under this Agreement, shall be effective unless in writing, executed by Secured Party and the other relevant parties. Except for currently existing obligations of Owner to Secured Party, all prior agreements, understandings, representations, warranties, and negotiations between the parties, whether oral or written, if any, which relate to the substance of this Agreement, are merged into this Agreement. Owner hereby waives the right to assert any agreement, promise, fact or any parol (oral) evidence which is contrary to the terms or representations specified in this Agreement.

**11.8** **Counterparts; Electronic Signatures.** This Agreement may be executed in counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute but one and the same agreement. A signed copy of this Agreement transmitted by a party to another party via facsimile or an emailed "pdf" version shall be binding on the signatory thereto.

**11.9** **WAIVER OF JURY TRIAL.** TO THE FULLEST EXTENT PERMITTED BY LAW, SECURED PARTY AND OWNER HEREBY VOLUNTARILY, UNCONDITIONALLY AND IRREVOCABLY WAIVE TRIAL BY JURY IN ANY LITIGATION OR PROCEEDING IN A STATE OR FEDERAL COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT OR THE OTHER CREDIT DOCUMENTS, OR THE SECURED OBLIGATIONS, OR ANY INSTRUMENT OR DOCUMENT DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING WITHOUT LIMITATION, CLAIMS RELATING TO THE APPLICATION, OR THE VALIDITY, PROTECTION, INTERPRETATION, COLLECTION OR ENFORCEMENT THEREOF, OR ANY OTHER CLAIM OR DISPUTE HOWSOEVER ARISING (INCLUDING TORT AND CLAIMS FOR BREACH OF DUTY), BETWEEN SECURED PARTY AND OWNER.

[signature page follows]

8

DOCSSFO-12525665.3

This **Security Agreement** is executed as of the date stated at the top of the first page.

**Accepted:**

**SECURED PARTY:**                    **OWNER:**

**KITH ELECTRONICS LIMITED**          **APEX DIGITAL, INC.**

By: _____        By: _____

Name: *Andrew HUI*                   Name: *David L.F. Ji*

Title: *Director*                    Title: *CEO*

9

DOCSSFO-12525665.3

<u>EXHIBIT A</u>
TO
SECURITY AGREEMENT
All Assets

This <u>Exhibit A</u> is an integral part of the Agreement between Secured Party and Owner, and the following terms are incorporated in and made a part of the Agreement to which this <u>Exhibit A</u> is attached:

1.    **Owner:**  Owner represents that his/her/its name, address and state of incorporation or formation (if Owner is a registered entity) is as follows:

   1.1    **Name:  Apex Digital, Inc.**

   1.2    **Trade Names or DBAs (if any):**  _____

   1.3    **Type of Entity and State of Formation or Incorporation: Corporation, California**

   1.4    **Address for Notices:**  301 Brea Canyon Road, Walnut, CA 91789

   1.5    **Tax Identification Number or Social Security Number:** _____

2.    **Secured Party's Notice Address:**

3.    1/F Hing Lung Commercial Building, 68 Bonham Strand East, Hong Kong

4.    **Additional Covenants:**

Exhibit A

**EXHIBIT B**
**TO**
**SECURITY AGREEMENT**
All Assets

**DESCRIPTION OF COLLATERAL**

The Collateral ("Collateral") consists of all of the right, title and interest of Owner in and to the following assets whether currently existing or hereafter arising: (a) Equipment; (b) Inventory; (c) fixtures located at Owner's business location at the address set forth in this Agreement; (d) other Goods, Instruments and Documents; (e) Chattel Paper; (f) General Intangibles; (g) Accounts and all other obligations now or hereafter owing to Owner; (h) all deposit accounts and certificates of deposit, Payment Intangibles, including those maintained with Secured Party; (i) Investment Property and Commercial Property; (j) Letters of Credit Rights; (k) all Commercial Tort Claims and any other causes of action of Owner against third parties arising in connection with Owner's business, excluding only claims for death and personal injury; (l) all Supporting Obligations; (m) all proceeds and products of the foregoing; and (n) all of Owner's Books relating to the foregoing. Terms used herein shall have the meanings provided in the Commercial Code.

Unless otherwise defined herein, the terms used herein shall have the meaning provided in the Uniform Commercial Code, as now enacted or hereafter amended, applicable in the State of California.

