1   RON BENDER (SBN 143364)
    *rb@lnbyb.com*
2   PHILIP A. GASTEIER (SBN 130043)
    *pag@lnbyb.com*
3   JULIET Y. OH (SBN 211414)
    *jyo@lnbyb.com*
4   LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
5   10250 Constellation Boulevard, Suite 1700
    Los Angeles, California 90067
6   Telephone: (310) 229-1234
    Facsimile: (310) 229-1244
7

8   Proposed Counsel for Chapter 11 Debtor and
    Debtor in Possession
9

10              **UNITED STATES BANKRUPTCY COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12                  **LOS ANGELES DIVISION**

13

14  In re                              ) Case No. 2:10-bk-44406-SB
                                        )
15  APEX DIGITAL, INC., a California    ) Chapter 11
    corporation,                        )
16                                      )
                                        ) **DECLARATION OF DAVID JI IN**
17              Debtor.                  ) **SUPPORT OF DEBTOR'S EMERGENCY**
                                        ) **"FIRST DAY" MOTIONS**
18                                      )
                                        ) DATE:     August 23, 2010
19                                      ) TIME:     1:30 p.m.
                                        ) PLACE:    Courtroom "1539"
20                                      )           255 E. Temple Street
                                        )           Los Angeles, California
21                                      )
                                        )
22                                      )
                                        )
23

24          I, David Ji, hereby declare as follows:

25          1.      I am over 18 years of age. If called as a witness, I could and would competently

26  testify with respect to the matters set forth in this declaration from my own personal knowledge

27  or from knowledge gathered from others within the organization of Apex Digital, Inc., a

28

                                        1

California corporation, the debtor and debtor in possession herein (the "Debtor"), my review of relevant documents, or my opinion based upon my experience concerning the Debtor's operations.

## I.

## THE DECLARANT

2.     I am the Founder, President and Chief Executive Officer ("CEO") of the Debtor.

3.     I have served as the President and CEO of the Debtor since its inception in 1997. I was born and raised in the Jiangsu province of China, immigrated to the United States in 1987 as a graduate student and became an American citizen on November 8, 2000.  I earned my bachelors degree on July 20, 1975 from Fudan University in Shanghai, majoring in English and American Literature and my MBA from Pacific State University in Los Angeles, California, on September 14, 1991.

4.     I met my former business colleague, Ancle Hsu ("Ancle") in the early 1990s.  We formed a scrap metal business, United Delta, in 1992.  We expanded United Delta's business to sell consumer items that we imported from China.  Although we started with nothing, by 1994, I earned sufficient funds to bring my wife and daughter to the United States.

5.     As the Debtor's President and CEO, and with the assistance of the Debtor's Chief Operating Officer, Alice Hsu (who is not related to Ancle Hsu), I oversee and direct all of the Debtor's financial planning, financial reporting, and cash management activities, as well as human resources, information systems, and distribution.  I have also been serving, and will continue to serve, as the point person for the Debtor's efforts in this chapter 11 case.  While I do not manage the day-to-day input in the Debtor's books and records, I am familiar with how the data is inputted into the books and records and as CEO, I have worked extensively with the Debtor's books and records, including its financial statements and projections, business plan, business analyses and reports, royalty obligations, lease obligations, contracts and other legal documents, notes and correspondence, and the like.  On a regular basis, I have participated, witnessed or consulted in negotiations with lenders, vendors, and customers of the Debtor.

1  Based on all of the foregoing, I have developed an intimate familiarity over the past 13 years

2  with the Debtor's books and records which are maintained in the ordinary course of business

3  under my supervision, its business and financial history, its operations, its current business and

4  financial situation, and the financial and operational details of the Debtor's business operations.

5          6.      I submit this declaration in support of the relief that the Debtor has requested in

6  the various emergency "first day" motions that have been filed in this case, and to assist the

7  Court and other interested parties in understanding the circumstances that led to the

8  commencement of the Debtor's chapter 11 case.  I have reviewed the Debtor's first day motions,

9  and I believe that the relief sought in such motions will enable the Debtor to continue to operate

10 effectively during its transition to chapter 11, thereby avoiding or minimizing certain adverse

11 operational and financial consequences that might otherwise result from the commencement of

12 this case, and that the relief sought in such motions is essential to ensuring the uninterrupted

13 operation of the Debtor's business and the success of its case.

**II.**

14

**THE DEBTOR'S BUSINESS HISTORY**

15

16         7.      The Debtor is a privately held California corporation headquartered in Walnut,

17 California.  The Debtor opened its doors in 1997, and has proven itself a leading market force in

18 consumer electronics since that time.  Since its inception, the Debtor's mission has been and

19 continues to be to provide quality consumer electronics products for the average American at

20 competitive prices.

21         8.      From its start, the Debtor was one of the earliest companies to harness the then-

22 emerging Chinese original equipment manufacturer ("OEM") Original Designed Manufacturer

23 ("ODM") industry.  An OEM manufactures products or components that are purchased by a

24 company and retailed under the primary company's brand name.  An ODM is a company which

25 designs and manufactures a product which is specified and eventually branded by another firm

26 for sale.  Such companies allow the brand firm to produce (either as a supplement or solely)

27 without having to engage in the organization or running of a factory.  In late 1999, Ancle and I

28

3

1    decided to have the Debtor enter the DVD market.  The Debtor struck immediate success in

2    February 2002 when the retailer Circuit City bought 5,000 units and sold them almost

3    immediately.  Due to the Debtor's low price point and because at that time only the DVD player

4    that the Debtor produced could also play MP3 music discs, the Debtor's sales soared.

5            9.    The Debtor quickly revolutionized the electronics industry by also moving into

6    the LCD television business.  Ancle and I soon persuaded Wal-Mart, KMart, Best Buy and other

7    discount retailers to stock the Debtor's products.  The Debtor's revenues jumped from $120

8    million in 2000 to approximately $700 million in 2003.  In fact, *Time Magazine* recognized the

9    Debtor, Ancle and me for its extensive global influence and success and named me one of its

10   fifteen "global influentials" of 2002.  A copy of the *Time Magazine* article is attached as

11   Exhibit "1" hereto.  While its sales grew, the Debtor continued to keep a slim profit margin and

12   spent very little money on advertising.  Rather, the Debtor's success was based on aggressive

13   pricing, desirable features, and new product designs capable of being realized in 3 to 6 months

14   instead of the industry standard of two years.

15          10.    The Debtor continued its expansion into the television market in 2001, and in

16   2002, the Debtor entered into a purchase agreement with Sichuan Changhong Electronics Co.,

17   Ltd ("Changhong"), a state-owned television manufacturer in China.  The Debtor's successes

18   continued.  By 2003, the Debtor commanded a 10% share of the United States DVD player

19   market and its gross sales was approximately $700 million a year.  As more fully set forth below,

20   while the Debtor's relationship with Changhong was initially profitable, it later became the

21   major factor in its decline.

22          11.    As a result of my extensive industry contracts (established over a period of more

23   than a decade), the Debtor possesses a myriad of marketing channels.  The Debtor's business is

24   presently concentrated in two markets – consumer electronics and, more recently, green energy

25   in the form of solar powered lights.  With the former, the Debtor has focused on nationwide

26   consumer sales of LCD high definition television and converter set top boxes, along with other

27   consumer electronics product lines – all branded in its name through such large scale chains as

28

1  Best Buy, Costco, Target and Wal-Mart, while likewise utilizing regional forces, *e.g.*, Office

2  Depot.  The Debtor has also offered its products on the internet, through such outlets as Amazon

3  and Tiger Direct.

4          12.     The Debtor is well known for its ability to bring new innovations to the mass

5  consumer market.  The Debtor developed a new product line – portable consumer solar lighting

6  for outdoor safety and landscaping – branded under an XEPA product line.  Although solar lights

7  are relatively new, the Debtor recently filled an order of 48,000 units to Costco that generated

8  approximately $1.65 million in gross sales.  The Debtor has been contacted by other large

9  retailers to supply its solar lights and expects the same success with its solar lighting product line

10  as it has enjoyed with DVD players, televisions and set top boxes.  In fact, because solar lights

11  do not require as many licenses, the profit margins are higher and will most likely generate larger

12  net profits for the Debtor.  In addition, the Debtor expects to introduce several new models of

13  lights for different uses, ranging from solar motion detector lights to solar landscaping lights.

14                                          **III.**

15                  **EVENTS LEADING TO THIS CHAPTER 11 FILING**

16          13.     Despite its success, the Debtor started having financial problems in 2003.

17  Products such as DVD players and televisions require patent licenses, which many of the

18  manufacturers sought out and obtained.  As the consumer electronics market developed, margins

19  thinned for the Debtor as well as its competitors, and disputes and disagreements arose between

20  the Debtor and its manufacturers as to which party was to bear the cost of various licenses.

21          14.     In addition to this setback, by April 2003, the Debtor had paid Changhong $250

22  million but Changhong claimed it was owed over $200 million more.  The Debtor strongly

23  disputed this contention and relations between Changhong and the Debtor began to severely

24  deteriorate.  In 2004, a widely publicized debacle began when Changhong caused me to be

25  detained in China for over two years.

26          15.     While Changhong made a plethora of charges against me, I was never formally

27  charged with a crime.  I was exonerated of all charges.  However, I was not able to leave China

28

5

as my release was negotiated at the highest levels of government.  During this time, the Debtor effectively had no leadership.  My partner, Ancle, expressed frustrated with the substantial decline of the Debtor's business, especially in light of the baseless reasons for my detention.  Emotionally depleted, Ancle eventually transferred his ownership interests in the Debtor to me (or my affiliates) and left the consumer electronics industry altogether.  The Debtor's sales dramatically declined from hundreds of millions of dollars to $10 million in gross revenue by 2007.  To obtain my release, I was forced to sign numerous documents drafted by Changhong's attorneys that were intended to sign away all of the Debtor's legal claims against Changhong and assign all of the Debtor's assets to Changhong.  I was also forced to surrender many of my personal assets, including various interests in businesses, and to permit Changhong to obtain a lien against my personal residence and assets for over $400 million.  After two years of efforts on all fronts – including intervention efforts by President George W. Bush, Governor Arnold Schwarzenegger and other American political leaders in 2007, I was finally able to negotiate my release (with the assistance of counsel) which, for political reasons, required concessions from the Debtor and me personally.  The terms of my release were negotiated through a "Foundational Agreement" among Changhong, the Debtor and me, a true and correct of which is attached as Exhibit "2" hereto.  I returned to California in 2007.

16.     As set forth above and in the Foundational Agreement, Changhong was paid a substantial sum of money, and the Debtor was required to forfeit significant rights, including its ownership of the "Apex Digital" trademark.  A true and correct copy of the trademark assignment is attached as Exhibit "3" hereto.  Until recently, Changhong licensed the "Apex Digital" trademark back to the Debtor which it regularly renewed on an annual basis.  On or about July 9, 2010, the Debtor received a notice from Changhong that it would <u>not</u> renew the Debtor's license to use the "Apex Digital" trademark.  A true and correct copy of this letter, along with a certified translation is attached as Exhibit "4" hereto.  Accordingly, the Debtor's rights to use the "Apex Digital" trademark expired on July 24, 2010.  The Foundational

Agreement also provides Changhong with an "option" to acquire 70% of the equity in the Debtor with no further capital contribution.

17.    During the period of my detention in China, many of the Debtor's customers took note of the situation and simply stopped paying the Debtor in the hope that it would go out of business.

18.    The Debtor took immediate steps to deal with its financial decline. The Debtor sold its real property located at 2626 Vista Industrial Parkway, Rancho Dominguez, California (the proceeds of which went entirely to Changhong) and the real property that housed its former corporate headquarters and warehouse located at 2919 East Philadelphia Street, Ontario, California 91761. In an effort to cut costs, the Debtor leased a modest office and warehouse space located in Walnut, California and laid off over a hundred employees, leaving a bare-bones staff of fewer than 30 employees.