# EXHIBIT "3"

# INFORMATION REQUEST

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

| A. NAME & PHONE OF CONTACT [optional] | FILING OFFICE ACCT# |
|---|---|
| UCC Administrator 916-564-7800 | |

**B. RETURN TO: (Name and Address)**

CLAS INFORMATION SERVICES
2020 HURLEY WAY STE 350
SACRAMENTO, CA 95825
USA

DOCUMENT NUMBER: 25247580003
ORDER DATE: 06/08/2010 14:21
IMAGE GENERATED ELECTRONICALLY FOR WEB ORDER
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1. DEBTOR NAME** to which this request relates - insert only <u>one</u> debtor name (1a or 1b) - do not abbreviate or combine names

| ORGANIZATION NAME |
|---|
| |

| INDIVIDUAL LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

**2 INFORMATION OPTIONS RELATING TO UCC FILINGS AND OTHER NOTICES FILED IN FILING OFFICE THAT INCLUDE AS A DEBTOR THE NAME IDENTIFIED IN ITEM 1**

☐ For 2a and 2b, **mark this box** to request a search that is **COMPLETE** to include **lapsed and unlapsed** filings. UNLESS MARKED, SEARCH MAY BE INCOMPLETE.

2a. ☐ SEARCH RESPONSE with copies of ALL records found.      ☐ Please CERTIFY all copies **(additional $5.00 fee per record).**

2b. ☐ **SEARCH RESPONSE only.**

2c. ☑ **COPIES ONLY. Please complete the information below, as appropriate. For UCC3 records, include the type of UCC3 and corresponding filing date.**

| File Number | # of copies | # of CERTIFIED COPIES (ADD'L FEE APPLIES) | FILE DATE (USE FOR UCC3 ONLY) | Filing Type-Financing Statement, Cont.,Term.,Assign.,Amend. |
|---|---|---|---|---|
| 08-7168547339 | 1 | 1 | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**3. CALIFORNIA SECRETARY OF STATE'S OFFICE OFFERS THESE ADDITIONAL SEARCHING OPTIONS:**

3a. ☐ SEARCH TO REFLECT - Please run the search after the filing document accompanying this request has been filed.

3b. ☐ DEBTOR SEARCH LIMITED TO THE FOLLOWING ADDRESS: _____

3c. ☐ DEBTOR SEARCH LIMITED FROM THIS DATE: _____

3d. ☐ SECURED PARTY LISTING: Insert only <u>one</u> name (organization or individual)

| ORGANIZATION NAME |
|---|
| |

| INDIVIDUAL LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| CITY | STATE | COUNTRY |
|---|---|---|
| | | |

**FILING OFFICE COPY**

# State of California

## Secretary of State

I, **Debra Bowen** , Secretary of State of the State of California, hereby certify:

That the attached transcript of 2  page(s) was prepared by and in this office from the record on file, of which it purports to be a copy, and that it is full, true and correct.



**IN WITNESS WHEREOF**,  I execute this certificate and affix the Great Seal of the State of California this day of

June 08, 2010

_____

*Debra Bowen*

Secretary of State

FILE #        087168547339

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

949 829 8866

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

Law Offices of Steve Tsai, ALC
6 Morgan, Suite 112
Alton Business Park
Irvine, CA 92618
USA

DOCUMENT NUMBER: 18024120003
FILING NUMBER: 08-7168547339
FILING DATE: 08/12/2008 14:38
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names**

| | | | | |
|---|---|---|---|---|
| **1a. ORGANIZATION'S NAME** Apex Digital, Inc. | | | | |

OR

| **1b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
|---|---|---|---|
| | | | |

| **1c. MAILING ADDRESS** 301 Brea Canyon Rd. | **CITY** Walnut | **STATE** CA | **POSTAL CODE** 91789 | **COUNTRY** USA |
|---|---|---|---|---|

| **1d. SEE INSTRUCTIONS** | **ADD'L DEBTOR INFO** | **1e. TYPE OF ORGANIZATION** Corporation | **1f. JURISDICTION OF ORGANIZATION** CA | **1g. ORGANIZATIONAL ID#, if any** C2017290 ☐ NONE |
|---|---|---|---|---|

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names**

| | | | | |
|---|---|---|---|---|
| **2a. ORGANIZATION'S NAME** | | | | |

OR

| **2b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
|---|---|---|---|
| | | | |

| **2c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
|---|---|---|---|---|

| **2d. SEE INSTRUCTIONS** | **ADD'L DEBTOR INFO** | **2e. TYPE OF ORGANIZATION** | **2f. JURISDICTION OF ORGANIZATION** | **2g. ORGANIZATIONAL ID#, if any** ☐ NONE |
|---|---|---|---|---|