19.    After my return to the United States in 2007, I was determined to rebuild the Debtor, virtually from scratch. I built new relationships with new manufacturers in China. At the same time, I personally reached out to American retailers and reconnected with key customers such as Best Buy, Target, Costco and Walmart. The Debtor became well known for its set top boxes which became popular when the United States moved from analog to digital television broadcast transmission in June 2009. The Debtor again earned top honors in sales of set top boxes in the government program. In the two-plus years since my return, I have rebuilt the Debtor's operations and increased annual gross revenues, from approximately $10 million dollars to approximately $120 million in year 2009. However, because margins have dramatically thinned in the television distribution business, the Debtor has not been able to generate sufficient net revenue to satisfy its legacy debt.

20.    The Debtor's current problems arise from outstanding licensing fees due to various license holders, such as MPEG-LA, LLC ("MPEG") and Thomson. I believe that the Debtor's outstanding (disputed) unsecured royalty debt is approximately $32 million, a large portion of which is related to the Debtor's distribution of LCD televisions. Although the Debtor

disputes much of this debt for a variety of reasons, the Debtor has attempted to negotiate with the license owners since 2007 to pay off the legacy debt and, in some cases, enter into new licensing agreements.  Although the Debtor was successful in its negotiations with some of its creditors, like Wi-Lan and Philips, it was unsuccessful with others, like MPEG.  Against this backdrop, and given a string of recent adverse events noted below, it is now difficult for the Debtor to continue to distribute televisions.

a.    ***MPEG***.  MPEG is an administrator of patent licenses, primarily audio and video licenses, and licenses and collects royalties on behalf of numerous patent holders.  Various licensing disputes have arisen between MPEG and the Debtor since 2002.  The parties have settled on at least two occasions and the Debtor has paid more than $20 million to MPEG from 1997 to 2009.  Despite the Debtor's efforts to work with MPEG, MPEG filed a lawsuit in New York for breach of contract (a settlement agreement) which was ultimately re-filed and is currently presently in the Los Angeles Superior Court for the State of California (Case No. BC416816).  On June 28, 2010, the Superior Court entered its Minute Order/Ruling on MPEG's Application For Right of Attain Order ("Minute Order").  A true and correct copy of the Minute Order is attached as Exhibit "5" hereto.  Although MPEG claims that it is owed over $21 million, the Superior Court found that MPEG had failed to establish a "likelihood of success" for a majority of its asserted claim, and awarded a Writ of Attachment for less than $4 million.

b.    ***Jiangsu Hongtu High Tech Co., Ltd.*** ("Hongtu").  Hongtu is also a state-owned Chinese manufacturer (like Changhong).  On October 18, 2006, Hongtu obtained a Chinese arbitration award in the amount of $8 million.  Although the Debtor questioned the propriety of Hongtu's judgment, the foreign judgment was confirmed by the United States District Court on August 5, 2009 (Case No. CV 08-3102-GW(PLAx)).  A copy of the ruling in Motion/Petition To Confirm Foreign Arbitration Award is attached as Exhibit "6" hereto.  Hongtu has recently begun aggressively pursuing its judgment.  Specifically, on May 27, 2010, it served a notice of debtor examination on Alice Hsu (the

Debtor's Chief Operating Officer).  It is my understanding and belief that Ms. Hsu appeared for examination on June 15, 2010 and July 14, 2010, and produced documents as requested.  A copy of Hongtu's proof of service on Alice Hsu and the District Court's Civil Minutes are attached as Exhibits "7" and "8," respectively, hereto.

c.    ***Kith Default***.   Kith Electronics Limited ("<u>Kith Electronics</u>") is the Debtor's senior secured creditor.  Kith Electronics holds a blanket UCC-1 lien against substantially all of the Debtor's assets.  Presumably concerned with the threat to the Debtor's ongoing business operations, and the risk that its collateral would be seized by MPEG or Hongtu, on June 7, 2010, Kith Electronics served its Notice of Default on the Debtor.  A true and correct copy of the Notice of Default is attached as Exhibit "9" hereto.  On July 6, 2010, the Debtor received a further notice from Kith Electronics regarding the Debtor's default under the parties' Security Agreement, which indicated that Kith Electronics intended to seek judicial action against the Debtor and demanded that the Debtor segregate its collateral.  A true and correct copy of the July 6, 2010 notice is attached as Exhibit "10" hereto.

d.    ***Apex Digital Trade Name.***   As noted above, on or about July 9, 2010, the Debtor received notice that Changhong would not renew the Debtor's license to use the "Apex Digital" trade name, effectively barring the Debtor from using the "Apex Digital" trade name as of July 24, 2010 (<u>see</u>, Exhibit "4" hereto).  I believe that Changhong has granted the license to use the "Apex Digital" trademark (as of July 24, 2010) to one of Kith Electronics' affiliates.

21.    Given the recent expiration of the Debtor's license to use the "Apex Digital" trademark, which is associated with the Debtor's television and set top box products, the Debtor no longer has the financial wherewithal or ability to continue operating that part of its business related to the production, import and sale of televisions, set top boxes and related products (the "<u>Television Business</u>").  However, the Debtor has recently entered into an agreement with Kith Consumer Product, Inc. ("<u>Kith Consumer</u>"), an affiliate of Kith Electronics, which provides for

(i) the transfer to Kith Consumer of the Debtor's inventory, accounts receivable and other related assets used in the Debtor's Television Business in exchange for the assumption by Kith Consumer of a certain portion of the debt owed by the Debtor to Kith Electronics, and (ii) Kith Consumer's retention of the Debtor as its consultant to provide, among other things, business and product development services and customer service and warranty services for certain consumer electronic products. It is my understanding and belief that Kith Consumer has acquired or will acquire the rights to the "Apex Digital" trade name. I believe that the Debtor's agreement with Kith Consumer will enable the Debtor to utilize and monetize its pipeline connections as a consultant, notwithstanding its current inability to operate the Television Business. The Debtor will continue to retain its lighting business and other assets.

22.    In short, the Debtor has filed this chapter 11 case for two primary reasons. It has become increasingly apparent to me that the Debtor will not be able to resolve its legacy debt in a consensual and feasible manner. Also, given the ongoing litigation against the Debtor, the recent loss of the Debtor's license to use the "Apex Digital" trademark, and Kith Electronics' declaration of default and related demands, it has become difficult, if not impossible, for the Debtor to continue operating its Television Business. However, through its chapter 11 bankruptcy case, the Debtor seeks to modify its business plan to enable it to utilize and monetize its pipeline connections as a consultant to Kith Consumer (which I expect will provide the Debtor with a significant amount of revenue), focus on growing its green energy lighting product line, deal with the licensing disputes that have continued to plague the Debtor, and restructure the Debtor's legacy debt and obligations to Changhong in a cohesive and efficient manner.

## IV.

### THE DEBTOR'S LIABILITIES

23.    It is my understanding that the four creditors described below have recorded financing statements with the California Secretary of State against the Debtor asserting liens upon substantially all or a portion of the Debtor's assets.

a.   The CIT Group/Commercial Services, Inc. ("CIT").  The Debtor and CIT were parties to a Factoring Agreement dated as of December 17, 2001.  To secure the Debtor's obligations under such Factoring Agreement, the Debtor granted to CIT a lien and security interest upon certain accounts receivable and related assets as collateral for the Debtor's obligations to CIT.  Thereafter, the Factoring Agreement with CIT was terminated and CIT agreed that its collateral would be limited only to accounts receivable created on or prior to January 1, 2008, any merchandise represented thereby (delivered or undelivered) and any proceeds thereof.  Based on the Debtor's books and records, the Debtor's current assets do not include any of the accounts receivable covered by CIT's financing statement and the Debtor owes no money to CIT.

b.   Kith Electronics.  Since approximately February, 2008, Kith Electronics has provided financing to the Debtor to, among other things, purchase inventory.  To secure these obligations, the Debtor granted to Kith Electronics a lien and security interest upon substantially all of the Debtor's assets as collateral for the Debtor's obligations to Kith Electronics.  A true and correct copy of the Security Agreement between the Debtor and Kith Electronics is attached as Exhibit "11" hereto.  Based on the Debtor's books and records, as of August 13, 2010, the outstanding principal amount owed to Kith Electronics was $12,067,734.80 plus attorney's fees in the amount of $130,395.25.

c.   Wells Fargo Trade Capital, LLC ("Wells").  The Debtor and Wells were parties to a Factoring Agreement (Collection) dated as of 2009 (the "Wells Factoring Agreement").  A true and correct copy of the Wells Factoring Agreement is attached as Exhibit "12" hereto.  To secure the Debtor's obligations under the Wells Factoring Agreement, the Debtor granted to Wells a lien and security interest upon the Debtor's presently existing and thereafter created receivables, general licenses, permits, property, tangible or intangible, at any time in Wells' possession or subject to Wells' control as collateral for the Debtor's obligations to Wells.  On or about January 21, 2010, the Debtor exercised its rights under the Wells Factoring Agreement and terminated such

agreement.    A true and correct copy of the letter terminating the Wells Factoring Agreement is attached as Exhibit "13" hereto.  Based on the Debtor's books and records, no money is owed to Wells.

        d.     The HongKong and Shanghai Banking Corporation Limited ("HSBC"). The Debtor and HSBC were parties to that certain Assignment of Factoring Proceeds (No Advances) Agreement dated as of February 9, 2009 (the "HSBC Assignment Agreement"), which agreement relates to the Wells Factoring Agreement, specifically to provide for the assignment to HSBC of 80% of the monies due or to become due to the Debtor under the Wells Factoring Agreement.  A true and correct copy of the HSBC Assignment Agreement is attached as Exhibit "14" hereto.  To secure the Debtor's obligations under the HSBC Assignment Agreement, the Debtor granted to HSBC a lien and security interest upon the 80% portion of all proceeds, monies, credit balances and claims for monies due or to become due to the Debtor under the Wells Factoring Agreement as collateral for the Debtor's obligations to HSBC.  As previously noted, the Debtor terminated the Wells Factoring Agreement on January 21, 2010 (see, Exhibit "13" hereto).  Given the termination of the Wells Factoring Agreement and the Debtor's belief that no money is owed to Wells, it follows that no money is owed to HSBC.

24.     In addition, as previously noted, in connection with the state court litigation involving the Debtor and MPEG, the Superior Court awarded to MPEG a pre-judgment Writ of Attachment in the sum of $3,946,678.  It is my understanding that, on or about July 31, 2010, MPEG executed its Writ of Attachment and levied against funds contained in the Debtor's bank accounts maintained at Hanmi Bank, in the total sum of $72,073 (the "Levied Funds").  It is further my understanding that Kith Electronics has asserted a third-party claim to the Levied Funds and that the Levied Funds are being held by the Los Angeles County Sheriff pending a disposition regarding Kith Electronics' third-party claim.  I do not believe that any of the Debtor's other assets have been attached pursuant to MPEG's Writ of Attachment.

25.    Based on the foregoing, I believe that it is only Kith Electronics which may have a valid and enforceable lien on the Debtor's cash and assets.

26.    In addition to the amount outstanding to Kith Electronics, the Debtor's books and records reflect liabilities totaling approximately $44 million.  This includes Hongtu's judgment in the amount of $8 million, royalty liability of approximately $32 million (most of which is disputed by the Debtor), and other accrued expenses and liabilities totaling approximately $4 million.

## V.

## THE DEBTOR'S ASSETS

27.    Television Inventory.  Based on the Debtor's books and records, the current value of the inventory relating to the Debtor's Television Business, at cost, is approximately $2,734,836.69.  A summary of the Debtor's inventory relating to the Television Business is provided in Exhibit "A" to the Declaration of Alice Hsu filed concurrently herewith (the "Hsu Declaration").  As noted above, the Debtor recently entered into a settlement agreement with Kith Consumer which I understand will be subject to separate Court approval, pursuant to which the Debtor proposes to sell its inventory and receivables relating to its television distribution business, and enter into a consulting agreement with Kith Consumer which will provide a future revenue stream to the Debtor.  The Debtor will also retain its lighting business and other assets. The Debtor's settlement agreement with Kith Consumer provides for the sale of the Debtor's inventory relating to the Television Business for approximately the value set forth herein.

28.    Customer and Warranty Services Inventory.  Based on the Debtor's books and records, the current value of the inventory relating to the Debtor's customer and warranty services (for the Television Business or otherwise), at cost, is approximately $319,221.18.  A summary of the Debtor's inventory relating to the Debtor's customer and warranty services business is provided in Exhibit "A" to the Hsu Declaration.