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)**

| | | | |
|---|---|---|---|
| **3a. ORGANIZATION'S NAME** Kith Electronics Limited | | | |

OR

| **3b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
|---|---|---|---|
| | | | |

| **3c. MAILING ADDRESS** 68 Bonham Strand East, 1/F Hing Lung Commercial Bldg. | **CITY** Hong Kong | **STATE** | **POSTAL CODE** | **COUNTRY** CHN |
|---|---|---|---|---|

**4. This FINANCING STATEMENT covers the following collateral:**

See Attachment(s)

**5. ALT DESIGNATION:** ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

| ☐ **6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS** Attach Addendum [if applicable] | **7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]** [optional] ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2 |
|---|---|

**8. OPTIONAL FILER REFERENCE DATA**

FILING OFFICE COPY

(a)  Debtor's accounts and accounts receivable from customers such as Circuit City and Best Buy, whether now owed, existing or arising on or after the date of this statement;

(b)  All inventory such as digital-analog converter set top boxes, whether now owned or acquired by Debtor after the date of this statement, or in which Debtor may now have or in the future acquire an ownership or other interest, including, without limitation, inventory temporarily out of Debtor's custody or possession and any returns or repossessions of any products on any sales or accounts;

(c)  All deposit accounts, negotiable and non-negotiable instruments, moneys, sources of money, uncalled capital, letters of credit and chattel paper, whether owned now or in the future by Debtor, or in which Debtor may now have or in the future acquire an interest of any kind;  AND

(d)  All proceeds arising from any of the personal property and collateral described above, in any form, including but not limited to proceeds consisting of any of the above types of collateral; and all replacements, substitutions, renewals, returns, additions and accessories of the above collateral; and all rents, royalties, issues, documents of ownership; and all receipts of any of the foregoing.

# EXHIBIT "F"

1  RON BENDER (SBN 143364)
   *rb@lnbyb.com*
2  PHILIP A. GASTEIER (SBN 130043)
   *pag@lnbyb.com*
3  JULIET Y. OH (SBN 211414)
   *jyo@lnbyb.com*
4  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
5  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
6  Telephone:  (310) 229-1234
   Facsimile:  (310) 229-1244
7
8  Proposed Counsel for Chapter 11 Debtor and
   Debtor in Possession
9

10              **UNITED STATES BANKRUPTCY COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12                 **LOS ANGELES DIVISION**

13

14  In re                              ) Case No. 2:10-bk-44406-SB
                                        )
15  APEX DIGITAL, INC., a California    ) Chapter 11
    corporation,                        )
16                                      )
                                        )
17                      Debtor.         )
                                        ) **ORDER:**
18                                      )
                                        )   **(A) GRANTING DEBTOR'S**
19                                      )       **EMERGENCY MOTION FOR USE**
                                        )       **OF CASH COLLATERAL ON AN**
20                                      )       **INTERIM BASIS PENDING A**
                                        )       **FINAL HEARING; AND**
21                                      )
                                        )   **(B) APPROVING STIPULATION**
22                                      )       **BETWEEN DEBTOR AND KITH**
                                        )       **ELECTRONICS LIMITED**
23                                      )       **REGARDING INTERIM USE OF**
                                        )       **CASH COLLATERAL**
24                                      )
                                        ) DATE:    August 23, 2010
25                                      ) TIME:    1:30 p.m.
                                        ) PLACE:   Courtroom "1539"
26                                      )          255 E. Temple Street
                                        )          Los Angeles, California
27                                      )
                                        )
28

                                    1                              61

1    A hearing was held on August 23, 2010, at 1:30 p.m., before the Honorable Peter H.

2    Carroll, United States Bankruptcy Judge for the Central District of California, in Courtroom

3    "1539" located at 255 East Temple Street, Los Angeles, California, to consider (A) the

4    emergency motion (the "Emergency Motion") filed by Apex Digital, Inc., a California

5    corporation, the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy

6    case (the "Debtor"), for the entry of an order, pursuant to 11 U.S.C. § 363(c), authorizing the

7    Debtor to use cash collateral on an emergency interim basis pending a final hearing in

8    accordance with the Debtor's operating budget (the "Budget"), a copy of which is attached as

9    Exhibit "D" to the Declaration of Alice Hsu filed concurrently with the Emergency Motion (the

10    "Hsu Declaration"); and (B) the stipulation entered into by and between the Debtor and Kith

11    Electronics Limited ("Kith Electronics") regarding interim use of cash collateral (the

12    "Stipulation").  Appearances at the hearing on the Motion were made as set forth on the record of

13    the Court.