29.    Lighting Inventory.  Based on the Debtor's books and records, the current value of the inventory relating to the Debtor's green energy lighting business, at cost, is approximately

$49,476.01. A summary of the Debtor's inventory relating to the lighting business is provided in Exhibit "A" to the Hsu Declaration.

30.  <u>Television Receivables</u>.  Based on the Debtor's books and records, the aggregate face value of the accounts receivable relating to the Debtor's Television Business is approximately $8,422,749.90.  A summary of the Debtor's accounts receivable relating to the Television Business is provided in Exhibit "B" to the Hsu Declaration.  Based on historical collection rates, I believe that approximately 95% of these accounts receivable are collectable, resulting in an estimated current value of $8,001,612.40.  The Debtor's settlement agreement with Kith Consumer provides for the sale of the Debtor's accounts receivable relating to the Television Business for approximately the value set forth herein.

31.  <u>Lighting Receivables</u>.  Based on the Debtor's books and records, the aggregate face value of the accounts receivable relating to the Debtor's green energy lighting business is approximately $1,494,740.54.  A summary of the Debtor's accounts receivable relating to the lighting business is provided in Exhibit "B" to the Hsu Declaration.  Based on historical collection rates, I believe that approximately 95% of these accounts receivable are collectable, resulting in an estimated current value of $1,420,003.51.

32.  <u>Fixed Assets and Equipment</u>.  Based on the Debtor's books and records, the current market value of the Debtor's fixed assets and equipment (after accounting for depreciation) is approximately $160,000.  A summary of the Debtor's fixed assets and equipment is provided in Exhibit "C" to the Hsu Declaration.

33.  Based on the Debtor's books and records, I believe that the aggregate market value of the Debtor's inventory, accounts receivable, fixed assets and equipment which serve as collateral for Kith Electronics is approximately $12,685,149.79.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of August 2010 at Walnut, California.

DAVID JI

# EXHIBIT "1"

**TIME** | Nation | World | Business | Arts | Sci-Health | Photos | Current Issue | Search

The oils in Wish-Bone® dressings help the body better absorb vitamins A & E from salad

Italian

► GET TYLER'S RECIPES

Sponsored By
ADVERTISEMENT

## 2002 Global Influentials



JOE TORENO FOR TIME

MORE INFLUENTIALS:   Select a Profile  ▼

• **Company Website:** Apex Digital

>> Complete List
>> 2001 Global Influentials
>> CNN: Watch video for this year's influentials
>> CNN: Play the CEO match game
>> CNN: CEO Profiles

# DAVID JI & ANCLE HSU
**Founders of Apex Digital**

✉ E-Mail a Friend

There was a time, only about 15 years ago, when David Ji, co-founder of Apex Digital, the top-selling maker and importer of DVD players, couldn't rent a movie. When he was a graduate student and part-time house painter, Ji says, "I wanted a VCR, but I couldn't afford to buy one."

Until recently, many Americans felt the same way about a DVD player. The digital successor to the VCR was a luxury item, costing hundreds of dollars on average. But that was before Ji, 50, and his partner, Ancle Hsu, 41, burst into the home-electronics market. Since Apex introduced its first model in early 2000, for $179, the price of DVD players has plummeted. Apex, based in Ontario, Calif., remains a low-price leader, with its basic units now selling for about $59 at large retailers like Circuit City and Wal-Mart. The fledgling company has captured 15% of the market, making it No. 1 in units sold this year, surpassing Sony and Panasonic.

The meteoric rise of Apex Digital, expected to exceed $1 billion in sales in 2002, has stunned the industry. Says Richard Doherty, research director for the Envisioneering Group, a technology consultancy located in Seaford, N.Y.: "This is a true overnight success story."

In reality, the story of Ji and Hsu is more one of dogged, thrifty perseverance. The two became friends in the late 1980s working for a Los Angeles scrap-metal business that exported to China. Hsu was a Taiwanese immigrant who arrived in 1984. Ji came to Los Angeles as a graduate student in 1987, having recently earned his M.B.A., and was sending money home to his wife and daughter in Shanghai.

The two formed a scrap-metal business of their own, then started a side business importing speakers and amplifiers, and later DVD players, from China. The first units they imported and sold through Circuit City differed from others sold in the U.S. at the time in that they could play MP3 files. The players also sported a quirk Ji and Hsu say they were unaware of: a manufacturing error allowed users to copy DVDs to videotape and override coding that prevents DVDs of films from being viewed in countries where they have not been released.

Apex quickly fixed the problem, but by then the brand had developed a certain rogue hipness among illicit copiers of films on DVD. "We noticed on our website that a lot of people were searching for Apex," says Rick Souder, a Circuit City vice president. But the key to Apex's rapid growth was its rock-bottom prices, which were achieved by working closely with low-cost Chinese producers, accepting slim profit margins and skimping on advertising.

Ji and Hsu are expanding the Apex brand. They launched a television line earlier this year and are looking into digital cameras and air conditioners. Both men rack up loads of frequent-flyer miles across the Pacific. "I'm much busier than I want to be," says Hsu, the father of a girl, 8, and a boy, 4. He likes to spend his downtime watching cartoons with the kids and teaching his daughter to roller-skate.

Ji, a slight man who accompanies handshakes with a subtle bow, has yet to embrace the trappings of executive life. His daughter, Jean, 24, who with her mother joined Ji in 1994, says her father eschews luxury items. A Cartier watch, a gift from Hsu, sits ignored in a drawer while Ji continues wearing the same beat-up Swiss-made Cyma timepiece that he's been changing wristbands on for at least a decade. An employee was recently shocked to find Ji, ever practical, scrubbing the men's room at company headquarters. Such modesty fits nicely with Apex Digital's products, which, Ji and Hsu say, are "for the average American"—for people like themselves.

—*By Leslie Berestein/Ontario*

>> Next:  Naina Lal Kidwai, Investment Banking, HSBC

QUICK LINKS: Global Influentials Index | Global Business | Business Main Index | TIME.com Home | CNN.com Home



FROM THE NOV. 30, 2002 ISSUE OF TIME MAGAZINE; POSTED SUNDAY, NOV. 22, 2002

Copyright © 2010 Time Inc. All rights reserved.
Reproduction in whole or in part without permission is prohibited.

Subscribe | Customer Service | FAQ | Site Map | Search | Contact Us
Privacy Policy | Terms of Use | Reprints & Permissions | Press Releases | Media Kit

# EXHIBIT "2"

注意保密

《美国 APEX 公司与四川长虹公司贸易纠纷》

# 和解框架协议及附件协议

（2006 年 04 月 11 日）



四川川达律师事务所
Sichuan Chuanda Law Firm
地址(ADD)：成都市科华北路65号桥南锦园四楼
邮编(P.C)：610041
电话(TEL)：86—028—85268606
传真(FAX)：86—028—85224098
电邮(E-mail)：chuanda_lawfirm@hotmail.com

# "美国 APEX 公司与四川长虹公司贸易纠纷"

# 和解框架协议及附件协议

## 目　录

**中文版**

**一、《和解框架协议》**

说　明·······························································1

1、总纲·······························································2

2、合同事项·························································4

3、法律适用及其管辖···········································8

4、违约责任·························································8

5、生效与效力·····················································8

6、其他条款·························································9

**二、《附件协议》**

1、APEX　DIGTAL 标识·····································10

2、商标转让协议···················································11

3、不动产转让协议···············································14

4、债权转让协议···················································17

5、股权转让协议···················································20

6、中华数据广播控股有限公司（以下简称 CDB）改组协议（草案）··········· 23

7、撤回诉讼协议书···············································26

**三、《特别约定》**···················································31

## English Version

**1.Foundational Agreement**

1.1 Recital·····························································32

1

1.2 Compendium ··························································································32

1.3 Contractual Stipulations ·······································································35

1.4 Governing Law and Jurisdiction ···························································39

1.5 Liabilities for Breach of Contract ·························································40

1.6 Execution and Effectiveness ·······························································40

1.7 Other Articles ·····················································································40

**2. Attachment Agreements:**

(1)Logo of "APEX DIGITAL" ·····································································42

(2)"Trademark Transfer Agreement" ·························································43

(3)"Real Estate Transfer Agreement" ·······················································46

(4)"Creditor's Rights Transfer Agreement" ···············································49

(5)"Stock Transfer Agreement" ·································································52

(6)"Restructuring of CDB Agreement " ·····················································55

(7)"Withdraw Action Agreement and Releases" ··········································58

2

"美国 Apex 公司与四川长虹公司贸易纠纷"

# 和解框架协议

## （Foundational Agreement）

签约时间：2006 年 4 月 11 日

签约地点：中国 · 四川 · 成都

甲　　方：中国四川长虹电器股份有限公司（以下简称长虹公司）
住　　所：中国四川绵阳市高新区绵兴东路 35 号 （邮编：621000）
电　　话：0086-（0）816-2418239
传　　真：0086-（0）816-2418618

乙　　方：Apex Digital Inc. （以下简称 Apex 公司）
住　　所：301 Brea Canyon Road Walnut, CA 91789
电　　话：001-909-923-8686
传　　真：001-909-923-9676

丙　　方：季龙粉先生（Apex 公司董事长，以下简称季先生）
住　　所：2581 Carlton Place Rowland Heights, CA 91748, USA

## 说　明：

（一）长虹公司位于中国四川，是依据中国法律成立，从事家用电器生产和销售的上市公司。 Apex 公司位于美国加利福尼亚州，是依据该州法律成立，专业从事家用电器生产和销售的有限责任公司。季龙粉先生为美国加州公民。

（二）本协议及附件协议由中、英文字写成，如果两种文本存在差异，以中文文本为准，但除附件协议七之外。

（三）为达成和解，解决先前贸易纠纷并安排未来合作，协议当事方缔结本协议。

I

# 一、总纲

## （一）事实

1.长虹公司与 Apex 公司自 2001 年 9 月开始合作，共同开辟美国市场。从 2002 年至 2004 三年间，长虹公司向 Apex 公司提供了总价值约为 11.7 亿美元的视听产品，包括电视机和 DVD 机等。

2. 截至 2004 年 12 月 31 日，经协议当事方财务对账，长虹公司向 Apex 公司销售货物中尚有价值约 4.72 亿美元的货物没有从 Apex 公司处收到相应的货款。到 2005 年 9 月为止，Apex 公司向长虹公司退回了价值约 1,400 万美元货物。

3. 长虹公司要求 Apex 公司如数支付 458，598，101.40 美元货款； 而 Apex 公司称其承担了三亿多美元的专利费、退货费、仓储费及 "反倾销"[①] 等损失，只愿意偿还 1.5 亿美元。

4、2004 年 12 月，长虹公司以 Apex 公司违反合同为由向加州高等法院(Superior Court of California, County of Los Angeles)提起民事诉讼要求 Apex 公司偿还全部债务；2005 年 1 月，Apex 公司对长虹公司的请求提出抗辩，并在同一法院以长虹公司为被告提起反诉。因协议当事方争议太大，该案至今未决。[②]

5、2005 年 6 月，Apex 公司和季先生向长虹公司提供了三部分资产作为其承认的 1.5 美元欠款的担保并签署了三份资产的《担保协议》：一是 Apex 公司的仓库（位于 2626 Vista Industrial Parkway, Rancho Dominguez California, 90221）；二是香港中华数据的股权，共计 222,897,340 股；三是 Apex 公司的商标。[③]

## （二）债权债务处理

1、为了避免旷日持久的诉讼带来两败俱伤的结果，协议当事方决定抱着 "向前看" 的态度，搁置部分争议，从实际出发，通过和解的方式解决标的为 458，598，101.40 美元的债务纠纷。

2、Apex 公司愿意承担对长虹公司的 1.7 亿美元未付债务。Apex 公司和季先生同意：

（1）按照 2005 年 6 月的《担保协议》[④]，Apex 商标、不动产[一座仓库（位于 2626 Vista Industrial Parkway, Rancho Dominguez California, 90221）]、旗

---

[①] Apex 公司称：专利费：78，161，591.76 美元（支付给菲利浦等十多家外国公司）；专利侵权纠纷的诉讼费用：9，388，116.39 美元；因专利纠纷及其它因素被迫降价造成的损失：67，766，159.78 美元；运输仓储方面的损失：66，495，676.11 美元；因质量瑕疵造成的退货损失：90，370，697.10 美元； 因零部件缺失和售后服务脱节造成的损失：10，493，427.43 美元；因 "反倾销" 造成的损失：尚未统计完整。