14    The Court, having considered the Emergency Motion and all papers filed by the Debtor

15    in support of the Emergency Motion, the Stipulation, and the oral arguments and statements of

16    counsel made at the hearing on the Emergency Motion, proper notice of the Emergency Motion

17    and the hearing on the Emergency Motion having been provided, and good cause appearing

18    therefor,

19    IT IS HEREBY ORDERED AS FOLLOWS:

20    A.    The Stipulation is approved in its entirety.

21    B.    As it relates to creditors other than Kith Electronics who assert liens in the

22    Debtor's cash collateral, the Emergency Motion is granted and the Debtor is authorized to use

23    cash collateral in accordance with the terms and conditions set forth in the Emergency Motion.

24    C.    Subject to the terms of the Stipulation and this Order, the Debtor is authorized to

25    use cash collateral through and including September 10, 2010 to pay all of the expenses set forth

26    in the Budget, subject to a permitted deviance of up to 10% of the total expenses (but not

27

28

2                              62

1  purchases) for any week, with any unused portions to be carried over into the following week on

2  a line-item by line-item basis only.

3          D.      As adequate protection for the cash collateral used by the Debtor from and after

4  the commencement of the Debtor's bankruptcy case, and only to the extent that the cash

5  collateral is used, Kith Electronics and any other creditors that have valid, perfected liens against

6  the Debtor's assets (collectively, the "Secured Creditors") shall have and are hereby granted,

7  pursuant to 11 U.S.C. §§ 361 and 363(e) and effective as of August 17, 2010, the date of the

8  filing of the Debtor's bankruptcy case, replacement liens on, and security interests in, the

9  Debtor's assets (excluding avoidance causes of action), with such replacement liens and security

10 interests to have the same extent, validity, and priority as the pre-petition liens and security

11 interests held by such creditors.

12         E.      A further hearing regarding the Emergency Motion and the Debtor's continued

13 authority to use cash collateral will be held on _____, 2010 at _____ __.m.

14         F.      The Debtor shall file with the Court its motion and any other papers to support the

15 Debtor's continued authority to use cash collateral (the "Supplemental Pleadings") by

16 _____, 2010.    The Debtor shall provide courtesy copies of the Supplemental

17 Pleadings to chambers, and serve the Supplemental Pleadings on the Secured Creditors (and their

18 counsel, if known), the Office of the United States Trustee ("OUST") and any official committee

19 appointed in the Debtor's case so that the Supplemental Pleadings are received by all such

20 parties by _____, 2010.

21         G.      Any response to the Supplemental Pleadings must be filed with the Court by

22 _____, 2010.    A courtesy copy of the response must be provided to chambers, and

23 served on the Debtor, counsel for the Debtor, the Secured Creditors (and their counsel, if

24 known), the OUST and any official committee appointed in the Debtor's case so that such

25 response is received by all such parties by _____, 2010.

26

27

28

H.      The Debtor's reply to any response to the Supplemental Pleadings must be filed with the Court by 4:00 p.m. (PDT) on _____, 2010.  A courtesy copy of the Debtor's reply must be provided to chambers, and served on the Secured Creditors (and their counsel, if known), the OUST and any official committee appointed in the Debtor's case so that such response is received by all such parties by 4:00 p.m. (PDT) on _____, 2010.