[②] 具体内容，参见相关诉讼文书。

[③] 具体内容，参见《担保协议》。

[④] 见 2005 年 6 月 30 日 Apex 和长虹之间的协议；2005 年 6 月 30 日 Apex 与长虹之间的 CDB 股份

下控股公司 CDB 相应的股份给个人持有的股票作为 Apex 公司对长虹公司债务的担保物，长虹公司已拥有上述担保物完整无瑕疵的担保权益，长虹公司自《担保协议》生效之日起就该担保物享有优先受偿权。此处这三项资产的转让系长虹对担保权利的实现。根据本《和解框架协议》及其附件协议将担保物转让给长虹公司，是长虹公司履行撤诉及其他义务的前提条件。

（2）用 Apex 公司对第三方的债权、存货及出售存货的现金抵偿上述债务。

3、为妥善解决对余下的 288，598，101.40 美元差额的争议，长虹公司同意在以下条件下放弃对 Apex 公司的追索权利：

（1）在本协议生效之日起 6 个月内，Apex 公司和季先生向长虹公司提供合法、真实、准确、完整的 Apex 公司财务资料，开放全部电子财务资料，配合长虹公司进行尽职调查（Due Diligence）；

（2）Apex 公司和季龙粉先生在本协议生效之日起两个月内，履行本协议及附件协议约定的：a.Apex 商标转让；b.CDB 股权转让；c.仓库不动产转让义务并完成这三部分资产的过户，但出现不符合法律规定或客观条件等不可抗力的情形除外；

（3）Apex 公司及季先生依据美国的法律承诺豁免并撤销在美国对长虹的反诉；

（4）为表明履行的诚意和合作的需要，季先生同意在离开中国（包括中国大陆、中国香港及澳门）前完成上述第（2）和（3）条约定的义务。

4、长虹公司承诺：Apex 公司和季先生用上述资产冲抵债务的同时，保证季先生持有现有 CDB 股份的 14%（即 44，520，000 股），该部分股份不纳入 Apex 公司和季先生冲抵债务的范围。

（三）合作与发展

1、基于以上事实与前提，本协议生效后 6 个月内，作为 CDB 股东的 Apex 公司、季先生及长虹公司将合力以中华数据广播控股有限公司(CDB)为平台开展业务合作。一方面，长虹公司将受让的 Apex 商标品牌许可 CDB 与 Apex 公司使用；另一方面，本协议生效后 6 个月内，季先生和 Apex 公司将海外客户网络、原材料供应渠道、以及 Apex 公司拥有的技术设计能力、物流管理网络及下属子公司 CDB（包括 CDB 的子公司美国 Apex LLC、香港 Apex）和上海 Apex 公司均统一纳入 CDB 所有、控制、运营，使其成为 CDB 可支配的资源。



担保品协议（该协议还另外由季龙粉先生签署）；2005 年 6 月 30 日 Apex 和长虹之间的商标担保品协议；以及 and Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing made 2005 年 6 月 30 日 Apex 作为受托人为受益人长虹签署的信托契据、租金转让、担保品协议和固定备案。

3

2、重组后 CDB 的经营模式以中国国内制造商巨大的生产能力（全球生产基地）为依托，CDB 将作为中心企业，对物流过程涉及的运输、仓储、分拣包装、装卸搬运、质量控制、信息共享等各个环节协同管理，努力使 CDB 成为以 Apex 品牌（市场）为中心，以研发设计为强项，集技术应用、质量控制、原材料供应与物流管理于一体的公司。

3、本协议生效后，协议当事方将以书面的方式同意及时发布共同认同的新闻稿，宣布长虹公司与 Apex 公司的贸易纠纷已达成全面和解并提供相关信息。除此之外，各方不得就本协议及附件协议或彼此之间任何的在先争议或行为发表言论，法律规定或各方事先书面同意的情形除外。但是，各方有权在第 BC325923 号民事诉讼中向加州高等法院公开本协议，用于提出诉讼中止的动议，以及共同要求法庭裁定该协议系《加州民法典》第 877 条和第 877.6 条意义上的善意下订立的。

4、季先生将不对长虹或季先生所知的长虹现任或前任关联机构、代理机构、负责人员、主管人员或雇员发表负面言论或采取不友好的行动，无论是采取直接还是间接方式。

5、Apex（包括但不限于其负责人员和主管人员）将不对长虹或 Apex 所知的长虹现任或前任关联机构、代理机构、负责人员、主管人员或雇员发表负面言论或采取不友好的行动，无论是采取直接还是间接方式。

6、长虹（包括但不限于其负责人员和主管人员）将不对 Apex 或长虹所知的 Apex 现任或前任关联机构、代理机构、负责人员、主管人员或雇员进发表负面言论或采取不友好的行动，无论是采取直接还是间接方式。

7、长虹（包括但不限于其负责人员和主管人员）将不对季先生发表负面言论或采取不友好的行动，无论是采取直接还是间接方式。

## 二、合同事项

### （一）商标转让与许可

1、Apex 公司将 Apex 商标转让给长虹公司以折抵其所欠长虹公司的债务，长虹公司享有 Apex 商标的权利、资格、所包含和相关的权益，包括（i）商标"APEX"，美国专利商标局序号 76433372；（ii）商标"APEX DIGITAL"，美国专利商标局序号 76020515；美国专利商标局注册号 2636367；(iii)附件 1 所列出的"APEX DIGITAL"标识设计。

2、该品牌具体价值以具备法定资格的中国境内评估机构的评估结果为准，但是该商标的抵偿债务的价值不高于 9000 万美元。

4

3、根据本协议总则，商标受让后的商标将许可香港 CDB 使用。许可费
每 5 年根据许可协议的条款和条件调整一次，在本协议生效后的第一个 5 年期，每
年许可费按 CDB 经会计师事务所审计的年终财务报表载明的年纯利润的 1%收取。

4、长虹公司同时应将该商标许可给 Apex 公司使用，以使 Apex 公司能继续使用
该商标在美国开展业务，但需就商标使用事宜接受长虹公司对产品质量的监督。许
可期限为本协议生效之日起 1 年。如有特殊情况，Apex 公司需继续使用 Apex 商标，
则由当事人另行协商。

5、该商标的转让协议和过户手续原则上应于本协议生效之日起两个月内完成，
但出现不符合法律规定或客观条件等不可抗力的情形除外。

商标转让具体协议条款由协议当事方另行商定。（详见附件 2"商标转让协议"）

## （二）不动产转让

Apex 公司所拥有的一座购进价值 9,000,000.00 美元的仓库及其所附着之土地
（位于 2626 Vista Industrial Parkway, Rancho Dominguez California, 90221）
以协议当事方共同认可的具备法定资格的美国境内评估机构（该评估机构由 Apex 公
司负责选择）所评估的价值转让给长虹公司或者出售给第三方所得价款用于偿还所
欠长虹公司的债务。但鉴于该资产上的在先权利状况不明，如有第三人在先权利情
形，协议当事方同意以最终实现价值为准。



不动产转让具体协议条款由协议当事方另行商定。（详见附件 3"不动产转让协议"）

## （三）债权转让

1、在本协议生效后 6 个月内，Apex 公司将继续对其应收账款享有权利，并可
努力清收此应收账款，在用于维持 Apex 公司的正常开支外，将剩余金额用于抵偿其
对长虹公司的欠款。其后，Apex 公司同意将其债权转让给长虹公司以折抵债务，并
有义务向长虹公司提供全部债权的有关文契票据及其他书面或非书面的信息资料。

2、长虹公司将根据债权资料和信息有选择地接受 Apex 公司的部分债权转让。
对于未转让的债权，Apex 公司和季先生有义务清收用于折抵 Apex 公司对长虹公司
的欠款；对于转让给长虹公司的债权，将由长虹公司自己或者委托 Apex 公司和季先
生清收。

3、鉴于债权形成的多样性以及转让的复杂性，债权清收工作应于本协议生效之
日起 1 年内完成，具体抵偿债务的数额以长虹公司实际收到的数额为准。

债权转让具体协议条款由当事方另行商定。（详见附件 4"债权转让协议"）

## （四）股权转让

5

1、Apex 公司和季先生共持有 CDB70.09%的股份（Apex：51.95%，季先生：18.14%）。[①]Apex 公司和季先生承诺转让 CDB56.09%的股份（计 178，377，340 股）用于抵偿其欠长虹公司的债务。

2、其中直接转让给长虹公司 CDB29.9%股份（计 95,399,999 股），具体抵偿债务的数额按 CDB 复牌后一年的平均交易价格计算。

3、剩余的约 26.09%的 CDB 股份（计 82,977,341 股）优先按以下方案一折抵长虹公司的债务，若方案一无法执行或执行中遭遇障碍，则按下列方案二执行：

方案一：由 Apex 公司、季龙粉先生同长虹公司一起联系第三方（出价高者优先）以每股不低于 1.44 元港币的价格购买，且由该第三方直接将股权转让款支付给长虹公司以折抵 Apex 公司对长虹的欠款。具体冲抵金额以长虹公司实际取得的股权转让款数额为准。

方案二：Apex 公司和季先生承诺向长虹出具认股权证。具体条款按香港联交所的惯例另行商定。

4、Apex 公司和季先生有义务担保所转让股权无瑕疵。同时，在股权转让时 Apex 公司和季先生应对持有的 14%的 CDB 股权持股作合理安排。

5、如因上述约定可能导致香港联交所及其他监管机构根据有关规定要求长虹公司承担"全面收购义务"，则由协议当事方另行议定。

股权转让具体协议条款由协议当事方另行商定。（详见附件 5"股权转让协议"）

（五）存货及存货出售现金的转让

为偿还欠款，Apex 公司和季先生应将其原库存货物及已销售存货所得现金支付给长虹公司，同时将协议当事方根据提存协议（Escrow Letter）已经保存和应当保存在 Powell Goldstein 律师事务所处的存货销售金额支付给长虹公司。其中保存在 Powell Goldstein 律师事务所处的存货销售金额在本协议生效之日起 2 个月内转让完毕；其余部分在本协议生效之日起 6 个月内转让完毕。最终抵偿金额以长虹公司实际取得数额为准。

（六）CDB 改组

1、股权结构调整。按本协议第二条第（四）项的原则处理。

2、资本资源重组。按本协议第一条第（三）项的原则处理。

---

[①] CDB 于 2000 年 1 月在香港联合交易所的创业板上市。公司已发行在外普通股总数为 318,000,000 股（股份代号：8016HK）。历经数度交易，截至本协议签订之时，Apex 公司持有 51.95%的股份（165,197,340 股），Apex 董事长季龙粉先生个人持有 18.14%的股份（57,700,000 股），其他市场流通股共占 29.91%（95,113,800 股）。

6

3、决策机构人事调整。鉴于上述解框架协议有效执行和公司整合的实际需要，改组后 CDB 董事会设 9 名董事，包括 6 名董事及 3 名独立非执行董事。长虹公司推荐 3 名董事，Apex 公司推荐 3 名董事（其中包括四川川达律师事务所推荐 1 名董事）。Apex 公司推荐的董事负责推荐长虹公司推荐的董事之一任公司董事长。另外三名独立非执行董事由股东大会按照香港联交所对上市公司的相关要求，选拔合格人士担任。改组后的 CDB 内部组织结构设置由董事会决定。

4、执行机构人事调整。为使 CDB 平稳过渡并快速投入营运，应尽量维持 CDB 原有经营班子的稳定性。CDB 总裁及 CDB 财务总监由长虹公司提名。长虹公司承诺，在 CDB 改组时，长虹方推荐的董事负责提名、推荐季先生在 CDB 的高层执行机构中担任重要职务。公司法定秘书及其他职能部门经理可维持不变，或根据实际需要，面向社会公开择优聘用。

5、长虹如因 Apex 股份的转让而被香港联交所及其他监管机构按照《公司收购及合并守则》的规定要求履行全面收购义务，且上述约定如有不符合香港联交所的有关规定，则由协议当事方另行协商处理。