###

# EXHIBIT "G"

Apex Digital Inc
Payroll, Vacation, Sick and 401K matching funds

| Hire Date | Last Name | First Name | 8/15 to 8/28 Payroll | Accrued Vacation - hours | Accrued Vacation - amount | Accrued Sick - hours | Accrued Sick - amount | 401 Matching Funds |
|---|---|---|---|---|---|---|---|---|
| 08/23/06 | Pena | Eddie | $ 934.38 | 42.68 | $ 498.49 | 2.6 | $ 30.37 | |
| 05/14/07 | Chen | Sara | $ 1,496.80 | 96.20 | $ 1,799.90 | 7.94 | $ 148.56 | $ 891.49 |
| 07/30/07 | Ye | Frank | $ 3,961.53 | 160.00 | $ 7,923.07 | 26.19 | $ 1,296.91 | |
| 02/11/08 | Velazquez | Brenda | $ 1,648.00 | 3.87 | $ 79.72 | -0.56 | $ (11.54) | |
| 03/31/08 | Au | Sharon | $ 2,575.00 | 44.88 | $ 1,444.58 | 18.19 | $ 585.49 | $ 1,542.00 |
| 04/01/08 | Li | Shannon | $ 2,040.18 | 94.69 | $ 2,414.81 | 7.19 | $ 183.36 | $ 1,221.74 |
| 06/30/08 | Chen | Yi Ping | $ 1,600.00 | 41.93 | $ 838.60 | 2.19 | $ 43.80 | $ 953.06 |
| 03/30/09 | Kuo | Chung Ching | $ 3,090.00 | 81.10 | $ 3,132.49 | 26.19 | $ 1,011.59 | |
| 05/22/09 | Chan | Vincent | $ 4,357.68 | 28.60 | $ 1,557.87 | 2.19 | $ 119.29 | |
| 06/08/09 | Zhang | Jin | $ 1,384.62 | 53.13 | $ 919.56 | 2.19 | $ 37.90 | |
| 06/22/09 | Lee | Fred | $ 1,280.00 | 54.68 | $ 874.88 | 24.19 | $ 387.04 | $ 51.20 |
| 06/29/09 | Magallanes | Robert | $ 1,280.00 | 34.65 | $ 554.40 | 2.19 | $ 35.04 | |
| 07/13/09 | Huang | Matthew | $ 5,384.62 | 90.08 | $ 6,063.08 | 10.19 | $ 685.87 | |
| 07/13/09 | Nunez | Helen | $ 1,200.00 | 32.08 | $ 481.20 | 3.69 | $ 55.35 | |
| 02/16/10 | Fang | Lu | $ 2,076.92 | 42.08 | $ 1,092.46 | 13.04 | $ 338.54 | |
| 03/08/10 | Gu | Yanni | $ 923.20 | 37.92 | $ 437.60 | 6.96 | $ 80.32 | |
| 03/15/10 | Stahl | Mark | $ 6,730.77 | 36.38 | $ 3,060.82 | 18.19 | $ 1,530.41 | |
| | | | $ 41,963.70 | | $ 33,173.52 | | $ 6,558.29 | $ 4,659.49 |

# EXHIBIT "H"

| Service | Utility Company | Utility Company Address | Account # | Monthly Average Payments | Proposed Cash Deposit |
|---|---|---|---|---|---|
| Alarm/ Security | E&E Electronic Engineering | 4978 Santa Anita Ave., Temple City, CA 91780 | LJ1789 | 117.33 | 117.33 |
| Cable | Dish Networks | Dept 0063, Palatine, IL 60055-0063 | 8.25571E+15 | 39.99 | 39.99 |
| Cable | DirectTV | PO Box 60036, Los Angeles, CA 90060-0036 | 46184951 | 44.98 | 44.98 |
| EDI | Commerce Technologies | 255 Fuller Road, Albany, NY 12203 | apexdigital | 351.63 | 351.63 |
| EDI | EasyLink | 6025 The Corners Parkway, Suite 100, Norcross, GA 30092 | 1000013086 | 295.83 | 295.83 |
| EDI | SPS Commerce | VB Box 3, PO Box 9202, Minneapolis, MN 55480-9202 | SPE-O 11478 | 360.40 | 360.40 |
| EDI | Sterling Commerce | PO Box 73199, Chicago, IL 60673 | 532506 | 150.00 | 150.00 |
| Internet | Verizon | PO Box 920041, Dallas, TX 75392-0041 | 1188840437 | 89.99 | 89.99 |
| Internet | Verizon | PO Box 920041, Dallas, TX 75392-0041 | 1147801445 | 89.99 | 89.99 |
| Telephone | Telepacific | PO Box 526015, Sacramento, CA 95852-6015 | 6403 | 3,567.59 | 3,567.59 |
| Telephone | Verizon Wireless | PO Box 660108, Dallas, TX 75266-0108 | 770559957-00001 | 835.76 | 835.76 |
| Telephone | Verizon California | PO Box 920041, Dallas, TX 75392-0041 | 1.25881E+16 | 43.27 | 43.27 |
| Web Hosting | websitedynamics.com | PO Box 12043, Room 1605, 555 West Hastings Street, Vancouver BC V6B 4N4 | N/A | 22.95 | 22.95 |
| Web Master | LA Link Networks | 2530 Greenfield Ave, Arcadia, CA 91006 | APEX | 473.00 | 473.00 |
| Workgroup Hosting | Project Insight | 17320 Red Hill Ave, Suite 270, Irvine, CA 92614 | N/A | 145.83 | 0.00 |
| | | | Total: | 6,628.54 | 6,482.71 |

| In re: | CHAPTER 11 |
| APEX DIGITAL, INC., | |
| Debtor(s). | CASE NO.  2:10-bk-44406-SB |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I.  Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067.