CDB 具体改组方案由协议当事方另行商定。

（详见附件 6 香港"中华数据广播控股有限公司改组协议"）

（七）债权债务的消灭与 Apex 公司股权转让

1、Apex 公司和季先生无论用现金或者资产在本协议生效后一年之内完成了对长虹公司 1.7 亿美元的清偿，Apex 公司与长虹公司 1.7 亿美元的债权债务关系即全部消灭；

2、在 Apex 公司和季先生在本协议生效后一年之内不能完全支付长虹公司 1.7 亿美元的前提下，季先生同意转让其在 Apex 公司股份的 70%作为未结差额债务的清偿。在经长虹公司尽职调查的前提下，长虹公司有权选择是否接受及如何接受该部分股份的权利。在季先生向长虹公司转让 70%的股权，且经长虹公司确认 Apex 公司没有其他可供抵债的财产后，Apex 公司与长虹公司 1.7 亿美元的债权债务关系即全部消灭；如长虹选择不接受上述股份，该债务亦同样消灭。

（八）终止诉讼

协议当事方将按照附件协议七的规定撤销在美诉讼（民事案号 BC 325923，加州洛杉矶郡高等法院）。协议当事方互向对方承诺在遵循本协议及附件协议的基础上 Apex 公司及其人员豁免并撤销对长虹的诉讼，并永不再就协议当事方的债权债务关系及与之相关的其他事件对协议当事方及人员提出诉讼。

具体协议条款由协议当事方另行商定。（详见附件 7"终止诉讼协议"）

7

1、在本协议及所有附件协议约定的权利义务被履行完毕前，Apex 公司或季先生不得自愿提请破产；亦应采取措施以避免其不被任何第三方提请破产；

2、协议当事方应本着诚信合作的精神，认真履行本协议所约定的事项。 Apex 公司应向长虹公司说明 Apex 公司真实财务状况，并提供 CDB 会计报表、财务对账单及其他一切履行合同义务所必要的登记材料和证明文件，同时办理相关资产过户所需的有关手续。另一方面，长虹公司也负有配合的义务，应提供善意的协助，以便利 Apex 公司及季先生履行合同。

3、在 CDB 及 Apex 公司的股权过户完毕之后的三年内，季先生不得以任何方式转移其所持 CDB 股份和 Apex 公司股份，也不得在此期间辞去在 CDB 和 Apex 公司内的职务或从事同 CDB 和 Apex 公司存在竞争关系的业务活动。如违反此条约定的义务，季先生无条件向长虹公司转让 6%CDB 股份（19，080，000 股）作为赔偿金。

### 三、法律适用及其管辖

（一）本协议适用中华人民共和国法律，但法律另有规定的除外。

（二）因本协议以及其附件协议的签订、生效、解释、履行及任何相关事宜而引发的争议，协议当事方首先应协商调解，协商不成，则约定提交北京中国国际贸易促进委员会（CCPIT）的中国国际经济贸易仲裁委员会（CIETAC）依照其仲裁规则进行仲裁。仲裁裁决是终局的，对协议当事方都有约束力。

### 四、违约责任

任何一方如不按约定的方式在约定的期限内履行相应的义务，即视为违约。其他违约事件的构成及违约责任的追究，由协议当事方在一系列附件协议中另行约定。如无约定，则比照中华人民共和国相关法律。

### 五、生效与效力

（一）本框架协议及除附件协议七之外的其他附件协议自当事方收到他方"协议生效确认书"之日即告生效（具体参见《协议生效特别约定》），自生效之日起即对协议当事方均产生同等约束力。附件协议七自签署之日起生效，但如果《协议生效特别约定》规定的期限届满后当事方未收到他方"协议生效确认书"，则附件协议七自始无效。本协议及附件协议非经协议当事方书面同意不得变更。

（二）附件协议与本框架协议同时签署。附件协议与本框架协议具有同等法律效力，但是附件协议不得与本协议冲突，否则附件协议中与本协议冲突的内容无效。附件协议被违反或未得到履行，本协议仍然有效。

8

（三）自本框架协议及其附件所议及履行完毕，所有当事方债权债务消灭，并且于本协议生效前签订的口头或书面协议、合约、合同、决议均告失效。Apex 公司董事长季龙粉先生以私人身份与长虹签订的所有协议及合同亦告失效。 Apex 公司、季先生及长虹公司均不得引用该等协议、合约、合同、决议向对方提起诉讼或仲裁。

## 六、其他条款

（一）Apex 商标、Apex 公司拥有所有权的仓库的评估费用由 Apex 公司和季先生连带承担，Apex 商标、Apex 公司拥有所有权的仓库以及 CDB 股权过户费用由长虹公司承担，相应的交易税费由当事方根据交易地法律自行承担，其他费用按照当地法律规定处理，没有规定的，协议当事方另行协商。

（二）如出现本协议未涉及事项，由协议当事方另行协商。

（三）本协议一式九份，甲、乙、丙协议当事方各执三份，具有同等法律效力。

四川长虹电器股份有限公司
授权代表：_____ 日期 ２００6．4．11

APEX Digital Inc.
授权代表：_____ 日期 ２００6．4．4

季龙粉先生 _____ 日期 4－11－－6

9

附件一：



10

附件二：

# 商标转让协议

签约日期：2006 年 4 月 11 日

签约地点：中国·四川·成都

甲 方（商标转让人）：Apex Digital Inc.（以下简称 Apex 公司）

乙 方（商标受让人）：四川长虹电器股份有限公司（以下简称长虹公司）

为尽快妥善解决美国 Apex 公司与四川长虹公司的贸易纠纷，Apex 公司、长
虹公司以及季龙粉先生于 2006 年 4 月 11 日共同签署了《美国 Apex 公司与四川
长虹公司贸易纠纷和解框架协议》。根据该《和解框架协议》的有关约定，甲、
乙双方经协商一致，就商标权的转让达成如下协议：

### 一、合同目的

（一）为解决先前贸易纠纷，并为将来合作奠定基础，双方缔结本协议。

（二）Apex 公司将 Apex 商标转让给长虹公司以折抵其所欠长虹公司的债务。

### 二、合同标的

（一）Apex 商标



长虹公司受让 Apex 商标后，享有 Apex 商标的权利、资格及其所包含和相关
的权益，包括（1）商标"APEX"，美国专利商标局序号 76433372（Serial Number:
76433372）；（2）商标"APEX DIGITAL"，美国专利商标局序号 76020515（Serial
Number: 76020515）；美国专利商标局注册号 2636367（Registration Number:
2636367）；（3）商标图样：附件 1 所列出的"APEX DIGITAL"标识设计。

（二）甲方保证被转让的商标无权利瑕疵。若该商标上存在长虹公司之外的
在先权利，甲方必须负责在转让商标冲抵债务前清理完毕。

### 三、商标转让与债务冲抵

（一）转让价格

Apex 商标具体价值以具备法定资格的中国境内评估机构的评估结果为准
（具体评估机构的选择及评估费用由甲方负责）。若该商标的评估价高于 9000

（含 9000）万美元，则该商标抵偿债务的额度以 9000 万美元计；若该商标的评估价低于 9000 万美元，则该商标抵偿债务的额度以实际评估价为准。

（二）债务冲抵

商标变更登记完成之日，Apex 公司与长虹公司相应份额的债权债务关系消灭。

**四、合同条件**

（一）甲方承诺：在《和解框架协议》生效之日起两个月之内，完成商标转让变更登记手续，但出现不符合法律规定或客观条件等不可抗力的情形除外。

（二）乙方承诺：

1、为增强 CDB 投资者的信心，乙方一经受让 Apex 商标，即刻将该商标许可 CDB 使用。同时，为避免 Apex 商标品牌市场混乱，除长虹公司和 CDB 另有约定外，乙方不使用 APEX 商标。许可费每 5 年酌情调整一次，在本协议生效后的第一个 5 年期，每年许可费按 CDB 经会计师事务所审计的年终财务报表载明的年纯利润的 1% 收取。

2、长虹公司同时将该商标许可给 Apex 公司使用，以使 Apex 公司能继续开展业务。许可期限为本协议生效之日起 1 年。



**五、变更登记**

在本协议生效后，甲方和乙方共同在美国专利商标局（United States Patent and Trademark Office）办理变更登记手续，但所需费用由乙方承担。

**六、纠纷解决**

因本协议签订、生效、解释、履行及任何相关事宜而引发的争议，应根据《和解框架协议》中规定的程序解决。

**七、合同效力**

本协议自当事方收到他方"协议生效确认书"之日起生效（具体参见《生效特别约定》）。

**八、其他条款**

（一）本协议用中、英文字写成，如果两种文本存在差异，以中文文本为准。

（二）本协议一式九份，协议当事方各执三份，具有同等法律效力。

APEX Digital Inc.

授权代表: _____        日期_____    2006.6.11

季龙粉先生: _____        日期 4-11--6

四川长虹电器股份有限公司

授权代表: _____        日期 2006.4.11

13

附件三：

# 不动产转让协议

签约日期：2006 年 4 月 11 日

签约地点：中国·四川·成都

甲　方（不动产转让方）：Apex Digital Inc. （以下简称 Apex 公司）

乙　方（不动产受让方）：四川长虹电器股份有限公司（以下简称长虹公司）

为尽快妥善解决美国 Apex 公司与四川长虹公司的贸易纠纷，Apex 公司、长虹公司以及季龙粉先生于 2006 年 4 月 11 日共同签署了《美国 Apex 公司与四川长虹公司贸易纠纷和解框架协议》。根据该《和解框架协议》的有关约定，甲、乙双方经协商一致，就不动产的转让达成如下协议：

## 一、合同目的

（一）为解决先前贸易纠纷，并为将来合作奠定基础，双方缔结本协议。

（二）Apex 公司将其拥有的不动产转让给长虹公司以折抵其对长虹公司的负债或将不动产卖给第三方以所获价款抵偿所欠长虹公司的债务。

## 二、合同标的

（一）Apex 公司享有所有权的一座仓库及其所附着之土地（位于 2626 Vista Industrial Parkway, Rancho Dominguez California, 90221）。

（二）该仓库基本运行需要的附属物和附着物。

## 三、转让价格及债务折抵

关于该不动产之具体转让价格及债务折抵方式,长虹公司有权选择下列方案之一：

**方案一：** 该标的物直接转让给长虹公司用以折抵债务。该标的物折抵债务的额度以协议当事方共同认可的具备法定资格的美国境内评估机构（该评估机构由 APEX 公司负责选择）所评估的价值为准（评估费用由甲方承担）。该标的物权属变更登记完成之日，Apex 公司与长虹公司相应份额的债权债务关系消灭。

**方案二：** 以该标的物出售给第三方所得价款折抵债务。转让该标的物时，由

14

Apex 公司、长虹公司以及受让人签订三方协议，约定由受让人直接将转让不动产的价款直接转入长虹公司指定的帐户。该标的物折抵债务的额度以长虹公司实际收到的款项为准。该标的物受让方将标的物转让款转入长虹公司指定的帐户之日，Apex 公司与长虹公司相应份额的债权债务关系消灭。

**四、甲方的义务**

（一）Apex 公司保证对上述合同标的物拥有合法所有权；

（二）Apex 公司保证上述合同标的物无权利瑕疵；

（三）Apex 公司有义务提供与上述标的物及附属物附着物有关的文件，在方案一的情形下，在《和解框架协议》生效后两个月内，协助长虹公司办理不动产过户登记手续；在方案二的情形下，在《和解框架协议》生效后两个月内，督促标的物受让人将标的物转让款转入长虹公司指定的帐户。但出现不符合法律规定或客观条件等不可抗力的情形除外。

**五、乙方的义务**

在 Apex 公司的协助下按期办理不动产过户登记手续并承担相应的手续费。



**六、纠纷解决**

因本协议签订、生效、解释、履行及任何相关事宜而引发的争议，应根据《和解框架协议》中规定的程序解决。

**七、合同效力**

本协议自当事方收到他方"协议生效确认书"之日起生效（具体参见《生效特别约定》）。

**八、其他条款**

（一）本协议用中、英文字写成，如果两种文本存在差异，以中文文本为准。

（二）本协议一式九份，协议当事方各执三份，具有同等法律效力。

15

APEX Digital Inc.