A true and correct copy of the foregoing document described as:  **DECLARATION OF ALICE HSU IN SUPPORT OF DEBTOR'S EMERGENCY "FIRST DAY" MOTIONS,** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document.  On **August 18, 2010**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Service information on attached page  [X]

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL OR ATTORNEY SERVICE:** On **August 18, 2010**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service and/or by attorney service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

*BY OVERNITE EXPRESS*
Hon. Peter H. Carroll
U. S. Bankruptcy Court/Los Angeles Div.
Edward R. Roybal Fed. Bldg. & Courthouse
255 E. Temple Street, Suite 1539
Los Angeles, CA  90012

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

Service information on attached page  [ ]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 18, 2010 | TRISH MELENDEZ | |
| Date | Type Name | Signature |

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

Juliet Y Oh on behalf of Debtor Apex Digital, Inc.
jyo@lnbrb.com, jyo@lnbrb.com

David B Shemano on behalf of Interested Party Courtesy NEF
dshemano@pwkllp.com

United States Trustee (LA)
ustpregion16.la.ecf@usdoj.gov

**II. SERVED BY U.S. MAIL**

[SEE ATTACHED SERVICE LISTS]

Apex Digital, Inc.
20 Largest
4722

Covington & Burling LLP
1201 Pennsylvania Ave. N.W.
Washington, DC 20004-2401

Regent USA Inc
1208 John Reed Court
City of Industry, CA 91745

Koninklijke Philips Electronics
1251 Avenue of the Americas
New York, NY 10020

Wintek Group, Inc.
13418 Wandering Ridge Way
Chino Hills, CA 91709

G & J Express Transport, Inc
9121 Blackley Street
Temple City, CA 91780

Disco Vision
2265 East 220th Street
Long Beach, CA 90810

Oracle Corporation
500 Oracle Parkway
Redwood City, CA 94065

MPEG LA
6312 S Fiddlers Green Circle
Suite 400E
Greenwood Village, CO 80111

Vizio
39 Tesla
Irvine, CA 92618

Jiangsu Qiao Yue Shu Ma You Xian
#1, Jing Jiu Road, Ding Mao Jing Ji
Kai Fa, Zhen Jiang City, Jiangsu
**CHINA**

Funai
7-1, 7-Chome, Nakagaito
Daito, Osaka 574-0013
**JAPAN**

Jiangsu Hongtu High Tech Co Ltd
83 Hu Bei Road
Nanijing P.R., Post Code 210009
**CHINA**

Shanghai World Trade Dev. Co., LTD
Unit 118, Suite 1016, Xin Ling Road
Wai Gao Qiao Bao Shui, Shanghai
**CHINA**

Wi-Lan V-Chip Corp.
41 Pullman Court
Toronto, Ontario
**CANADA**

Thomson Multimedia
46, Quai Alphonse Le Gallo
Boulogne
**FRANCE    92468**

Sichuan Digital Telemedia Co. Ltd.
Jiuzhopu Electric Bldg., 6th Floor
High-Tech Park, Nanshan, Shenzhen
**CHINA**

Apex Digital Inc. Ltd.
Unit 37031, 37/F West Tower Shun
Tak Centre 168-200 Connaught Rd Cen
**HONG KONG**

Apex Digital, Inc.
4722

The CIT Group/Commercial Services
300 South Grand Avenue
Los Angeles, CA 90071

Wells Fargo Trade Capital, LLC
333 South Grand Avenue, Suite 4150
Los Angeles, CA 90071

Alan S. Gutman, Esq.
9401 Wilshire Blvd., Suite 575
Beverly Hills, CA 90212

Kith Electronics Limited
1/F Hing Lung Commerical Building
68 Bonham Stand East, Hong Kong
CHINA

MPEG LA
6312 S Fiddlers Green Circle
Suite 400E
Greenwood Village, CO 80111

Counsel for MPEG LA
Michael H. Steinbuerg, Esq.
Sullivan & Cromwell LLP
1888 Century Park East, Suite 2100
Los Angeles, CA 90067