授 权 代 表:                        日期

季龙粉先生:                        日期 ⨍- ıı - 6

四川长虹电器股份有限公司

授 权 代 表:                        日期 2006·4·11

16

附件四：

# 债权转让协议

签约日期：2006 年 4 月 11 日

签约地点：中国·四川·成都

甲　　方(债权转让方)：Apex Digital Inc.（以下简称 Apex 公司）

乙　　方(债权受让方)：四川长虹电器股份有限公司（以下简称长虹公司）



　　为尽快妥善解决美国 Apex 公司与四川长虹公司的贸易纠纷，Apex 公司、长虹公司以及季龙粉先生于 2006 年 4 月 11 日共同签署了《美国 Apex 公司与四川长虹公司贸易纠纷和解框架协议》。根据该《和解框架协议》的有关约定，甲、乙双方经协商一致，就债权转让达成如下协议：

**一、合同目的**

（一）为解决先前贸易纠纷，并为将来合作奠定基础，双方缔结本协议。

（二）Apex 公司将其享有的债权转让给长虹公司以折抵其对长虹公司的负债。

**二、合同标的**

　　Apex 公司对第三方的到期债权（长虹公司具体受让的债权，由长虹公司与 Apex 公司另行签订补充协议确定）。

**三、债权转让的方式及债务折抵**

（一）长虹公司将根据债权资料和信息有选择地接受 Apex 公司的部分债权转让。

（二）对于长虹公司选择受让的债权，长虹公司可以自行清收或委托 Apex 公司或季先生清收。长虹公司实际清收回款项之日，Apex 公司与长虹公司相应份额的债权债务关系消灭。长虹公司有义务将未清收回来的债权重新转让给 Apex 公司。

（三）对于长虹公司未受让的债权，Apex 公司和季先生有义务清收用于折抵 Apex 公司对长虹公司的欠款。长虹公司收到相应款项之日，Apex 公司与长虹公司相应的债权债务关系消灭。

（四）债务折抵金额以《框架协议》生效之日起 1 年实际清收的金额为准。

**四、甲方承诺**

（一）合同标的系 Apex 公司的合法债权；

（二）于《框架协议》生效之日起六个月内向乙方提供与被转让债权有关的各种法律、商业文件及非书面的信息资料；对于长虹公司受让的债权，有义务会同长虹公司和第三方办理债权转让的各项手续，但出现不符合法律规定或客观条件等不可抗力的情形除外。

（三）在本协议生效后 6 个月内，对于清收到的应收帐款，除用于维持 Apex 公司的正常开支外，将剩余金额用于抵偿其对长虹公司的欠款。

**五、乙方承诺**

（一）在本协议生效后 6 个月内，Apex 公司将继续对其应收账款享有权利，并可努力清收此应收账款。

（二）与 Apex 公司共同办理因转让债权、实现债权需要的相关手续，并承担相应的手续费。



**六、合同的变更和解除**

发生下列情况之一时，可变更或解除本合同，但甲、乙双方需另行签订变更或解除协议书：

（一）由于不可抗力致使本合同无法履行，且因此无法履行合同义务的一方已在该情形结束起十五日内通知其他方，并经其他方确认；

（二）由于一方违约，严重影响了另一方的经济利益，使合同履行成为不必要；

（三）因情况发生变化，当事人双方经过协商同意。

**七、纠纷解决**

因本协议签订、生效、解释、履行及任何相关事宜而引发的争议，应根据《和解框架协议》中规定的程序解决。

**八、合同效力**

本协议自当事方收到他方"协议生效确认书"之日起生效（具体参见《生效特别约定》）。

**九、其他条款**

（一）本协议用中、英文字写成，如果两种文本存在差异，以中文文本为准。

（二）本协议一式九份，协议当事方各执三份，具有同等法律效力。

18

39

APEX Digital Inc.

授 权 代 表: _____    日期 _____

季龙粉先生: _____    日期 _____

四川长虹电器股份有限公司

授 权 代 表: _____    日期 _____

19

40

附件五：

# 股权转让协议

签约日期：2006 年 4 月 11 日

签约地点：中国·四川·成都

甲　　方（股权转让方）：**Apex Digital Inc.**（以下简称 Apex 公司）

乙　　方（股权转让方）：季龙粉先生（Apex 公司董事长，以下简称季先生）

丙　　方（股权受让方）：四川长虹电器股份有限公司（以下简称长虹公司）


为尽快妥善解决美国 Apex 公司与四川长虹公司的贸易纠纷，Apex 公司、长虹公司以及季龙粉先生于 2006 年 4 月 11 日共同签署了《美国 Apex 公司与四川长虹公司贸易纠纷和解框架协议》。根据该《和解框架协议》的有关约定，甲、乙、丙各方经协商一致，就股权转让达成如下协议：

### 一、合同目的

（一）为解决先前贸易纠纷，并为将来合作奠定基础，双方缔结本协议。

（二）Apex 公司和季先生转让 CDB56.09%的股份（计 178，377，340 股）用于抵偿其欠长虹公司的债务。

### 二、合同标的

Apex 公司和季先生持有的香港中华数据广播控股有限公司（以下简称 CDB）56.09%的股份（计 178，377，340 股）。[①] Apex 公司和季先生有义务担保所转让股权无瑕疵。

### 三、股权转让方式及债务冲抵

（一）Apex 公司和季先生转让 CDB29.9%的股份（计 95,399,999 股）给长虹公司，转让价按 CDB 复牌后一年的平均交易价格计算。

协议当事方应于 CDB 复牌后一年期届满之日起十五日内，对上述平均交易

---

[①] CDB 于 2000 年 1 月在香港联合交易所的创业板上市。公司已发行在外普通股总数为 318,000,000 股（股票代号：8016HK）。历经数度交易，截至本协议签订之时，Apex 公司持有 51.95%的股份(165,197,340 股)，Apex 董事长季龙粉先生个人持有 18.14%的股份(57,700,000 股)，其他市场流通股共占 29.91%（95,113,800 股）。

20

41

价格进行结算。结算完成之日，Apex 公司与长虹公司相应份额的债权债务关系消灭。

（二）剩余的约 26.09%的 CDB 股份（计 82,977,341 股）优先按以下方案一折抵长虹公司的债务，若方案一无法执行或执行中遭遇障碍，则按下列方案二执行：

方案一：由 Apex 公司、季龙粉先生同长虹公司一起联系第三方（出价高者优先）以每股不低于 1.44 元港币的价格购买，且由该第三方直接将股权转让款支付给长虹公司以折抵 Apex 公司对长虹的欠款。具体冲抵金额以长虹公司实际取得的股权转让款数额为准。长虹公司收到该部分股权的转让款时，Apex 公司与长虹公司相应的债权债务关系消灭。

方案二：Apex 公司和季先生承诺向长虹出具认股权证。具体条款按香港联交所的惯例另行商定。

（三）如因上述约定可能导致香港联交所及其他监管机构根据有关规定要求长虹公司承担"全面收购义务"，则由协议当事方另行议定股权转让事宜。

**四、变更登记**

《和解框架协议》生效之后，甲方与乙方应于两个月内将丙方的名称、住所、受让的出资额记载于股东名册并在香港联交所办理有关变更登记手续，但出现不符合法律规定或客观条件等不可抗力的情形除外；丙方有义务协助甲方、乙方办理相关手续。办理股权变更登记相关手续费用由长虹公司承担。

**五、纠纷解决**

因本协议签订、生效、解释、履行及任何相关事宜而引发的争议，应根据《和解框架协议》中规定的程序解决。

**六、合同效力**

（一）本协议自当事方收到他方"协议生效确认书"之日起生效（具体参见《生效特别约定》）。

（二）本协议如有不符合香港联交所的相关规定，则由协议当事人另行议定。

**七、合同的变更和解除**

发生下列情况之一时，可变更或解除本合同：

21

42

（一）由于不可抗力致使本合同无法履行，且因此无法履行合同义务的一方已在该情形发生之日起十五日内通知其他方，并经其他方确认；

（二）由于一方违约，严重影响了另一方的经济利益，使合同履行成为不必要；

（三）因情况发生变化，当事人双方经过协商同意。

**八、其他条款**

（一）本协议用中、英文字写成，如果两种文本存在差异，以中文文本为准。

（二）本协议一式九份，协议当事方各执三份，具有同等法律效力。

**APEX Digital Inc.**

授 权 代 表：　　　　　　　　　　日 期＿＿＿＿＿

　　　　　　　　　　　　　　　　2006. 4. 4

季龙粉先生：　　　　　　　　　日 期 4-11-06

四川长虹电器股份有限公司

授 权 代 表：　　　　　　　　日 期 2006. 4. 11

22

43

附件六：

# 中华数据广播控股有限公司（以下简称 CDB）

## 改组协议（草案）

## Restructuring of CDB (Draft)

签约日期：2006 年 4 月 11 日

签约地点：中国·四川·成都

甲　　方：**Apex Digital Inc.**（以下简称 Apex 公司）

　　　　　季龙粉先生（Apex 公司董事长，以下简称季先生）

乙　　方：四川长虹电器股份有限公司（以下简称长虹公司）

根据《美国 Apex 公司与四川长虹公司贸易纠纷和解框架协议》（以下简称《和解框架协议》）的约定，Apex 公司及季龙粉先生转让其部分 CDB 股份给长虹公司以抵偿 Apex 公司对长虹公司的债务。这一转让意味 CDB 股权结构发生重大变动。为确保股权变动后的 CDB 更有效地运行和发展，协议当事人就 CDB 的决策机构、执行机构以及股权变更等相关事宜协议如下：

**一、股权结构调整**

（一）Apex 公司和季先生直接转让 CDB29.9%的股份（计 95,399,999 股）给长虹公司。

（二）Apex 公司承诺将 26.09%的 CDB 股份（计 82,977,341 股）转让给第三方或向长虹公司出具认股权证。

（三）CDB 股权重组时，季先生持有 CDB 总股本 14%的股份（计 44,520,000 股）。

有关股权结构调整具体事宜，依照《框架协议》第二条第（四）项及附件五《股权转让协议》的约定处理。

**二、资源重组与经营模式**

（一）Apex 公司、季先生及长虹公司将合力以 CDB 为平台，全面整合 Apex 与长虹的资源。

23

44

（二）重组后 CDB 的将采纳供应链管理的经营模式。

有关资源重组与经营模式具体事宜，依照《框架协议》第一条第（三）项的约定处理。

### 三、决策机构人事调整

（一）CDB 董事会设 9 名董事，包括 6 名董事及 3 名独立非执行董事。

（二）长虹公司推荐 3 名董事，Apex 公司推荐 3 名董事（其中包括四川川达律师事务所推荐 1 名董事）。Apex 公司推荐的董事负责推荐长虹公司推荐的董事之一任公司董事长。

（三）3 名独立非执行董事由股东大会按照香港联交所对上市公司的相关要求，选拔合格人士担任。

（四）改组后的 CDB 内部组织结构设置由董事会决定。

### 四、执行机构人事调整

（一）为使 CDB 平稳过渡并快速投入营运，尽量维持 CDB 原有经营班子的稳定性。

（二）CDB 总裁及 CDB 财务总监由长虹公司提名。

（三）长虹公司推荐的董事负责推荐季龙粉先生任 CDB 执行总裁。

（四）公司法定秘书及其他职能部门经理可维持不变，或根据实际需要，面向社会公开择优聘用。



### 五、相关附随义务

（一）在 CDB 改组完成（重组后董事会召开第一次会议）之前，甲方尽职管理 CDB 运营和其他公司事务。

（二）在 CDB 改组过程中，乙方在股权转让、资源重组、决策机构及执行机构人事调整等方面配合甲方完成相关手续。

### 六、时间安排

（一）《和解框架协议》生效之日起两个月内甲方完成向乙方的 29.9%的 CDB 股权转让，但出现不符合法律规定或客观条件等不可抗力的情形除外；

（二）甲方完成向乙方转让 29.9%的 CDB 股权之日，甲、乙双方共同提议按香港相关法律及 CDB 公司章程的规定及时召开公司股东特别大会，选举董事会成员；

24

（三）董事会成员确定后，按香港相关法律及 CDB 公司章程的规定及时召开
董事会，决定公司内部组织结构。

**七、纠纷解决**

因本协议签订、生效、解释、履行及任何相关事宜而引发的争议，应根据《和
解框架协议》中规定的程序解决。

**八、合同效力**

（一）本合同自甲、乙各方法定代表人或法定代表人书面授权的代表签字后
立即生效。

（二）本协议如有不符合香港联交所的相关规定，则由协议当事人另行议定。

**九、其他条款**

（一）本协议用中、英文字写成，如果两种文本存在差异，以中文文本为准。

（二）本协议一式九份，协议当事方各执三份，具有同等法律效力。

APEX Digital Inc.

授 权 代 表：                     日期_____

四川长虹电器股份有限公司

授 权 代 表：                     日期 2006.4.11

季龙粉先生：                     日期 4.11-06

25

附件七：

# 撤回诉讼协议书

签约日期：2006 年 4 月 11 日
签 约 地：中国·四川·成都
甲　　方：中国四川长虹电器股份有限公司 （以下简称长虹公司）
乙　　方：**Apex Digital Inc.** （以下简称 Apex 公司）
丙　　方：季龙粉先生（以下简称季先生）

　　为尽快妥善解决美国 Apex 公司与四川长虹公司的贸易纠纷，Apex 公司、长虹公司以及季龙粉先生于 2006 年 4 月 11 日共同签署了《美国 Apex 公司与四川长虹公司贸易纠纷和解框架协议》。根据该《和解框架协议》的有关约定，甲、乙双方经协商一致，就撤回诉讼达成如下协议：

## 一、合同目的

　　为和平解决先前贸易纠纷，并为将来合作奠定基础，双方缔结本协议。

## 二、诉讼中止与撤销诉讼

　　（一）双方就在美诉讼问题（民事案号 BC 325923，加州洛杉矶郡高等法院）达成谅解。在 4 月 15 日之前（含 4 月 15 日），甲方、丙方与乙方向洛杉矶郡高等法院联合提交各自申请，申请应涵盖以下内容：

　　1. 协议当事方共同签署了一份《框架协议》，《框架协议》规定在实现协议中特定事项的基础上，协议当事方就所有纠纷全面和解。《框架协议》的英文版附录在后并将在保密状态下提交。



　　2. 在商谈《框架协议》时，各方都由其选择的独立的美国和中国律师作为代表，在知情、自由、自愿及非胁迫的情况下签署该协议及其附件。



　　3. 为使当事方有充分的时间履行《框架协议》约定的商业交易，当事方要求法庭采取下列行动：

　　（1）取消所有现有听证会日期和 7 月 31 日开庭日期；

　　（2）暂缓所有的动议期限、证据调查期限和专家交换期限；

　　（3）中止所有的进一步程序直到 2006 年 6 月 20 日；

　　（4）在 2006 年 6 月 19 日安排一次案件管理会议。

　　4. 在 2006 年 6 月 13 日或之前，如果当事方并没有按照以下第（四）条约

26

定去联合提起无保留地撤销，他们应当提出联合情况会议报告，告之法庭《框架
协议》约定的转让的情况，并要求延续中止或其他合适补救措施。

（二）为支持其申请，季应当提交经宣誓的声明，其中应说明，在《框架协
议》谈判中，他由自己选择的独立的美国和中国律师代表，在知情、自由、自愿
和非胁迫的情况下签署本协议极其框架协议。

（三）如果在中止诉讼的联合申请提交时，或者此后 5 日内，法庭没有批准
该中止诉讼的联合申请，那么在提起申请的 10 个工作日内，协议当事方会订立
恰当的协议，中止所有有关的诉讼时效，并联合要求有保留地撤销该诉讼中所有
主张。

（四）在按照《框架协议》规定的 Apex 商标、加州仓库和 CDB 股票转让后
10 日内，长虹和 Apex 将联合要求无保留地撤销该诉讼中所有主张，各方承担各
自的费用，不违背有关法律和本协议及《框架协议》的条款。

（五）如果非本协议或者框架协议的任何个人或者实体基于合同、侵权或
者其他主张以共同关系或者免除关系为由向协议当事方主张补偿，协议当事方必
须在得到主张通知起的 10 个工作日内，共同向法院申请做出指令，裁决本协议
的和解是按照加州民事程序法典 877 节和 877.6 条规定的真实意思达成的，且各
方及其各自的律师相信并必须努力及时的获得这一 "真实意思" 裁决。

（六）双方同意基于框架协及其附件协议的规定，双方必须永远不得以同一
争议对对方提起诉讼。

### 三. 豁免条款：

（一）季先生的豁免：除了框架协议及其附件列明的义务，并考虑到此处和
《框架协议》包含的其他协议，自《框架协议》要求的 Apex 商标、加州仓库和
CDB 转让完毕起生效，季先生，代表其本人及其代表、代理人、律师、接受人、
指定人、继承人、受遗赠人、执行人或任何代表季利益的个人或实体，在此完全
并永久地向长虹及其所有过去、现在和未来的母公司、子公司和关联公司及其所
有过去、现在、未来的董事、官员、股东、雇员、律师、代理人及其各人放弃、
豁免并免除所有有任何种类、类型、属性或特征的诉讼主张、要求、义务、指控、
金额、责任、债务、诉讼、过失、过错、错误、诉因、案件、费用、赔偿、争议、
承诺、损害、损失和花费，不论己知或未知、已提出或未提出、已怀疑或未怀疑、
已清算或未清算、现有的或从有史以来至本弃权订立之日产生者。不论是否与上
述或者任何条款相冲突，该豁免都不意图且不得以任何方式，豁免任何和所有季
先生可能对 Cadwalader, Wickersham & Taft LLP 或者 Hennigan Bennett &

Dorman LLP 律师事务、其各自合法的指定人、被继受人或者继受人、或者任何现任或前任官员或者合作人所提起的诉讼。

（二）Apex 的豁免：除了框架协议及其附件列明的义务，并考虑到此处和框架协议包含的其他协议，自《框架协议》要求的 Apex 商标、加州仓库和 CDB 转让时起生效，Apex 代表本公司及其子公司和关联公司、继受人、指定人、董事、官员、股东、雇员，在此完全并永久地向长虹及其所有过去、现在和未来的母公司、子公司和关联公司及其所有过去、现在、未来的董事、官员、股东、雇员、律师、代理人及其代表放弃、豁免并免除所有任何种类、类型、属性或特征的诉讼主张、要求、义务、指控、金额、责任、债务、诉讼、过失、过错、错误、诉因、案件、费用、赔偿、争议、承诺、损害、损失和花费，不论已知或未知、已提出或未提出、已怀疑或未怀疑、已清算或未清算、现有的或从有史以来至本弃权订立之日产生者。如果与上述或者任何条款相反，该豁免不意图且不得以任何方式，豁免任何和所有 Apex 可能对 Hennigan Bennett & Dorman LLP 律师事务、其各自合法的指定人、被继受人或者继受人、或者任何现任或前任官员或者合作人所提起的诉讼。

（三）长虹的豁免：除了框架协议及其附件列明的义务，并考虑到此处和框架协议包含的其他协议，自 Apex 商标、加州仓库和 CDB 转让时起生效，长虹、代表本公司及其子公司和关联公司、继受人、指定人、董事、官员、股东、雇员，在此完全并永久地向季先生及其代表、配偶、家庭成员、代理人、接受人、指定人、继承人、受遗赠人、执行人、律师，和 Apex 及其所有过去、现在和未来的母公司、子公司和关联公司及其所有过去、现在、未来的董事、官员、股东、雇员、律师、代理人及其代表放弃、豁免并免除所有任何种类、类型、属性或特征的诉讼主张、要求、义务、指控、金额、责任、债务、诉讼、过失、过错、错误、诉因、案件、费用、赔偿、争议、承诺、损害、损失和花费，不论已知或未知、已提出或未提出、已怀疑或未怀疑、已清算或未清算、现有的或从有史以来至本弃权订立之日产生者。如果与上述或者任何条款相反，该豁免不意图且不得以任何方式，豁免任何和所有长虹可能对 Cadwalader, Wickersham & Taft LLP 或者 Hennigan Bennett & Dorman LLP 律师事务、其各自合法的指定人、被继受人或者继受人、或者任何现任或前任官员或者合作人所提起的诉讼。

（四）豁免不及于框架协议以及附件中的义务。上述豁免并不意图且不得及于或者以其他方式豁免或者免除任何一方当事人由于框架协议或者其他方式产生的框架协议及其所有附件下的任何权利、特权、利益、责任或者义务。

（五）加州民事法典 1542 节下的弃权。双方表示并保证上述的豁免事项不

28

49

限于所知道的或者公开的事项，且据此放弃任何和所有现在拥有的、或者将来可能拥有基于加州民事法典 1542 节以下之规定的的权利或者利益：

"一项概括豁免不及于债权人不知道或者认为在执行豁免时仍在他或者她的控制下——如果她或者他知道将会实质性的影响他或者她和债务人的和解——的主张。"

（六）季先生对长虹免责：在不限制上述豁免条款的效力的情况下，季先生同意，为长虹对抗并使长虹免受因共同关系、代位关系、免责关系或者其他类似主张导致的所有诉讼、主张或责任，且这些诉讼是涉及、关于或者源于该诉讼或者诉讼中提及的任何事实、主张、事件或者事务引起的，包括但不限于 Cadwalader, Wickersham & Taft LLP 或者 Hennigan Bennett & Dorman LLP，或他们各自的指定人、被继受人或者继受人，或者任何现任或前任雇员或者合作人对长虹提起的任何诉讼。

（七）**Apex 对长虹免责**：在不限制上述豁免条款的效力的情况下，Apex 同意，为长虹对抗并使长虹免受因共同关系、代位关系、免责关系或者其他类似主张导致的所有诉讼、主张或责任，且这些诉讼是涉及、关于或者源于该诉讼或者诉讼中提及的任何事实、主张、事件或者事务引起的，包括但不限于 Hennigan Bennett & Dorman LLP，或他们各自的指定人、被继受人或者继受人，或者任何现任或前任雇员或者合作人对长虹提起的任何诉讼。



（八）**长虹对季先生和 Apex 免责**：在不限制上述豁免条款的效力的情况下，长虹同意，为季先生和 Apex 对抗并使季和 Apex 免受因共同关系、代位关系、免责关系或者其他类似主张导致的所有诉讼、主张或责任，且这些诉讼是涉及、关于或者源于该诉讼或者诉讼中提及的任何事实、主张、事件或者事务引起的，包括但不限于 Cadwalader, Wickersham & Taft LLP 或者 Hennigan Bennett & Dorman LLP，或他们各自的指定人、被继受人或者继受人，或者任何现任或前任雇员或者合作人对长虹提起的任何诉讼。

**四、合同条件**

双方同意上述的豁免构成框架协议的实质性部分；且豁免的违反或者关于豁免的无效性或者不可执行性的裁决将使《框架协议》中的豁免全体失效。根据本条款如果豁免失效，双方将按照《框架协议》中规定的仲裁条款解决争议。

**五、法律适用及纠纷解决**

（一）本协议适用美国加州法律。

29

（二）因本协议签订、生效、解释、履行及任何相关事宜而引发的争议，应
根据框架协议中规定的程序解决。

**六、合同生效**

本合同自签署之日起生效。

**七、其他条款**

（一）本协议用中、英文字写成，如果两种文本存在差异，以英文文本为准。

（二）本协议一式九份，协议当事方各执三份，具有同等法律效力。

**APEX Digital Inc.**

授 权 代 表:                     日期_____
                                    2006.4.11

季龙粉先生:                       日期____4-11-06

四川长虹电器股份有限公司

授 权 代 表:                     日期 2006.4.11

关于美国 Apex 公司与四川长虹公司贸易纠纷案

《和解框架协议》及附件协议生效的

# 特 别 约 定

签约时间：2006 年 4 月 11 日

签约地点：中国 · 四川 · 成都

一、美国 Apex 公司与四川长虹公司"4.7 亿美元贸易纠纷案"经过当事方近一年的谈判与磋商，现已达成全面和解协议，各方代表已完成相关和解协议法律文书的签署。但鉴于当事方完成各自内部相关批准程序之需，当事方同意：《和解框架协议》及除《撤回诉讼协议书》之外的其他附件协议的正式生效日期为收到他方"协议生效确认书"之日，当事方应于本特别约定签署之日起 10 日内给他方发出合法有效的"协议生效确认书"，送达的方式包括邮寄、E-mail、当面递交等。长虹公司同意指定谭明献先生为接收人，Apex 公司和季先生同意指定向朝阳先生为接收人。

二、《撤回诉讼协议书》自签署之日起生效，但如果上述 10 日期限届满后当事方未收到他方"协议生效确认书"，则《撤回诉讼协议书》自始无效。

特此约定。

四川长虹电器股份有限公司

授权代表：_____   日期 _2006. 4. 11_

Apex Digital Inc.

授权代表：_____   日期 _2006. 4. 4_

季龙粉先生：_____   日期 _4-11-06_

31

Disputes Settlement Between Apex Digital Inc. and Sichuan Changhong Electric. Co.Ltd

# Foundational  Agreement

**Date: April 11, 2006**
**Location: Sichuan Chuanda Law Firm, Chengdu, Sichuan, the People's Republic of China**
**Party A: Sichuan Changhong Electric Co., Ltd (hereinafter referred to as "Changhong")**
**Address: 35 East Mianxing Road**
**        High Tech Park**
**        Mianyang**
**        Sichuan Province, 621000**
**        The People's Republic of China**
**Telephone: 0086-(0)816-2418239**
**Fax:    0086-(0)816-2418618**
**Party B: Apex Digital, Inc. (hereinafter referred to as "Apex")**
**Address: 301 Brea Canyon Road, Walnut, CA 91789 USA**
**Telephone: 001-909-923-8686**
**Fax:    001-909-923-9676**
**Party C: Mr. David Long Fen Ji, (President of Apex, hereinafter referred to as "Mr. Ji"; together with Apex and Changhong, the "Parties")**
**Address: 2581 Carlton Place, Rowland Heights, CA 91748 USA**



## 1. Recital

a.   Changhong Electric Co., Ltd., located in the Sichuan province of China, is a listed company organized under the laws of the People's Republic of China and engaged in the manufacture and distribution of household appliances. Apex Digital Inc., located in the state of California in the United States, is a corporation organized under California state law and engaged in the manufacture and distribution of household electrical appliances. Mr. David Long Fen Ji is a United States citizen and resident of California.

b.   This agreement and attached agreements are written in both Chinese and English. Except for the attachment agreement 7, in the event that there are any discrepancies between these two versions, for whatever reason, the Chinese version shall be considered binding.

c.   To settle existing disputes and ensure future cooperation, the Parties agree to the conditions described in this Foundational Agreement and attached agreements.

## 2. Compendium

### a.  Facts

i Changhong cooperated with Apex from September 2001 to 2004 to exploit the United

32

Disputes Settlement Between Apex Digital Inc. and Sichuan Changhong Electric. Co.Ltd

States market. From 2002 to 2004, Changhong supplied Apex with audiovisual products (including TV sets and DVD players) worth US$1,170,000,000.00.

ii As of December 31st, 2004, based on an audit carried out by Changhong and Apex, it was determined that Changhong had not received full payment from Apex for goods supplied in the amount of US$472,000,000.00. As of September, 2005, Apex had returned to Changhong audiovisual products worth US$14,000,000.00.

iii Changhong requested that Apex pay US$458,598,101.40 for audiovisual products supplied by Changhong. Apex claimed that it had suffered losses more than US$300,000,000.00 for patent fees, returns charges, storage charges, antidumping charges, etc.[1], and was only willing to pay US$150,000,000.00.

iv In December, 2004 Changhong pursued civil litigation against Apex in the Superior Court of California, County of Los Angeles, for breach of contract and requested that Apex pay its debt in full. Apex raised a counterplea to Changhong's claims, and brought a Cross-Complaint against Changhong in the same venue in January, 2005. The claims made in this case have not been adjudicated because the parties have continued to have major disputes.[2]

v In June, 2005, Apex and Mr. Ji provided three types of assets as security for approbatory arrearage of US$ 150,000,000.00 and have signed three security agreements regarding the following assets: the Apex related real estate (located at 2626 Vista Industrial Parkway, Rancho Dominguez, California 90221); the rights to 222,897,340 shares of capital stock in China Data Broadcasting Holdings Ltd; and the Apex trademark.[3]

**b. Disposal of Obligatory Rights and Indebtedness**

i In order to avoid the mutually detrimental results produced by litigation, the parties have agreed to look toward the future, lay aside certain disputes, and settle the primary dispute of the US$458,598,101.40 through negotiation.

ii Apex has agreed to take responsibility for US$170,000,000.00 in outstanding debt to Changhong. Apex and Mr.Ji agree to the following:
(a) pursuant to the "Security Agreement" dated June 30, 2005, the APEX trademark, a related real estate (located at 2626 Vista Industrial Parkway, Rancho Dominguez, California, 90221)], stock in its controlled holding company (China Data Broadcasting

---

[1] Apex claims, patent fees: US$78,161,591.76 (paid to Philips and other foreign companies); legal costs for patent infringement litigation: US$9,388,116.39; loss of markdown due to patent infringement disputes and other factors: US$67,766,159.78; losses occurring during transportation and storage: US$66,495,676.11; loss of revenue due to returns for poor quality: US$90,370,697.10; losses due to missing accessories and inadequate after-sale service: US$10,493,427.43; and losses due to antidumping violations: to be determined.

[2] See to the Parties' related litigation document

[3] See "Security Agreement"

33

Holdings Limited, hereafter referred to as "CDB") is collateral securing the obligations owing by Apex to Changhong. Changhong has the right to exercise its remedies with respect to the collateral. The transfer of the three types of assets herein is in lieu of any such exercise of remedies by Changhong. Apex and Mr. Ji agree to transfer the collateral to fulfill the debt owed to Changhong.

(b) Apex and Mr. Ji shall transfer account receivables of Apex, inventory and money earned by selling the inventory in order partially to satisfy the liability.

iiiIn order to appropriately resolve the disputes over the remaining US$288,598,101.40, Changhong has agreed that it will abandon its right of recourse to Apex for the remaining balance if the conditions given below are met.

(a) Within six months after the date the parties sign this agreement, Apex provides Changhong with legal, truthful, precise and complete financial information, releases electronic financial data to Changhong, and cooperates with Changhong when investigating Due Diligence;

(b) Within two months after the date Apex and Mr. Ji sign this agreement, they shall carry out their duties defined in this agreement, as well as in the attached agreements, (i) to transfer trademark rights, (ii) to transfer rights to the CDB stock, and (iii) to transfer the related real estate related real estate, and fully complete the transfer of ownership for all aforementioned property, subject to compliance with applicable laws, and terms and conditions set out in this agreement.



(c) Apex and Mr. Ji agree to release and dismiss all claims against Changhong in the United States pursuant to the laws of the United States.

(d) In order to demonstrate good faith for implementation and cooperation, Mr. Ji agrees to fulfill the duties delineated in condition (b) and (c) before leaving China (which includes mainland China, Hong Kong and Macau).

iv Changhong has agreed that while the aforementioned assets shall be used to reduce the debt owed by Apex to Changhong, Changhong will assure that 14% (44,520,000 shares) of the CDB outstanding stocks will continue to be held by Mr. Ji. These stocks will not be used to discharge the indebtedness to Changhong by Apex and Mr. Ji.

**c. Cooperation and Development**

i Within 6 months after the date the parties sign this agreement, pursuant to the aforementioned facts and preconditions, Changhong will grant to Apex and CDB a license to the transferred Apex trademark and Apex brand for their use. Within 6 months after the date that the Parties sign this Agreement, Mr. Ji and Apex shall transfer to CDB their overseas client base, raw material supply network, research and design facilities, materials circulation management network and subsidiary CDB (which includes United States Apex LLC, Hong Kong Apex) and Shanghai Apex to exclusive CDB ownership, control, and

Disputes Settlement Between Apex Digital Inc. and Sichuan Changhong Electric. Co.Ltd

use.

ii CDB's business mode after restructuring shall be based on the enormous production ability of domestic manufacturers (global production base). The restructured CDB will serve as the central enterprise, managing transportation, storage, packaging, assembling and disassembling, transportation, and quality control. It will share information to make CDB an enterprise that can exploit the market for products with the Apex's trademark, and take advantage of research and design, quality control, raw materials supply and materials circulation management.

iii Soon after the date the Parties sign this Agreement, they shall issue a press release announcing that the parties have settled their disputes and providing other relevant information to be agreed upon in writing by the Parties. Other than this press release, the parties will make no statement regarding this Agreement and attached agreements or any prior dispute or conduct among them, except as may be required by law or with the prior written consent of each of the Parties, provided, however, that the Parties shall be entitled to disclose the Agreement to the Superior Court of California, County of Los Angeles in Civil Case No. BC 325923, in moving to stay that case and in jointly seeking an order from the Court that this Agreement was made in good faith within the meaning of California Code of Civil Procedure Sections 877 and 877.6.

### 3. Contractual Stipulations

### a. Transfer of Trademark and License

i Apex will transfer ownership of the Apex trademarks and all goodwill associated with the Apex trademarks to Changhong in partial payment of its debt. Changhong will have all rights and title to the Apex trademarks, and all included and related benefits, including without limitation (i) the "Apex" trademark, United States Patent Office application number 76433372; (ii) the "APEX DIGITAL" trademark United States Patent Office application number 76020515; U.S. trademark registration number 2636367; (iii) the "APEX DIGITAL" logo provided on Attachment 1.



ii The exact value of the Apex trademarks and brand shall be determined by a legally qualified valuation agency in China. However, the amount that the transfer of the Apex trademarks and brand can reduce the indebtedness cannot exceed US$90,000,000.00.

iii Pursuant to the compendium of this agreement, Changhong will grant CDB use of the "Apex" trademarks for the purpose of conducting its business. The license fee for such license will be adjusted every five years. During the first 5 years after signing this agreement, CDB shall pay Changhong an annual license fee of 1% of annual net profit of CDB as determined by yearend financial statements audited by CDB's accounting firm.

iv Changhong shall grant to Apex a license to continue to use the Apex trademarks for one year from the signing of this agreement. If special circumstances arise and Apex needs to use the aforementioned trademark after the one year period, the parties shall negotiate a

35

new resolution.

v  The specific terms of the agreements regarding the transfer and licenses of the Apex trademarks will be negotiated by the parties. Agreement regarding the terms and procedure for the transfer and license of the Apex trademarks shall be reached within two months of the signing of this agreement The parties acknowledge that such terms and procedure will have to comply with applicable laws and the terms and conditions set out in this agreement. (Refer to attachment 2 "Trademark Transfer Agreement").

**b. Transfer of Assets**

The exact value of the related real estate (located at 2626 Vista Industrial Parkway, Rancho Dominguez, California, 90221), which was originally purchased for US$9,000,000.00, shall be determined by a legally qualified valuation agency located in the United States. The initial selection of this agency shall be the responsibility of Apex, and the parties to this agreement must collectively agree to enlist the services of this valuation agency. The related real estate shall be transferred to Changhong or sold to a third party based on such valuation and the proceeds will be used to reduce Apex's liability to Changhong. However, there is some uncertainty as to the property rights over the related real estate If a third party claims prior rights on the related real estate, the parties agree that the transfer of this property shall be the actual realized value of the related real estate. Specific details shall be negotiated by the parties (refer to attachment 3 "Related real estate Transfer Agreement)

**c. Conveyance of Creditor's Rights**

i Within the 6 month period after the date the parties sign this agreement, Apex shall have the right to its account receivables and shall attempt to collect the account receivables, which, except for the use of Apex's operational costs, shall be used to fulfill Apex's debt to Changhong,  Thereafter, Apex agrees to convey its creditor's rights to Changhong to counteract its debt and is accountable to provide Changhong with documents, notes and other written or unwritten information relating to its creditor's rights.

ii Changhong shall have the option whether to accept the transfer of such creditor rights after reviewing the relevant information and materials provided by Apex. For the creditor rights that are not transferred, Apex and Mr. Ji shall collect such debts and then use them to discharge partially Apex's debt to Changhong; and for such rights which have been transferred, Changhong shall itself or entrust Apex and Mr. Ji to collect such debt.

iii Owing to the diversity of liabilities and the complexity of the transfer, the collection process shall be completed within one year after the date of this agreement. The specific amount to be used to reduce the indebtedness to Changhong shall be determined by the actual amount that Changhong receives. (See Attachment 4 "Obligatory Right Transfer Agreement")

**d. Assignment of Stock Ownership**

36