1  RON BENDER (SBN 143364)
   rb@lnbyb.com
2  PHILIP A. GASTEIER (SBN 130043)
   pag@lnbyb.com
3  JULIET Y. OH (SBN 211414)
   jyo@lnbyb.com
4  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
5  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
6  Telephone: (310) 229-1234
   Facsimile: (310) 229-1244
7

8
   Proposed Counsel for Chapter 11 Debtor
9  and Debtor in Possession

10              UNITED STATES BANKRUPTCY COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12                 LOS ANGELES DIVISION

13 In re:                              ) Case No.: 2:10-bk-44406-PC
                                       )
14 APEX DIGITAL, INC., a California     ) Chapter 11 Case
15 corporation,                        )
                                       ) NOTICE OF MOTION AND MOTION
16              Debtor.                ) FOR ENTRY OF AN ORDER: (A)
                                       ) APPROVING COMPROMISE OF
17                                     ) CONTROVERSY BETWEEN DEBTOR
                                       ) AND SECURED CREDITOR; (B)
18                                     ) AUTHORIZING THE SALE OF
                                       ) SUBSTANTIALLY ALL OF THE
19                                     ) DEBTOR'S ASSETS FREE AND CLEAR
                                       ) OF LIENS, CLAIMS, ENCUMBRANCES
20                                     ) AND INTERESTS; (C) APPROVING
                                       ) CONSULTING AGREEMENT; AND (D)
21                                     ) GRANTING RELATED RELIEF;
                                       ) MEMORANDUM OF POINTS AND
22                                     ) AUTHORITIES
                                       )
23                                     )
                                       )
24                                     ) Date:  September 15, 2010
                                       ) Time:  9:30 a.m.
25                                     ) Place: Courtroom 1539
                                       )        255 East Temple Street
26                                     )        Los Angeles, CA 90012
27 _____ )

28

                          1

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 8

I.      THE DEBTOR'S BUSINESS HISTORY ............................................................... 8

II.     EVENTS LEADINGS TO THIS CHAPTER 11 FILING ........................................ 10

III.    THE DEBTOR'S LIABILITIES ............................................................................. 14

IV.     THE DEBTOR'S ASSETS .................................................................................... 17

V.      PROPOSED TRANSACTIONS UNDER THE AGREEMENT ............................. 18

VI.     REORGANIZATION OBJECTIVES ..................................................................... 22

VII.    SALE OF ASSETS SHOULD BE APPROVED ..................................................... 23

        A.      The Court Should Authorize the Debtor to Sell Its Assets to Kith
                Consumer Pursuant to the Terms of the Agreement ..................................... 23

                1.      Sound Business Purpose ..................................................................... 24

                2.      Accurate and Reasonable Notice ......................................................... 25

                3.      Fair and Reasonable Price .................................................................. 27

                4.      Good Faith ......................................................................................... 28

        B.      Section 363(f) of the Bankruptcy Code Permits the Debtor's Sale of
                Assets to Be Free and Clear of Any Liens, Claims or Interests .................... 30

        C.      The Debtor Requests the Court to Waive the 14-Day Waiting Period
                Set Forth in Bankruptcy Rule 6004(h) ........................................................ 35

VIII.   THE CONSULTING SERVICES ASPECT OF THE AGREEMENT IS A
        WISE EXERCISE OF THE DEBTOR'S BUSINESS JUDGMENT AND
        SHOULD BE APPROVED .................................................................................... 36

IX.     COMPROMISE OF CONTROVERSY SHOULD BE APPROVED ...................... 37

        A.      The probability of success in the litigation ................................................... 39

        B.      The difficulties, if any, to be encountered in the matter of collection .......... 39

i

C.    The complexity of the litigation involved, and the expense,
       inconvenience, and delay necessarily attending it ........................................    40

D.    The paramount interest of the creditors and a proper deference to their
       reasonable views in the premises ...............................................................    40

X.    CONCLUSION .......................................................................................................    40

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

CASES

4

Anaconda-Ericsson Inc. v. Hessen (In re Teltronics Services, Inc.)
  762 F.2d 185, 189 (2d Cir. 1985)----------------------------------------------------------------------- 38

5

Benson v. Newman
  409 U.S. 1039 (1972) ----------------------------------------------------------------------------------- 38

6

7

Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)
  391 B.R. 25 (9ᵗʰ Cir. B.A.P. 2008) -------------------------------------------------------------------33, 34

8

Coastal Indus., Inc. v. U.S. Internal Revenue Service
  (In re Coastal Indus., Inc.)
  63 B.R. 361 (Bankr. N.D. Ohio 1986) ----------------------------------------------------------------- 27

9

10

Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.)
  722 F.2d 1063 (2d Cir. 1983) ----------------------------------------------------------------- 23, 24, 36

11

12

Compak Companies, LLC v. Johnson
  415 B.R. 334 (N.D.Ill. 2009) ----------------------------------------------------------------------------- 30

13

Cosoff v. Rodman (In re W.T. Grant Co.)
  699 F.2d 599, 608 (2d Cir. 1983), cert. denied 464 U.S. 822 (1983)----------------------------- 38

14

15

In re Abbotts Dairies of Pennsylvania, Inc.
  788 F.2d 143 (3d Cir. 1986) -------------------------------------------------------------------------- passim

16

In re Alpha Industries, Inc.
  84 B.R. 703 (Bankr. D. Mont. 1988)--------------------------------------------------------------------- 29

17

18

In re Apex Oil Co.
  92 B.R. 847 (Bankr. E.D.Mo. 1988)
  citing In re Exennium, Inc.
  715 F.2d 1401 (9th Cir. 1983) ----------------------------------------------------------------------------- 29

19

20

In re Atlanta Packaging Products, Inc.
  99 B.R. 124 (Bankr. N.D. Ga. 1988)--------------------------------------------------------------------- 27

21

22

In re Continental Airlines, Inc.
  780 F.2d 1223 (5th Cir. 1986) ------------------------------------------------------------------------24, 25

23

In re Delaware & Hudson Railway Co.
  124 B.R. 169 (D. Del. 1991)-------------------------------------------------------------------------------- 25

24

25

In re Delaware and Hudson Ry. Co.
  124 B.R. 169 (D. Del. 1991)-----------------------------------------------------------------------------23, 36

26

In re Filtercorp, Inc.
  163 F.3d 570 (9ᵗʰ Cir. 1998) ------------------------------------------------------------------------------- 29

27

28

In re Huntington, Ltd.
  654 F.2d 578 (9th Cir. 1981)------------------------------------------------------------------ 23

In re Integrated Resources, Inc.
  135 B.R. 746 (Bankr. S.D.N.Y. 1992), aff'd, 147 B.R. 650 (S.D.N.Y. 1992) ------------------ 27

In re Jolan, Inc., 2009 WL 1163928 (Bankr. W.D. Wash. 2009) ------------------------------------ 34

In re Karpe
  84 B.R. 926 (Bankr. M.D.Pa. 1988) ----------------------------------------------------------------26, 27

In re Lee Way Holding Co.
  120 B.R. 881, 891 (Bankr. S.D. Ohio 1990) ---------------------------------------------------- 38

In re Martin (Myers v. Martin)
  91 F.3d 389 (3d Cir. 1996)
  (citing In re Schipper (Fulton State Bank v. Schipper), 933 F.2d 513 (7th Cir. 1991)-----23, 36

In re Martin (Myers v. Martin), 91 F.3d 389 (3d Cir. 1996) ---------------------------------------- 23

In re Particle Drilling Technologies, Inc.  L 2382030, 2-4 (Bkrtcy.S.D.Tex. 2009) -------------- 31

In re Qintex Entertainment, Inc.
  950 F.2d 1492 (9th Cir. 1991) ------------------------------------------------------------------------ 24

In re Rock Indus. Mach. Corp.
  572 F.2d 1195 (7th Cir. 1978) ------------------------------------------------------------------------ 29

In re Snyder
  74 B.R. 872 (Bankr. E.D. Pa. 1987)------------------------------------------------------------------- 27

In re The Seychelles, Partnership and Genius Corp. v. Banyan Corp.
  32 B.R. 708 (N.D. Tex. 1983 ------------------------------------------------------------------------- 27

In re Walter
  83 B.R. 14 (9th Cir. BAP 1988) -------------------------------------------------------------- 23, 24, 25

In re Whittemore
  37 B.R. 93 (Bankr. D. Or. 1984) ---------------------------------------------------------------------- 30

In re Zimmer
  313 F.3d 1220 (9th Cir. 2002) ------------------------------------------------------------------------- 34

Martin v. Kane (In re A & C Properties)
  784 F.2d 1377, 1380-81 (9th Cir. 1986), cert. denied 479 U.S. 854 (1986)--------------------- 37

Newman v. Stein
  464 F.2d 689, 698 (2d Cir. 1972)--------------------------------------------------------------------- 38

Precision Indus., Inc. v. Qualitech Steel SBQ, LLC
  327 F.3d 537 (7th Cir.2003) --------------------------------------------------------------------------- 30

Thompkins v. Lil' Joe Records, Inc.
  476 F.3d 1294 (C.A.11 2007)-------------------------------------------------------------------------- 31

Titusville Country Club v. Pennbank (In re Titusville Country Club)
  128 B.R. 396, (Bankr. W.D. Pa. 1991) ------------------------------------------------------------ 24

United States v. Alaska National Bank (In re Walsh Constr., Inc.)
  669 F.2d 1325, 1328 (9th Cir. 1982)-------------------------------------------------------------- 37

Willemain v. Kivitz
  764 F.2d 1019 (4th Cir. 1985) -------------------------------------------------------------------- 27

Woodson v. Fireman's Fund Ins. Co. (In re Woodson)
  839 F.2d 610, 620 (9th Cir. 1988)---------------------------------------------------------------- 37

## STATUTES

11 U.S.C. § 363(b)(2)------------------------------------------------------------------------------------ 26
11 U.S.C. § 363(f)---------------------------------------------------------------------------------------- 30
11 U.S.C. § 363(f)(1) ----------------------------------------------------------------------------------- 31
11 U.S.C. § 363(f)(2) ----------------------------------------------------------------------------------- 32
11 U.S.C. § 363(f)(4) ----------------------------------------------------------------------------------- 32
11 U.S.C. § 705------------------------------------------------------------------------------------------- 26
11 U.S.C. § 1107 ------------------------------------------------------------------------------------------2, 8
11 U.S.C. § 1109 ------------------------------------------------------------------------------------------2, 8
11 U.S.C. § 1129 ----------------------------------------------------------------------------------------- 28
Cal. Com. Code § 9620---------------------------------------------------------------------------------- 35
Cal. Com. Code § 9622---------------------------------------------------------------------------------- 35
C.C.P. §708.110 (d) -------------------------------------------------------------------------------------- 33

## RULES

Fed. Rule Bk. P. 2002(a)(2)-----------------------------------------------------------------------------26, 27
Fed. Rule Bk. P. 2002(c)(1)----------------------------------------------------------------------------- 26
Fed. Rule Bk. P. 2002(c)(1)(I)-------------------------------------------------------------------------26, 27
Fed. Rule Bk. P. 2002(I) -------------------------------------------------------------------------------- 26
Fed. Rule Bk. P. 2002(k)-------------------------------------------------------------------------------- 26
Fed. Rule Bk. P. 6004(a) -------------------------------------------------------------------------------- 26
Fed. Rule Bk. P. 6004(c) --------------------------------------------------------------------------------26, 27
Local Bankruptcy Rule 6004-2 ------------------------------------------------------------------------- 26
Local Bankruptcy Rule 9013-1(1)(f)------------------------------------------------------------------- 26
Local Bankruptcy Rule 9014 ---------------------------------------------------------------------------- 26

1   TO THE HONORABLE PETER H. CARROLL, UNITED STATES BANRUPTCY

2   JUDGE; CIT GROUP/COMMERCIAL SERVICES, INC.; KITH ELECTRONICS LIMITED;

3   WELLS FARGO TRADE CAPITAL, LLC; THE HONG KONG AND SHANGHAI BANKING

4   CORPORATION LIMITED; JIANGSU HONGTU HIGH TECH CO., LTD.; SICHUAN

5   CHANGHONG ELECTRIC CO. LTD.; MPEG LA, LLC; THOMSON LICENSING LLC;

6   THOMSON MULTIMEDIA; FUNAI ELECTRIC CO., LTD.; KONINKLIJKE PHILIPS

7   ELECTRONICS N.V.; PHILIPS INTELLECTUAL PROPERTY AND STANDARDS; WI-

8   LAN V-CHIP CORP.; VIZIO, INC.; ORACLE CORPORATION; DISCOVISION

9   ASSOCIATES; DIGITAL CONTENT PROTECTION, LLC; DOLBY LABORATORIES, INC.;

10  HITACHI AMERICA, LTD.; THE OFFICE OF THE UNITED STATES TRUSTEE AND

11  PARTIES IN INTEREST:

12      PLEASE TAKE NOTICE that Apex Digital, Inc., a California corporation, the debtor

13  and debtor in possession in the above-captioned chapter 11 bankruptcy case (the "Debtor"), has

14  filed its Motion For Entry Of An Order: (A) Approving Compromise Of Controversy Between

15  Debtor And Secured Creditor; (B) Authorizing The Sale Of Substantially All Of The Debtor's

16  Assets Free And Clear Of Liens, Claims, Encumbrances And Interests; (C) Approving

17  Consulting Agreement; And (D) Granting Related Relief (the "Motion"). The terms of the

18  proposed settlement, sale and consulting agreement are set forth in the Consulting, Sale and

19  Settlement Agreement ("Agreement") dated as of August 17, 2010, between the Debtor, Kith

20  Consumer Product, Inc. ("Kith Consumer") and to a limited extent Kith Electronics Limited

21  ("KEL"), a copy of which is attached as Exhibit "1" to the Declaration of David Ji filed

22  concurrently herewith (the "Ji Declaration").

23      The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on

24  August 17, 2010 (the "Petition Date"). The Debtor continues to operate its business, manage its

25  financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to Sections

26  1107 and 1108 of the Bankruptcy Code.

27      The Debtor is a leading producer and seller of consumer electronic products, including

28

2

1  high-definition LCD televisions, home entertainment media devices, digital set top boxes and

2  green energy products (e.g., solar powered lights), which are carried and sold in hundreds of

3  retail outlets nationwide under the "Apex Digital" trademark.

4        The Debtor has operated under the "Apex Digital" trade name since its inception.

5  However, the Debtor's license to use the "Apex Digital" trade name expired on July 24, 2010.

6  Due to, among other things, the expiration of its license, the Debtor has elected to discontinue that

7  part of its business related to the production, import and sale of televisions or set top boxes and

8  related products (the "Television Business"), but wishes to continue that part of its business related

9  to the production and sale of lighting products and products related thereto (the "Lighting

10  Business"). The Lighting Business does not operate under the "Apex Digital" trade name.

11        The Debtor will not be able to maintain its required payments on the Debt from operation

12  of its Lighting Business alone. In addition, due to the expiration of its license agreement for the

13  trade name, the Debtor has ceased to sell products in the Television Business, and is unable to

14  dispose of its remaining inventory in the ordinary course of business.

15        The Debtor is indebted to KEL in the principal amount of $12,067,734.80 as of August 13,

16  2010, plus attorneys fees asserted by KEL in the amount of $130,395.25 (the "KEL Debt"), which

17  debt is secured by a valid, perfected first priority security interest and lien against substantially all

18  of the Debtor's assets including the Debtor's current and future accounts receivable and inventory

19  and proceeds thereof.

20        Kith Consumer (which is an affiliate of KEL) is engaged in the marketing and distribution

21  of consumer electronic products and wishes to retain an independent contractor to serve as a

22  consultant for its business and product development efforts and other services hereafter described

23  for Kith product lines and/or services currently offered, and/or distributed by Kith or that Kith may

24  from time to time hereafter develop, excluding lighting products (hereinafter the "Kith Products").

25  Kith Consumer anticipates that it will be able to obtain the rights to use the "Apex Digital" trade

26  name and would like to add that to its product line.

27

28

3

In the course of its business, the Debtor has developed very significant and relevant experience and necessary skills in securing orders and developing new business for products, overseeing and managing the manufacturing process for products, providing customer service and warranty service, and developing new and/or related products. Kith Consumer desires to retain the Debtor to provide such services on a consulting basis.

Subject to the approval of the Court, the Debtor and Kith Consumer have entered into the Agreement, pursuant to which the parties have agreed, with KEL's consent as to related provisions, to the settlement of the claim of KEL based on (i) the transfer to Kith Consumer of the Debtor's inventory, accounts receivable and certain other assets used in its Television Business in exchange for the assumption by Kith Consumer of a certain amount of the KEL Debt; and (ii) the retention by Kith Consumer of the Debtor as an independent contractor, pursuant to which the Debtor will provide to Kith Consumer certain consulting services as described in the Agreement.

While the Debtor values its television inventory at approximately $2,734,836.69 at cost with the "Apex Digital" trademark in place, the inventory may become of questionable value to the Debtor now that it has lost the right to use that trademark. The Debtor's only recourse other than a sale to Kith Consumer or some other party with the right to use the trademark may be to attempt to return the inventory to the manufacturers in China. In that event, and considering the costs of such return, the value would likely be a fraction of the current value placed on it by the Debtor in the ordinary course of business. If this occurs, the potential distribution from this estate to unsecured creditors could be severely impacted.

Following extensive negotiations, the Debtor, Kith Consumer and KEL have agreed to the following transaction:

1.    All of the Debtor's interest in the Television Business inventory, pre-paid inventory, accounts receivable, sale orders and related books and records (as more specifically described in the Agreement, the "Purchased Assets") will be transferred to Kith free and clear of liens, claims and encumbrances;

4

2.    The KEL Debt will be assumed by Kith Consumer except for the amount of $1,500,000 (the "Residual Claim") which shall remain as a secured claim against the Debtor's remaining assets to the same priority, force and effect as KEL's existing lien; and

3.    The Debtor will provide future consulting services to Kith Consumer on the terms and for the consideration set forth in the Agreement.

The proposed transactions are designed to preserve as much value as possible from the Debtor's existing assets and to provide the Debtor a future income stream from which it can propose a plan of reorganization and rebuild its business around the Lighting Business and the consulting services. The Debtor believes that the proposed transactions are in the best interest of creditors because they will reduce the amount of the KEL secured claim by approximately $10.7 million, leave the Debtor with the part of its business which is not subject to termination due to the loss of its trade name, and create a consulting agreement which will provide a future source of income and enable the Debtor to retain some of its employees.

It is important that the Agreement be approved and implemented without delay in order to avoid further loss of value of the inventory and receivables, and damage to customer relationships which are central to the consulting agreement. For this reason, the Debtor has not proposed a traditional bankruptcy auction process, given also that KEL and Kith Consumer are the parties uniquely in a position to offer the benefits available to the Debtor under the Agreement. Nevertheless, the Debtor has filed the Motion on regular notice in order to provide any party who wishes to present a higher and better offer the opportunity to do so.

This Motion is based upon 11 U.S.C. §§ 105(a), 363(c), and 363(f), Federal Rules of Bankruptcy Procedure 2002, 6004 and 9019, Local Bankruptcy Rule 6004-1, the accompanying Memorandum of Points and Authorities and the Declarations of David Ji and Alice Hsu filed concurrently herewith, the entire record of this bankruptcy case, the statements, arguments and representations of counsel to be made at the hearing on the Motion, and any other evidence properly presented to the Court at, or prior to, the hearing on the Motion.

5

WHEREFORE, based upon all of the foregoing, the Debtor respectfully requests that the Court:

1. Approve the Agreement and authorize the Debtor to carry out its terms;

2. Find that the KEL Debt is a valid secured claim as to the Purchased Assets, and authorize the sale of the Purchased Assets to Kith Consumer, free and clear of any liens, claims or encumbrance in such Purchased Assets within the meaning of Section 363(f) of the Bankruptcy Code (subject to permitted encumbrances), in exchange for the assumption by Kith Consumer of the Debt Assumption (as defined in the Agreement) and other consideration provided under the Agreement;

3. Find that the Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's-length bargaining positions and that Kith Consumer has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code and is a good faith buyer entitled to all of the protections afforded by that Section;

4. Order that the Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to the Agreement, or the breach thereof;

5. Provide that the Agreement and the transactions contemplated thereby may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, the Debtor or any chapter 7 or chapter 11 trustee of the Debtor;

6. Provide that the terms and provisions of the Agreement and the Order approving the Agreement shall be binding in all respects upon all persons, including, but not limited to, the Debtor and its estates and creditors and all governmental bodies;

7. Waive the 14-day period provided for in the Federal Rule of Bankruptcy Procedure 6004(h);

8. Determine that (i) the Residual Claim is an allowed claim against the Debtor's bankruptcy estate and not subject to objection, avoidance, subordination or other challenge by any entity, and (ii) the Residual Claim is secured by a valid, perfected first priority security interest and lien against all of Borrower's assets identified as collateral in the documentation for

6

1    KEL's security interest, including Debtor's  accounts receivable and inventory, which security

2    interest is not subject to objection, avoidance, subordination or other challenge by any entity; and

3         9.    Grant such other and further relief as the Court deems just and proper.

4    Dated: August 25, 2010    APEX DIGITAL, INC., a California corporation

6    By:    _____*/s/ Philip A. Gasteier*_____
        RON BENDER

7            PHILIP GASTEIER
        JULIET Y. OH

8            LEVENE, NEALE, BENDER, YOO

9            & BRILL  L.L.P.
        Proposed Attorneys for Chapter 11

10           Debtor and Debtor in Possession

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### THE DEBTOR'S BUSINESS HISTORY

The Debtor is a privately held California corporation headquartered in Walnut, California. The Debtor opened its doors in 1997, and has proven itself a leading market force in consumer electronics since that time. Since its inception, the Debtor's mission has been and continues to be to provide quality consumer electronics products for the average American at competitive prices.

On August 17, 2010 (the "Petition Date"), Apex Digital, Inc. (the "Debtor"), the debtor and debtor in possession herein, filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code"). The Debtor is operating its business, managing its financial affairs and operating its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

From its start, the Debtor was one of the earliest companies to harness the then-emerging Chinese original equipment manufacturer ("OEM") Original Designed Manufacturer ("ODM") industry. An OEM manufactures products or components that are purchased by a company and retailed under the primary company's brand name. An ODM is a company which designs and manufactures a product which is specified and eventually branded by another firm for sale. Such companies allow the brand firm to produce (either as a supplement or solely) without having to engage in the organization or running of a factory. In late 1999, the Debtor decided to move to enter the DVD market. The Debtor struck immediate success in February 2002 when the retailer Circuit City bought 5,000 units and sold them almost immediately. Due to the Debtor's low price point and because at that time only the DVD player that the Debtor produced could also play MP3 music discs, the Debtor's sales soared.

The Debtor quickly revolutionized the electronics industry by also moving into the LCD television business. The Debtor persuaded Wal-Mart, KMart, Best Buy and other discount retailers to stock its products. The Debtor's revenues jumped from $28 million in 2000 to

8

1    approximately $700 million in 2003.  In fact, Time Magazine recognized the Debtor, its

2    extensive global influence and success and named its President David Ji as one of its fifteen

3    "global influentials" of 2002.  While its sales grew, the Debtor continued to keep a slim profit

4    margin and spent very little money on advertising.  Rather, the Debtor's success was based on

5    aggressive pricing, desirable features, and new product designs capable of being realized in 3 to

6    6 months instead of the industry standard of two years.

7        The Debtor continued its expansion into the television market in 2001, and in 2002, the

8    Debtor entered into a purchase agreement with Sichuan Changhong Electronics Co., Ltd

9    ("Changhong"), a state-owned television manufacturer in China.    The Debtor's successes

10   continued.  By 2003, the Debtor commanded a 10% share of the United States DVD player

11   market and its gross sales was approximately $700 million a year.  As more fully set forth below,

12   while the Debtor's relationship with Changhong was initially profitable, it later became the

13   major factor in its decline.

14       As a result of extensive industry contracts (established by David Ji over a period of more

15   than a decade), the Debtor possesses a myriad of marketing channels.  The Debtor's business is

16   presently concentrated in two markets – consumer electronics and, more recently, green energy

17   in the form of solar powered lights.  With the former, the Debtor has focused on nationwide

18   consumer sales of LCD high definition television and converter set top boxes, along with other

19   consumer electronics product lines – all branded in its name through such large scale chains as

20   Best Buy, Costco, Target and Wal-Mart.  The Debtor has also offered its products on the

21   internet, through such outlets as Amazon and Tiger Direct.

22       The Debtor is well known for its ability to bring new innovations to the mass consumer

23   market.  The Debtor developed a new product line – portable consumer solar lighting for outdoor

24   safety and landscaping – branded under an XEPA product line.  Although solar lights are

25   relatively new, the Debtor recently filled an order of 48,000 units to Costco that generated

26   approximately $1.65 million in gross sales.  The Debtor has been contacted by other large

27   retailers to supply its solar lights and expects the same success with its solar lighting product line

28

9

1   as it has enjoyed with DVD players, televisions and set top boxes. In fact, because solar lights

2   do not require as many licenses, the profit margins are higher and will most likely generate larger

3   net profits for the Debtor. In addition, the Debtor expects to introduce several new models of

4   lights for different uses, ranging from solar motion detector lights to solar landscaping lights.

5   

II.

6   

EVENTS LEADING TO THIS CHAPTER 11 FILING

7   Despite its success, the Debtor started having financial problems in 2003. Products such

8   as DVD players and televisions require patent licenses, which many of the manufacturers sought

9   out and obtained. As the consumer electronics market developed, margins thinned for the Debtor

10   as well as its competitors, and disputes and disagreements arose between the Debtor and its

11   manufacturers as to which party was to bear the cost of various licenses.

12   In addition to this setback, by April 2003, the Debtor had paid Changhong \$250 million

13   but Changhong claimed it was owed over \$200 million more. The Debtor strongly disputed this

14   contention and relations between Changhong and the Debtor began to severely deteriorate. In

15   2004, a widely publicized debacle began when Changhong caused Mr. Ji to be detained in China

16   for over two years.

17   While Changhong made a plethora of charges against Mr. Ji, he was never formally

18   charged with a crime. He was exonerated of all charges. However, he was not able to leave

19   China as his release was negotiated at the highest levels of government. During this time, the

20   Debtor effectively had no leadership. The Debtor's sales dramatically declined from hundreds of

21   millions of dollars to \$10 million in gross revenue by 2007. To obtain his release, Mr. Ji was

22   forced to sign numerous documents drafted by Changhong's attorneys that were intended to sign

23   away all of the Debtor's legal claims against Changhong and assign all of the Debtor's assets to

24   Changhong. Mr. Ji was also forced to surrender many of his personal assets, including various

25   interests in businesses, and to permit Changhong to obtain a lien against his personal residence

26   and assets for over \$400 million. After two years of efforts on all fronts – including intervention

27   efforts by President George W. Bush, Governor Arnold Schwarzenegger and other American

28   

10

1   political leaders in 2007, Mr. Ji was finally able to negotiate his release (with the assistance of

2   counsel) which, for political reasons, required concessions from the Debtor and from Mr. Ji

3   personally. The terms of his release were negotiated through a "Foundational Agreement"

4   among Changhong, the Debtor and Mr. Ji, a true and correct of which is attached as Exhibit "2"

5   to the Ji Declaration. Mr. Ji returned to California in 2007.

6        As set forth above and in the Foundational Agreement, Changhong was paid a substantial

7   sum of money, and the Debtor was required to forfeit significant rights, including its ownership

8   of the "Apex Digital" trademark. A true and correct copy of the trademark assignment is

9   attached to the Ji Declaration as Exhibit "3." Until recently, Changhong licensed the "Apex

10   Digital" trademark back to the Debtor which it regularly renewed on an annual basis. On or

11   about July 9, 2010, the Debtor received a notice from Changhong that it would not renew the

12   Debtor's license to use the "Apex Digital" trademark. A true and correct copy of this letter,

13   along with a certified translation is attached to the Ji Declaration as Exhibit "4." Accordingly,

14   the Debtor's prior rights to use the "Apex Digital" trademark expired on July 24, 2010. The

15   Foundational Agreement also provides Changhong with an "option" to acquire 70% of the equity

16   in the Debtor with no further capital contribution.

17        During the period of Mr. Ji's detention in China, many of the Debtor's customers took

18   note of the situation and simply stopped paying the Debtor in the hope that it would go out of

19   business.

20        The Debtor took immediate steps to deal with its financial decline. The Debtor sold its

21   real property located at 2626 Vista Industrial Parkway, Rancho Dominguez, California (the

22   proceeds of which went entirely to Changhong) and the real property that housed its former

23   corporate headquarters and warehouse located at 2919 East Philadelphia Street, Ontario,

24   California 91761. In an effort to cut costs, the Debtor leased a modest office and warehouse

25   space located in Walnut, California and laid off over a hundred employees, leaving a bare-bones

26   staff of fewer than 30 employees.

27

28

1          After Mr. Ji's return to the United States in 2007, Mr. Ji was determined to rebuild the

2 Debtor, virtually from scratch.  Mr. Ji built new relationships with new manufacturers in China.

3 At the same time, Mr. Ji personally reached out to American retailers and reconnected with key

4 customers such as Best Buy, Target, Costco and Walmart.  The Debtor became well known for

5 its set top boxes which became popular when the United States moved from analog to digital

6 television broadcast transmission in June 2009.  The Debtor again earned top honors in sales of

7 set top boxes in the government program.  In the two-plus years since his return, Mr. Ji rebuilt

8 the Debtor's operations and increased annual gross revenues, from approximately $10 million

9 dollars to approximately $120 million in year 2009.   However, because margins have

10 dramatically thinned in the television distribution business, the Debtor has not been able to

11 generate sufficient net revenue to satisfy its legacy debt.

12          The Debtor's current problems arise from outstanding licensing fees due to various

13 license holders, such as MPEG-LA, LLC ("MPEG") and Thomson.  The Debtor's outstanding

14 (disputed) unsecured royalty debt is approximately $32 million, a large portion of which is

15 related to the Debtor's distribution of LCD televisions.  Although the Debtor disputes much of

16 this debt for a variety of reasons, the Debtor has attempted to negotiate with the license owners

17 since 2007 to pay off the legacy debt and, in some cases, enter into new licensing agreements.

18 Although the Debtor was successful in its negotiations with some of its creditors, like Wi-Lan

19 and Philips, it was unsuccessful with others, like MPEG.  Against this backdrop, and given a

20 string of recent adverse events noted below, it is now impossible for the Debtor to continue to

21 distribute televisions.

22          a.      MPEG.  MPEG is an administrator of patent licenses, primarily audio and

23 video licenses, and licenses and collects royalties on behalf of numerous patent holders.

24 Various licensing disputes have arisen between MPEG and the Debtor since 2002.  The

25 parties have settled on at least two occasions and the Debtor has paid more than $20

26 million to MPEG from 1997 to 2009.  Despite the Debtor's efforts to work with MPEG,

27 MPEG filed a lawsuit in New York for breach of contract (a settlement agreement) which

28

was ultimately re-filed and is currently presently in the Los Angeles Superior Court for the State of California (Case No. BC416816). On June 28, 2010, the Superior Court entered its Minute Order/Ruling on MPEG's Application For Right of Attachment Order ("Minute Order"). A true and correct copy of the Minute Order is attached to the Ji Declaration as Exhibit "5." Although MPEG claims that it is owed over $21 million, the Superior Court found that MPEG had failed to establish a "likelihood of success" for a majority of its asserted claim, and awarded a Writ of Attachment for less than $4 million.

b.    Jiangsu Hongtu High Tech Co., Ltd. ("Hongtu"). Hongtu is also a state-owned Chinese manufacturer (like Changhong). On October 18, 2006, Hongtu obtained a Chinese arbitration award in the amount of $8 million. Although the Debtor questioned the propriety of Hongtu's judgment, the foreign judgment was confirmed by the United States District Court on August 5, 2009 (Case No. CV 08-3102-GW(PLAx)). A copy of the ruling in Motion/Petition To Confirm Foreign Arbitration Award is attached to the Ji Declaration as Exhibit "6." Hongtu has recently begun aggressively pursuing its judgment. Specifically, on May 27, 2010, it served a notice of debtor examination on Alice Hsu (the Debtor's Chief Operating Officer). Ms. Hsu appeared for examination on June 15, 2010 and July 14, 2010, and produced documents as requested. A copy of Hongtu's proof of service on Alice Hsu and the District Court's Civil Minutes are attached to the Ji Declaration as Exhibits "7" and "8," respectively.

c.    Kith Default. Kith Electronics Limited ("KEL") is the Debtor's senior secured creditor. KEL holds a blanket UCC-1 lien against substantially all of the Debtor's assets. Presumably concerned with the threat to the Debtor's ongoing business operations, and the risk that its collateral would be seized by MPEG or Hongtu, on June 7, 2010, KEL served its Notice of Default on the Debtor. A true and correct copy of the Notice of Default is attached to the Ji Declaration as Exhibit "9." On July 6, 2010, the Debtor received a further notice from KEL regarding the Debtor's default under the parties' Security Agreement, which indicated that KEL intended to seek judicial action

13

against the Debtor and demanded that the Debtor segregate its collateral. A true and correct copy of the July 6, 2010 notice is attached to the Ji Declaration as Exhibit "10."

d. Apex Digital Trade Name. On or about July 9, 2010, the Debtor received notice that Changhong would not renew the Debtor's license to use the "Apex Digital" trade name, effectively barring the Debtor from using the "Apex Digital" trade name as of July 24, 2010 (see, Exhibit "4" to the Ji Declaration). The Debtor is informed and believes that Changhong has or will grant the license to use the "Apex Digital" trademark (as of or after July 24, 2010) to Kith Consumer Product, Inc. ("Kith Consumer"), an affiliate of KEL.

III.

## THE DEBTOR'S LIABILITIES

The four creditors described below have recorded financing statements with the California Secretary of State against the Debtor asserting liens upon substantially all or a portion of the Debtor's assets.

a. The CIT Group/Commercial Services, Inc. ("CIT"). The Debtor and CIT were parties to a Factoring Agreement dated as of December 17, 2001. To secure the Debtor's obligations under such Factoring Agreement, the Debtor granted to CIT a lien and security interest upon certain accounts receivable and related assets as collateral for the Debtor's obligations to CIT. Thereafter, the Factoring Agreement with CIT was terminated and CIT agreed that its collateral would be limited only to accounts receivable created on or prior to January 1, 2008, any merchandise represented thereby (delivered or undelivered) and any proceeds thereof. Based on the Debtor's books and records, the Debtor's current assets do not include any of the accounts receivable covered by CIT's financing statement and the Debtor owes no money to CIT.

b. KEL. Since approximately February, 2008, KEL has provided financing to the Debtor to, among other things, purchase inventory. To secure these obligations, the Debtor granted to KEL a lien and security interest upon substantially all of the Debtor's assets,

14

including the Debtor's current and future accounts receivable and inventory and proceeds thereof, pursuant to that certain Security Agreement dated as of September, 2008. A true and correct copy of the Security Agreement between the Debtor and KEL is attached to the Ji Declaration as Exhibit "11." On August 12, 2008, KEL recorded a financing statement with the California Secretary of State, a copy of which is attached to the Ji Declaration as Exhibit "12." Based on the Debtor's books and records, and the Security Agreement, financing statement and related documents (collectively, the "Loan Documents"), the outstanding principal amount owed to KEL was $12,067,734.80 as of August 13, 2010, plus attorneys' fees of $130,395.25 asserted by KEL (the "KEL Debt"). A copy of the KEL Invoice Aging Report as of August 13, 2010, which evidences the indebtedness to KEL in the amount of $12,067,734.80, is attached to the Declaration of Alice Hsu filed concurrently herewith (the "Hsu Declaration") as Exhibit "A." No further payments have been made to KEL since August 13, 2010. The report reflects that KEL provided 90 day terms on shipments to the Debtor. All invoices listed on this report reflect unpaid invoices for goods shipped to the Debtor by KEL. The Debtor believes that KEL is the only creditor with a valid and unavoidable lien against substantially all of the Debtor's assets, including inventory and receivables.

c. Wells Fargo Trade Capital, LLC ("Wells"). The Debtor and Wells were parties to a Factoring Agreement (Collection) dated as of 2009 (the "Wells Factoring Agreement"). A true and correct copy of the Wells Factoring Agreement is attached to the Ji Declaration as Exhibit "13." To secure the Debtor's obligations under the Wells Factoring Agreement, the Debtor granted to Wells a lien and security interest upon the Debtor's presently existing and thereafter created receivables, general licenses, permits, property, tangible or intangible, at any time in Wells' possession or subject to Wells' control as collateral for the Debtor's obligations to Wells. On or about January 21, 2010, the Debtor exercised its rights under the Wells Factoring Agreement and terminated such agreement. A true and correct copy of the letter terminating the Wells Factoring

15

Agreement is attached to the Ji Declaration as Exhibit "14." Based on the Debtor's books and records, no money is owed to Wells.

d.    The HongKong and Shanghai Banking Corporation Limited ("HSBC"). The Debtor and HSBC were parties to that certain Assignment of Factoring Proceeds (No Advances) Agreement dated as of February 9, 2009 (the "HSBC Assignment Agreement"), which agreement relates to the Wells Factoring Agreement, specifically to provide for the assignment to HSBC of 80% of the monies due or to become due to the Debtor under the Wells Factoring Agreement. A true and correct copy of the HSBC Assignment Agreement is attached to the Ji Declaration as Exhibit "15." To secure the Debtor's obligations under the HSBC Assignment Agreement, the Debtor granted to HSBC a lien and security interest upon the 80% portion of all proceeds, monies, credit balances and claims for monies due or to become due to the Debtor under the Wells Factoring Agreement as collateral for the Debtor's obligations to HSBC. As previously noted, the Debtor terminated the Wells Factoring Agreement on January 21, 2010 (see, Exhibit "14" hereto). Given the termination of the Wells Factoring Agreement and the Debtor's belief that no money is owed to Wells, it follows that no money is owed to HSBC.

In addition, as previously noted, in connection with the state court litigation involving the Debtor and MPEG, the Superior Court awarded to MPEG a pre-judgment Writ of Attachment in the sum of $3,946,678. To the best Debtor's information and knowledge, MPEG has levied on or attempted to levy on certain of the Debtor's assets consisting of bank accounts at Hanmi Bank and certain accounts receivable, all within the past 30 days or less. Any such attachment liens should be terminated as a result of the bankruptcy.

Based on the foregoing, the Debtor submits that it is only KEL which may have a valid and unavoidable lien on the Debtor's inventory, accounts receivable and other assets.

In addition to the amount outstanding to KEL, the Debtor's books and records reflect liabilities totaling approximately $44 million. This includes Hongtu's judgment in the amount of

16

1  $8 million, royalty liability of approximately $32 million (most of which is disputed by the
2  Debtor), and other accrued expenses and liabilities totaling approximately $4 million.

3                                          IV.

4                          THE DEBTOR'S ASSETS

5          Television Inventory.  Based on the Debtor's books and records, the current value as of
6  August 13, 2010, of the inventory relating to that part of the Debtor's business related to the
7  production, import and sale of televisions or set top boxes and related products (the "Television
8  Business"), at cost, is approximately $2,734,836.69.  A summary of the Debtor's inventory
9  relating to the Television Business (the "Television Inventory") is provided in Exhibit "B" to the
10 Hsu Declaration.  The Agreement with Kith Consumer provides for the sale of the Debtor's
11 inventory relating to the Television Business for approximately the value set forth herein.  The
12 resale value of such inventory could potentially be much higher.  However, without the rights to
13 use the trade name, the value of such inventory to the Debtor could be far less.

14         Lighting Inventory.  Based on the Debtor's books and records, the current value as of
15 August 13, 2010, of the inventory relating to the Debtor's green energy lighting business, at cost,
16 is approximately $49,476.01.  A summary of the Debtor's inventory relating to the lighting
17 business is provided in Exhibit "B" to the Hsu Declaration.  The resale value of such inventory
18 could potentially be much higher.

19         Customer and Warranty Services Inventory.  Based on the Debtor's books and records,
20 the current value as of August 13, 2010, of the inventory relating to the Debtor's customer and
21 warranty services (for the Television Business or otherwise), at cost, is approximately
22 $319,221.18.  A summary of the Debtor's inventory relating to the Debtor's customer and
23 warranty services business is provided in Exhibit "B" to the Hsu Declaration.

24         Television Receivables.  Based on the Debtor's books and records, the aggregate face
25 value as of August 13, 2010, of the accounts receivable relating to the Debtor's Television
26 Business is approximately $8,422,749.90 ("Television AR").  A summary of the Debtor's
27 accounts receivable relating to the Television Business is provided in Exhibit "C" to the Hsu
28

                                           17

1    Declaration. Based on historical collection rates, the Debtor believes that approximately 95% of
2    these accounts receivable are collectable, resulting in an estimated current value of
3    $8,001,612.40. The Debtor's settlement agreement with Kith Consumer provides for the sale of
4    the Debtor's accounts receivable relating to the Television Business for approximately the value
5    set forth herein.

6         Lighting Receivables. Based on the Debtor's books and records, the aggregate face value
7    as of August 13, 2010, of the accounts receivable relating to the Debtor's green energy lighting
8    business is approximately $1,494,740.54. A summary of the Debtor's accounts receivable
9    relating to the lighting business is provided in Exhibit "C" to the Hsu Declaration. Based on
10   historical collection rates, the Debtor believes that approximately 95% of these accounts
11   receivable are collectable, resulting in an estimated current value of $1,420,003.51.

12        Fixed Assets and Equipment. Based on the Debtor's books and records, the current
13   market value as of August 13, 2010, of the Debtor's fixed assets and equipment (after accounting
14   for depreciation) is approximately $160,000. A summary of the Debtor's fixed assets and
15   equipment is provided in Exhibit "D" to the Hsu Declaration.

16        Based on the Debtor's books and records and the above analysis, the Debtor believes that
17   the aggregate market value of its inventory, accounts receivable, fixed assets and equipment is
18   approximately $12,685,149.79, although the actual realizable value of the inventory relating to
19   the Television Business may significantly reduce that figure in the absence of the Agreement.

20                                             V.

21                     PROPOSED TRANSACTIONS UNDER THE AGREEMENT

22        Given the recent expiration of the Debtor's license to use the "Apex Digital" trademark,
23   which is associated with the Debtor's television and set top box products, the Debtor no longer
24   has the financial wherewithal or ability to continue operating the Television Business. However,
25   in order to retain some value from its remaining inventory and from its past association with the
26   brand, the Debtor has entered into the Consulting, Sale and Settlement Agreement
27   ("Agreement") dated as of August 17, 2010, between the Debtor, Kith Consumer and to a limited
28

1   extent KEL, a copy of which is attached as Exhibit "1" to the Ji Declaration. In brief, the

2   Agreement provides for (i) the transfer to Kith Consumer of the Debtor's inventory, accounts

3   receivable and other related assets used in the Debtor's Television Business in exchange for the

4   assumption by Kith Consumer of a certain portion of the debt owed by the Debtor to KEL, and

5   (ii) Kith Consumer's retention of the Debtor as its consultant to provide, among other things,

6   business and product development services and customer service and warranty services for

7   certain consumer electronic products. The Agreement will enable the Debtor to utilize and

8   monetize its pipeline connections as a consultant, notwithstanding its inability to continue

9   operating the Television Business. The Debtor will retain its lighting business and other assets.

10       The Agreement provides for a settlement among the Debtor, KEL and Kith Consumer

11   under which core assets of the Television Business included in KEL's collateral, including the

12   Television Inventory and Television AR, will be transferred to Kith Consumer in exchange for

13   (i) Kith Consumer's assumption of – and the release of the debtor from – an equivalent amount

14   of KEL Debt (the "Debt Assumption"); and (ii) Kith Consumer's agreement to retain the Debtor

15   to provide consulting services.  Thus, the transactions include a sale, debt assumption, a

16   settlement and a consulting agreement.

17       All of the Debtor's interest in the Television Inventory, Television AR, pre-paid

18   inventory relating to the Television Business (the "Television Prepaid Inventory"), and open or

19   pending sales orders relating to the Television Business (collectively, and as more specifically

20   described in the Agreement, the "Purchased Assets") will be sold to Kith Consumer free and

21   clear of liens, claims and Encumbrances (as defined in the Agreement).

22       The KEL Debt will be assumed by Kith Consumer except for the amount of $1,500,000

23   (the "Residual Claim") which shall remain as a secured claim against the Debtor's remaining

24   assets to the same priority, force and effect as KEL's existing lien; provided that, if the Debtor

25   cannot deliver title to the Television Inventory and the Television Prepaid Inventory free and

26   clear of all claims including intellectual property violations, including but not limited to

27   infringement claims, Kith Consumer may elect to exclude the Television Inventory and the

28

1  Television Prepaid Inventory from the sale, in which event the $10,698,130.05 Debt Assumption
2  will be reduced by the sum of $2,500,000 – which will be an <u>unsecured</u> claim in against the
3  Debtor.

4       Thus, the Debtor will receive the benefit of the reduction of the secured KEL Debt in an
5  amount approximately equal to the value of the Television AR and Television Inventory valued
6  at cost. This is a significant benefit for the Debtor since the Debtor could not continue to sell the
7  Television Inventory without the Apex Digital trademark license. In addition, the transfer of the
8  receivables to an ongoing business will help to insure their continued value. Since receipt of the
9  trademark termination notice, the Debtor has reviewed possible means of realizing value from
10 the Television Inventory and its past association with the Apex Digital brand. The Debtor has
11 contacted potential interested parties including several other Chinese companies, all of whom
12 expressed no interest. Ultimately, Changhong also concluded that Kith Consumer was the best
13 party to receive the new license for the "Apex Digital" trademark, given the financial and
14 business strength of KEL and its prior involvement with financing the supply of product to the
15 Debtor. The Debtor has found no better way in which the Debtor can realize the most value than
16 under the Agreement. The Debtor's only recourse other than a sale to Kith Consumer or some
17 other party with the right to use the trade name may be to attempt to return the inventory to the
18 manufacturers in China. In that event, and considering the costs of such return, the value would
19 likely be a fraction of the current value placed on it by the Debtor in the ordinary course of
20 business.

21      The Debtor will provide consulting services to Kith Consumer and receive compensation
22 on sales by Kith Consumer of products bearing the mark "Apex" or "Apex Digital" that are sold
23 by Kith to both the Debtor's customers existing as of the Closing Date (as that term is defined in
24 the Agreement) and to customers procured by the Debtor as part of the Debtor's performance of
25 the consulting services contemplated by the Agreement ("<u>Included Products</u>"). The consulting
26 services shall include the identification and introduction to Kith Consumer of existing and
27 potential business suppliers, customers, and partners for both existing and new product and new
28

20

1   product feature development, assistance in product brand positioning and business strategy
2   meetings, provision of customer and warranty services for Included Products, and other related
3   services as reasonably requested by Kith, all as set forth in greater detail in the Agreement. For
4   the remainder of 2010, the Debtor will receive a monthly advance of $100,000.00, with the
5   amount of the advance to be adjusted for following periods.  The Debtor will receive a
6   commission of up to 1.5%, dependant on the applicable gross profit margin, on sales of up to
7   $50,000,000, and a commission to be negotiated on sales greater than that amount. The Debtor
8   estimates that it will earn over $500,000 in commissions through the end of 2010. The sale of
9   the Purchased Assets is to be on an "as is, where is, with all faults" basis. Representations and
10  warranties in the Agreement will not survive the Closing Date.  However, the Agreement
11  provides for certain indemnities by both parties, among them the indemnity of Kith by the
12  Debtor for not to exceed $500,000.00 in connection with the use, possession or ownership of the
13  Purchased Assets prior to the Closing Date.  The $500,000.00 indemnity cap is based on the
14  amount of unpaid royalties which may be associated with the Television Inventory. The Debtor
15  should be permitted to sell the Purchased Assets, including the Television Inventory, free and
16  clear of all Encumbrances, including claims for unpaid royalties and for infringement. However,
17  Kith Consumer does not wish to be bound to purchase the Television Inventory and Television
18  Prepaid Inventory in the event that Debtor cannot obtain the necessary order for any reason. In
19  that event, Kith Consumer will have the right to exclude those assets from the sale, and to reduce
20  the Debt Assumption by $2,500,000.00. Even though it will then retain the assets, the Debtor
21  would still benefit from the conversion of $2,500,000.00 of the KEL Debt to an unsecured claim.

22          The closing of the transactions are subject to certain conditions. The Order approving the
23  Agreement must be entered by September 17, 2010.  It is important that the Agreement be
24  approved and implemented without delay in order to avoid further loss of value of the inventory
25  and receivables, and damage to customer relationships which are central to the consulting
26  agreement.  For this reason, the Debtor has not proposed a traditional bankruptcy auction
27  process, given also that KEL and Kith Consumer are the parties uniquely in a position to offer
28

1    the benefits available to the Debtor under the Agreement. Nevertheless, the Debtor has filed this
2    Motion on regular notice in order to provide any party who wishes to present a higher and better
3    offer the opportunity to do so.

4    　　As a part of the settlement with KEL, the Debtor has agreed that $1.5 million of the
5    Residual Claim shall remain subject to KEL's existing security interest and lien, to the same
6    priority, force and effect as KEL's existing lien, and (i) shall be an allowed claim against the
7    Debtor's bankruptcy estate and not subject to objection, avoidance, subordination or other
8    challenge by any entity, and (ii) is secured by a valid, perfected first priority security interest and
9    lien against substantially all of Debtor's assets, including Debtor's accounts receivable and
10    inventory, which security interest is not subject to objection, avoidance, subordination or other
11    challenge by any entity. The value of inventory and receivables in the lighting business exceed
12    the amount of this remaining secured claim. Given the benefits of the settlement, the fact that
13    most of the KEL Debt is being eliminated as a secured claim, and that the value of the remaining
14    collateral is in excess of the remaining secured debt, this settlement is more than justified.

15    　　The Agreement contains other provisions, including detailed provisions concerning the
16    consulting services, and provisions of the type normally contained in such agreements. The
17    description contained herein is a summary only and is qualified in its entirety by the contents of
18    the Agreement, which will control in the event of any conflict with this summary.

19                                    VI.

20                        REORGANIZATION OBJECTIVES

21    　　It has become increasingly apparent that the Debtor will not be able to resolve its legacy
22    debt in a consensual and feasible manner. Given the ongoing litigation against the Debtor, the
23    recent loss of the Debtor's license to use the "Apex Digital" trademark (which is mostly associated
24    with the Debtor's television and set top box products), and Kith's declaration of default and related
25    demands, the Debtor no longer has the financial wherewithal or ability to continue distributing
26    televisions and set top boxes. Through its chapter 11 bankruptcy case, the Debtor seeks to modify
27    its business plan to enable it to utilize and monetize its pipeline connections as a consultant (which
28

1    the Debtor expects will provide it with essentially the same net revenue) and focus on growing its

2    green energy product line, while dealing with the claims arising from the licensing disputes that

3    have continued to plague the Debtor, the Debtor's legacy debt, and obligations to Changhong in a

4    cohesive and efficient manner.

5        The transactions under the Agreement will be a large step forward in reorganizing the

6    Debtor's business and providing for the realization of value by general unsecured creditors.

7                                    VII.

8                  SALE OF ASSETS SHOULD BE APPROVED

9    A.    The Court Should Authorize the Debtor to Sell Its Assets to Kith Consumer Pursuant to the

10        Terms of the Agreement.

11        Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing,

12    may use, sell or lease, other than in the ordinary course of business, property of the estate." To

13    approve a use, sale or lease of property other than in the ordinary course of business, the court

14    must find "some articulated business justification." See, e.g., In re Martin (Myers v. Martin), 91

15    F.3d 389, 395 (3d Cir. 1996) citing In re Schipper (Fulton State Bank v. Schipper), 933 F.2d 513,

16    515 (7th Cir. 1991); Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.), 722

17    F.2d 1063, 1070 (2d Cir. 1983); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d

18    Cir. 1986) (implicitly adopting the "sound business judgment" test of Lionel Corp. and requiring

19    good faith); In re Delaware and Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991) (concluding that

20    the Third Circuit adopted the "sound business judgment" test in the Abbotts Dairies decision).

21        In the Ninth Circuit, "cause" exists for authorizing a sale of estate assets if it is in the best

22    interest of the estate, and a business justification exists for authorizing the sale.    In re

23    Huntington, Ltd., 654 F.2d 578 (9th Cir. 1981); Walter v. Sunwest Bank (In re Walter), 83 B.R.

24    14, 19-20 (9th Cir. B.A.P. 1988).  The Ninth Circuit has also held that §363 allows the sale of

25    substantially all assets of a debtor's bankruptcy estate after notice and a hearing.    In re Qintex

26    Entertainment, Inc., 950 F.2d 1492 (9th Cir. 1991).

27        In determining whether a sale satisfies the business judgment standard, courts have held

28

                                    23

1   that: (1) there be a sound business reason for the sale; (2) accurate and reasonable notice of the

2   sale be given to interested persons; (3) the sale yield an adequate price (i.e., one that is fair and

3   reasonable); and (4) the parties to the sale have acted in good faith. Titusville Country Club v.

4   Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); see also,

5   In re Walter, 83 B.R. at 19-20).

6          The Debtor submits that the proposed sale to Kith Consumer comports with each of these

7   four criteria and demonstrates that the Debtor's business judgment to proceed with the sale is

8   sound.

9          1.     Sound Business Purpose.

10         There must be some articulated business justification, other than appeasement of major

11  creditors, for using, selling or leasing property out of the ordinary course of business before the

12  bankruptcy court may order such disposition under §363(b). In re Lionel Corp., 722 F.2d at

13  1070.   The Ninth Circuit Bankruptcy Appellate Panel in In re Walter, supra, has adopted a

14  flexible case-by-case test to determine whether the business purpose for a proposed sale justifies

15  disposition of property of the estate under § 363(b).  In Walter, the Bankruptcy Appellate Panel

16  adopting the reasoning of the Fifth Circuit in In re Continental Airlines, Inc., 780 F.2d 1223 (5th

17  Cir. 1986) and the Second Circuit in In re Lionel Corp., supra, articulated the standard to be

18  applied under § 363(b) as follows:

19                      Whether the proffered business justification is sufficient depends
20                   on the case.  As the Second Circuit held in Lionel, the bankruptcy
                     judge should consider all salient factors pertaining to the
21                   proceeding and, accordingly, act to further the diverse interests of
                     the Debtor, creditors and equity holders, alike.  He might, for
22                   example, look to such relevant facts as the proportionate value of
                     the asset to the estate as a whole, the amount of elapsed time since
23                   the filing, the likelihood that a plan of reorganization will be
                     proposed and confirmed in the near future, the effect of the
24                   proposed disposition on future plans of reorganization, the
                     proceeds to be obtained from the disposition vis-à-vis any
25                   appraisals of the property, which of the alternatives of use, sale or
                     lease the proposal envisions and, most importantly perhaps,
26                   whether the asset is increasing or decreasing in value.  This list is
27                   not intended to be exclusive, but merely to provide guidance to the

28

                                          24

1    bankruptcy judge.

2    In Re Walter, 83 B.R. at 19-20, citing In re Continental Air Lines, Inc., 780 F.2d 1223, 1226 (5th

3    Cir. 1986).

4    As explained above, while the Debtor values its Television Inventory at approximately

5    $6,000,000 at cost with the "Apex Digital" trade name in place, the Television Inventory may

6    become virtually worthless to the Debtor now that it has lost the right to use that trade name.

7    The Debtor's only recourse other than a sale to Kith Consumer or some other party with the right

8    to use the trade name may be to attempt to return the inventory to the manufacturers in China. In

9    that event, and considering the costs of such return, the value would likely be a fraction of the

10   current value placed on it by the Debtor in the ordinary course of business. If this occurs,

11   unsecured creditors will very likely receive no distribution whatsoever from this estate.

12   The proposed transactions are designed to preserve as much value as possible from the

13   Debtor's existing assets and to provide the Debtor a future income stream from which it can

14   propose a plan of reorganization and rebuild its business around the lighting business and the

15   consulting services. The Debtor believes that the proposed transactions are in the best interest of

16   creditors because they will reduce the amount of the KEL secured claim by in excess of $10

17   million, leave the Debtor with the part of its business which is not subject to termination due to

18   the loss of its trade name, and create a consulting agreement which will provide a future source

19   of income and enable the Debtor to retain some of its employees.

20       2.    Accurate and Reasonable Notice.

21   In connection with a proposed sale under §363 of the Bankruptcy Code, "four pieces of

22   information must be presented to the creditors. The notice should: place all parties on notice that

23   the debtor is selling its business; disclose accurately the full terms of the sale; explain the effect

24   of the sale as terminating the debtor's ability to continue in business; and explain why the

25   proposed price is reasonable and why the sale is in the best interest of the estate." In re Delaware

26   & Hudson Railway Co., 124 B.R. 169, 180 (D. Del. 1991). A notice is sufficient if it includes

27   the terms and conditions of the sale and if it states the time for filing objections. In re Karpe, 84

28

25

1  B.R. 926, 930 (Bankr. M.D. Pa. 1988). The purpose of the notice is to provide an opportunity

2  for objections and hearing before the court if there are objections. Id.

3      Rule 6004(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

4  provides in pertinent part that notice of a proposed sale not in the ordinary course of business

5  must be given pursuant to Fed. R. Bankr. P. 2002(a)(2), (c)(1), (i) and (k), and, if applicable, in

6  accordance with § 363(b)(2) of the Bankruptcy Code. Fed. R. Bankr. P. 6004(a). Bankruptcy

7  Rule 2002(a)(2) requires at least 20 days' notice by mail of a proposed sale of property of the

8  estate other than in the ordinary course of business, unless the Court for cause shown shortens

9  the time or directs another method of giving notice. Fed. R. Bankr. P. 2002(a)(2). Bankruptcy

10 Rule 2002(c)(1) requires that the notice of a proposed sale include the date, time and place of any

11 public sale, the terms and conditions of any private sale, and the time fixed for filing objections.

12 It also provides that the notice of sale or property is sufficient if it generally describes the

13 property. Fed. R. Bankr. P. 2002(c)(1). Bankruptcy Rule 2002(i) requires that the notice be

14 mailed to committees elected pursuant to 11 U.S.C. § 705 or appointed pursuant to 11 U.S.C. §

15 1102. Fed. R. Bankr. P. 2002(i). Bankruptcy Rule 2002(k) requires that the notice be given to

16 the United States Trustee. Fed. R. Bankr. P. 2002(k).

17     Bankruptcy Rule 6004(c) provides that a motion for authority to sell property free and

18 clear of liens or other interests must be made in accordance with Bankruptcy Rule 9014 and must

19 be served on the parties who have liens or other interests in the property to be sold. Fed. R.

20 Bankr. P. 6004(c).

21     Local Bankruptcy Rule 9013-1(d)(2) requires that, unless otherwise ordered by the Court,

22 a notice of motion and motion be served at least 21 days before the hearing on the date specified

23 in the notice. L.B.R. 9013-1(d)(2).

24     In addition, Local Bankruptcy Rule 6007-1(f) requires that an additional copy of the

25 Notice be submitted to the Clerk of the Bankruptcy Court together with a document Form 6004-2

26 at the time of filing for purposes of publication. L.B.R. 6007-1(f).

27     The Debtor has complied with all of the above provisions of the Bankruptcy Code, the

28

26

1  Bankruptcy Rules and the Local Bankruptcy Rules, subject to any modifications to service
2  ordered by this Court. The Debtor has complied with Bankruptcy Rules 6004(a) and 2002(a)(2),
3  (c)(1), (i) and (k), because the Notice that has been filed contemporaneously herewith, which
4  includes the date time and place of the sale and the deadline for objecting thereto, was served on
5  the United States Trustee, all of the Debtor's known creditors, and all parties requesting special
6  notice.  The Debtor has complied with Bankruptcy Rule 6004(c), because the Notice and the
7  Motion were also served upon the parties who have alleged liens or interests in the assets to be
8  sold.  The Debtor has complied with the requirements of Local Bankruptcy Rule 6007-1(f)
9  because the Debtor has filed the Notice and Form 6004-2 with the Clerk of the Bankruptcy
10 Court. The Motion has been filed on regular notice.

11        The Debtor submits that the foregoing satisfies the requirements of Bankruptcy Rules
12 6004(a) and (c).   The Debtor has complied with all noticing procedures required by the
13 Bankruptcy Rules and Local Bankruptcy Rules.

14        3.      Fair and Reasonable Price.

15        In order to be approved under § 363(b) of the Bankruptcy Code, the purchase price must
16 be fair and reasonable. Coastal Indus., Inc. v. U.S. Internal Revenue Service (In re Coastal
17 Indus., Inc.), 63 B.R. 361, 368 (Bankr. N.D. Ohio 1986).  Several courts have held that "fair
18 value" is given for property in a bankruptcy sale when at least 75% of the appraised value of
19 such property is paid. See In re Karpe, 84 B.R. at 933; In re Abbotts Dairies of Pennsylvania,
20 Inc., 788 F.2d 143, 149 (3d Cir. 1986); Willemain v. Kivitz, 764 F.2d 1019 (4th Cir. 1985); In re
21 Snyder, 74 B.R. 872, 878 (Bankr. E.D. Pa. 1987); In re The Seychelles, Partnership and Genius
22 Corp. v. Banyan Corp., 32 B.R. 708 (N.D. Tex. 1983). However, the Debtor also realizes that its
23 "main responsibility, and the primary concern of the bankruptcy court, is the maximization of the
24 value of the asset sold." In re Integrated Resources, Inc., 135 B.R. 746, 750 (Bankr. S.D.N.Y.
25 1992), aff'd, 147 B.R. 650 (S.D.N.Y. 1992). "It is a well-established principle of bankruptcy law
26 that the objective of bankruptcy rules and the [debtor's] duty with respect to such sales is to
27 obtain the highest price or greatest overall benefit possible for the estate."  In re Atlanta
28

27

1  Packaging Products, Inc., 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988); see also In re Wilde Horse

2  Enterprises, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991) ["in any sale of estate assets, the ultimate

3  purpose is to obtain the highest price for the property sold"].

4      As discussed above, the book value of the Debtor's Television Inventory and Television

5  AR totals approximately $11,157,586.59. However, the Debtor estimates that 95% of the

6  Television AR, or approximately $8,001,612.40, would be collectible in the ordinary course of

7  business; however, since the Debtor is unable to continue the Television Business, it is

8  reasonable to anticipate that that the collections by the Debtor would fall short of that amount. In

9  addition, the Television Inventory – with a book value of $2,734,836.69 – is of questionable

10 actual value to the Debtor without the trademark rights. Even assuming that 95% of the

11 Television AR is collectible and that the Debtor could obtain 50% of the book value of the

12 Television Inventory, the recovery to the Debtor would be approximately $9,369,000.00.

13     Pursuant to the Agreement, the sale of the Purchased Assets will result in a reduction of

14 the indebtedness to KEL of $10,698,130.05 if the Television Inventory is included. If the

15 Television Inventory is not included there will be a reduction in the secured claim of the same

16 amount, and an absolute reduction of $8,198,130.05. In either event, the reduction in the secured

17 claim will be well in excess of the anticipated recoverable value to the Debtor under any other

18 scenario identified to date. In addition, the Debtor is obtaining the future benefit of the

19 consulting services compensation under the Agreement. In the absence of the sale to Kith, the

20 value of the Debtor's television assets will drop considerably. If this occurs, there may be no

21 value remaining in the estate for the benefit of the unsecured creditors. Based on the foregoing,

22 the Debtor submits that the price to be paid by Kith Consumer is fair and reasonable.

23     4.    Good Faith.

24     When a bankruptcy court authorizes a sale of assets pursuant to § 363(b)(1), it is required

25 to make a finding with respect to the "good faith" of the purchaser. In re Abbotts Dairies, 788

26 F.2d at 149. Such a procedure ensures that § 363(b)(1) will not be employed to circumvent the

27 creditor protections of Chapter 11, and as such, it mirrors the requirement of § 1129, that the

28

28

1   Bankruptcy Court independently scrutinizes the debtor's reorganization plan and makes a finding

2   that it has been proposed in good faith. Id. at 150.

3          "Good faith" encompasses fair value, and further speaks to the integrity of the

4   transaction.   In re Wilde Horse Enterprises, 136 B.R. at 842.   With respect to the Debtor's

5   conduct in conjunction with the sale, the good faith requirement "focuses principally on the

6   element of special treatment of the Debtor's insiders in the sale transaction." See In re Industrial

7   Valley Refrig. and Air Cond. Supplies, Inc., 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987). With respect

8   to the buyer's conduct, this Court should consider whether there is any evidence of "fraud,

9   collusion between the purchaser and other bidders or the [debtor], or an attempt to take grossly

10  unfair advantage of other bidders." In re Abbotts Dairies, 788 F.2d at 147, In re Rock Indus.

11  Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978); In re Wilde Horse Enterprises, Inc., 136 B.R.

12  at 842; In re Alpha Industries, Inc., 84 B.R. 703, 706 (Bankr. D. Mont. 1988). In short, "[l]ack

13  of good faith is generally determined by fraudulent conduct during the sale proceedings." In re

14  Apex Oil Co., 92 B.R. 847, 869 (Bankr. E.D. Mo. 1988), citing In re Exennium, Inc., 715 F.2d

15  1401, 1404-05 (9th Cir. 1983).

16         In In re Filtercorp, Inc., 163 F.3d 570 (9th Cir. 1998), the Ninth Circuit set forth the

17  following test for determining whether a buyer is a good faith purchaser:

18              A good faith buyer "is one who buys 'in good faith' and 'for
                value.'" [citations omitted.] [L]ack of good faith is [typically]
19              shown by 'fraud, collusion between the purchaser and other
                bidders or the trustee, or an attempt to take grossly unfair
20              advantage of other bidders.'" [citations omitted.]
21
    Filtercorp, 163 F.3d at 577.
22

23         The Ninth Circuit made clear in Filtercorp that this standard for determining good faith is

24  applicable even when the buyer is an insider.

25         In the present case, KEL is a secured creditor of the Debtor, and has declared a default in

26  payment and demanded its rights to turnover of its collateral under the Uniform Commercial

27  Code.  The sale is being consummated pursuant to a consensual settlement with the secured

28

1    creditor. Neither Kith Consumer, KEL nor any parties affiliated with them are "insiders" of the

2    Debtor. No common identity of directors or controlling stockholders exists between Kith

3    Consumer and the Debtor. None of the principals of the Debtor has any financial interest in KEL

4    or in Kith Consumer. The Debtor is not aware of any fraud, collusion or attempt to take unfair

5    advantage of any potential bidders or interested parties. The Agreement between Kith Consumer

6    and the Debtor was extensively negotiated at arm's length with all parties involved acting in

7    good faith. Based on the foregoing, the Debtor submits that the Court should find that Kith

8    Consumer is a good faith purchaser entitled to all of the protections afforded by $ 363(m) of the

9    Bankruptcy Code.

10   B.    Section 363(f) of the Bankruptcy Code Permits the Debtor's Sale of Assets to Be Free and

11         Clear of Any Liens, Claims or Interests.

12         Bankruptcy Code § 363(f) provides that a debtor may sell property of the estate "free and

13   clear of any interest in such property" if:

14              (1)    applicable non-bankruptcy law permits the sale of such property free

15                     and clear of such interest;

16              (2)    such entity consents;

17              (3)    such interest is a lien and the price at which such property is to be sold

18                     is greater than the aggregate value of all liens on such property;

19              (4)    such interest is in bona fide dispute; or

20              (5)    such entity could be compelled, in a legal or equitable proceeding, to

21                     accept a money satisfaction of such interest.

22   11 U.S.C. §363(f). Because § 363(f) is in the disjunctive, the Debtor must only meet one of the

23   five subsections of § 363(f) in order to sell the Purchased Assets free and clear of all liens,

24   claims, interests and encumbrances. In re Whittemore, 37 B.R. 93, 94 (Bankr. D. Or. 1984).

25         The bankruptcy statute does not define "interest," but courts have interpreted the term

26   broadly. See Precision Indus., Inc. v. Qualitech Steel SBQ, LLC, 327 F.3d 537, 545-46 (7th

27   Cir.2003) (leasehold);. Compak Companies, LLC v. Johnson, 415 B.R. 334, 339 (N.D.Ill. 2009)

28

                                              30

1    (license).

2              (1)    The Sale Should Be Approved Under 11 U.S.C. § 363(f)(1) As To

3                     Unsecured Claims.

4              Several parties, including MPEG, have asserted claims for unpaid royalties.  Some of

5    these claims are in dispute (see, for example, MPEG Right to Attach Order).  The claims assert

6    rights to payment on an unsecured basis (subject to any amounts which may have been enforced

7    by levy on assets).  To the extent that claims for damages based on unpaid royalties or violation

8    of trademark or intellectual property rights constitute an interest in the inventory, accounts or

9    other Purchased Assets, they are claims against the Debtor and do not legally attach to the

10   Purchased Assets after sale.    See Thompkins v. Lil' Joe Records, Inc. 476 F.3d 1294,

11   1313 (C.A.11 2007); In re Particle Drilling Technologies, Inc. L 2382030, 2-4 (Bkrtcy.S.D.Tex.

12   2009).  The Purchased Assets may therefore be sold free and clear of such claims

13             It is important that the order approving the sale and settlement expressly provide for the

14   sale of the Television Inventory and other Purchased Assets free and clear of such claims.  The

15   Agreement requires that the Approval Order (as defined therein) confirm the sale free and clear

16   of Encumbrances, which are defined therein as "any lien, encumbrance, claim, right, demand,

17   charge, mortgage, option, pledge, security interest or similar interests, title defects and claims

18   relating to unpaid license fees, royalty fees, other intellectual property violations and

19   infringement claims, all to the extent subject to §363(f) of the Bankruptcy Code, tenancies (and

20   other possessory interests), easements, rights of way, covenants, encroachments, rights of first

21   refusal, preemptive rights, judgments, conditional sale or other title retention agreements and

22   other impositions or imperfections of title or restrictions on transfer of any nature whatsoever."

23   In addition, pursuant to sections 1.5 and 2.1 of the Agreement, Kith may decline to include the

24   Television Inventory and the Television Prepaid Inventory in the sale if the Debtor cannot

25   deliver title to such assets free and clear of all claims including intellectual property violations,

26   including but not limited to infringement claims; in that event, the Debt Assumption is decreased

27   by $2.5 million, with such amount to become a general unsecured claim.

28

31

1    Given that such claims are claims for monetary relief which do not attach to the

2    Purchased Assets, and that there are no security interests supporting such claims, the Purchased

3    Assets may be sold free and clear of such claims.

4    (2)    The Sale Should Be Approved Under 11 U.S.C. § 363(f)(2).

5    Section 363(f)(2) of the Bankruptcy Code authorizes a sale to be free and clear of an

6    interest if the interest holder consents to the sale. In this case, KEL, as the primary secured

7    creditor, has consented to the proposed transaction pursuant to the Agreement. As a result, §

8    363(f)(2) has been satisfied as to KEL. The Debtor believes that no other valid and unavoidable

9    liens exist. To the extent any other liens exist, they are junior to the lien of KEL and will likely

10    be unsecured claims in this case. The Debtor believes that the benefits of the Agreement are

11    sufficiently clear that junior lien holders and holders of unsecured claims will not object. They

12    will therefore be deemed to have consented to the sale.

13    (3)    The Sale Should Be Approved Under 11 U.S.C. § 363(f)(4).

14    To the extent that any creditors asserting intellectual property infringement claims oppose

15    the sale free and clear of liens, the Motion should be granted based on the fact that such claims

16    are in bona fide dispute. Specifically, the Debtor believes that it has the requisite licenses for the

17    Television Inventory, and does not consent to the validity of any contrary claims at this time.

18    Even if any such claims prove to have merit, however, the claims should constitute unsecured

19    claims and not attach to the Purchased Assets. Any such claims or claims for unpaid royalties

20    are disputed by the Debtor. Accordingly, any interest asserted based on such claims is subject to

21    a bona fide dispute.

22    Also, any liens asserted by MPEG as a result of attachment levies, or by Hongtu based on

23    an ORAP resulting from service of its notice of judgment debtor exam, are either void or

24    avoidable, and therefore subject to bona fide dispute. All were initiated within 90 days of the

25    filing of the petition on August 17, 2010. The MPEG Right to Attach Order was issued June 28,

26    2010, and any liens would have been created by levies effected thereafter. See, California Code

27    of Civil Procedure §488.500. Any attachment lien obtained within 90 days of the filing of the

28

32

1  petition in this case is terminated pursuant to California Code of Civil Procedure §493.030(b).

2  Similarly, service of the Hongtu notice of judgment debtor exam occurred on May 27, 2010, also

3  within 90 days of the filing of the petition. Any ORAP lien resulting from that service is also

4  avoidable as a preference. See, California Code of Civil Procedure §708.110 (d).

5            (4)    The Sale Should Be Approved Under 11 U.S.C. § 363(f)(5).

6         The Debtor believes that other than the security interest of KEL, there are no other valid

7  and unavoidable liens on the Purchased Assets. KEL has consented to the sale, and any other

8  liens are either terminated or subject to bona fide dispute. However, even if junior liens exist,

9  the Debtor can sell free and clear of such liens under § 363(f)(5).

10        The Bankruptcy Appellate Panel for the Ninth Circuit recently scrutinized § 363(f)(5) in

11  the context of the sale of real property. See Clear Channel Outdoor, Inc. v. Knupfer (In re PW,

12  LLC), 391 B.R. 25 (9th Cir. B.A.P. 2008) ("Clear Channel"). In Clear Channel, the senior

13  secured creditor attempted to purchase the debtor's real property by way of a credit bid, free and

14  clear of the interest of a nonconsenting junior lienholder outside of a plan of reorganization. The

15  Bankruptcy Court approved the sale to the senior lender under § 363(f)(5), finding that §

16  363(f)(5) permits a sale free and clear of the creditor's interest in property "whenever a claim can

17  be paid with money." 391 B.R. at 42.

18        In reversing the Bankruptcy Court's decision, the Bankruptcy Appellate Panel found that

19  § 363(f)(5) requires that "(1) a proceeding exists or could be brought, in which (2) the nondebtor

20  could be compelled to accept a money satisfaction of (3) its interest." Id. at 41. Taking up these

21  factors in reverse order, the Bankruptcy Appellate Panel concluded that a lien, such as the lien of

22  the Bank here at issue, constitutes an "interest" for purposes of § 363(f)(5). With respect to the

23  second factor, the Bankruptcy Appellate Panel ruled that § 363(f)(5) refers to those proceedings

24  in which the creditor "could be compelled to take less than the value of the claim secured by the

25  interest." Id. In order to approve a sale free and clear under § 363(f)(5), the Court must "make a

26  finding of the existence of ... a mechanism [to address extinguishing the lien or interest without

27  paying such interest in full] and the [debtor in possession] must demonstrate how satisfaction of

28

33

1   the lien 'could be compelled.'" Id. at 45. Finally, the Bankruptcy Appellate Panel held that §

2   363(f)(5) requires that there be, "or that there be the possibility of, some proceeding, either at

3   law or at equity, in which the nondebtor could be forced to accept money in satisfaction of its

4   interest." Id.

5       Here, all of the factors set forth in Clear Channel for a sale free and clear of the

6   mechanic's lienholder interests are satisfied. Specifically, any party who asserts an "interest" in

7   the Purchased Assets which is junior to the KEL's lien could be compelled, in a legal or

8   equitable proceeding, to accept a money satisfaction of its interest. Recently, the Bankruptcy

9   Court in In re Jolan, Inc., 2009 WL 1163928 (Bankr. W.D. Wash. 2009) provided an analysis of

10  the Bankruptcy Appellate Panel's decision in Clear Channel and suggested that the scope of the

11  Panel's ruling in Clear Channel should be narrowly construed to the facts of that particular case.

12  The Court in Jolan noted that the appellees defending the sale free and clear in Clear Channel

13  never argued that there were any qualifying "legal or equitable proceedings" beyond the

14  cramdown under § 1129 and that the Panel, in turn, exercised its prerogative to limit its ruling to

15  the arguments presented by the parties. Id. at 3.[2]

16      Accordingly, the Panel in Clear Channel did not address whether any non-contractual

17  mechanisms exist whereby a lienholder might get less than full payment yet lose the lien. Id. at

18  3. The Court in Jolan, however, did address the issue and concluded that there are a number of

19  legal and equitable proceedings available in Washington in which a junior lienholder could be

20  compelled to accept a money satisfaction including, without limitation, "a senior secured party's

21  disposition of collateral under the default remedies provided in part VI of Article 9" of

22  Washington's Uniform Commercial Code (specifically, RCW 62A.9A-617), and the disposition

---

24  [2] The Clear Channel decision is not binding on this court as it remains an open issue whether
    BAP opinions are binding on the bankruptcy courts in this Circuit. Zimmer v. PSB Lending Corp (In re
25  Zimmer), 313 F.3d 1220, 1225 n. 3 (9th Cir. 2002), and accordingly, the Court's own analysis may be and
    should be independent of any influences of the Clear Channel holding. The Debtor does not adopt the
26  Clear Channel holdings and, specifically, contends that the ability to cramdown under § 1129 is also a
    proper basis for a sale free and clear under section 363(f)(5). However, it is unnecessary to decide that
27  issue as adequate grounds consistent with the decision in Clear Channel exist here.

1   of real property through "judicial and nonjudicial foreclosures, which operate to clear junior

2   lienholders' interests, with their liens attaching to proceeds in excess of the costs of sale and the

3   obligation or judgment foreclosed." Id. at 3-4.

4          There are legal and equitable proceedings available in California which parallel the

5   proceedings discussed by the Court in Jolan. Specifically, a junior lienholder in California could

6   be compelled to accept a money satisfaction upon a senior secured party's disposition of

7   collateral under the default remedies provided in § 9617 of California's Uniform Commercial

8   Code. In addition, the Commercial Code authorizes strict foreclosure, under which a secured

9   creditor can accept collateral in full or partial satisfaction of the debt secured if the debtor

10  consents or does not object within a time certain. Strict foreclosure discharges any subordinate

11  security interest or other subordinate lien, and terminates any other subordinate interest. See,

12  e.g., Cal. Com. Code § 9622. The settlement in this case is equivalent in part to an acceptance of

13  collateral in partial satisfaction of the secured obligation pursuant to Cal. Com. Code § 9620.

14         Based on the foregoing, the Debtor respectfully submits that the holder of any party who

15  asserts a junior lien against the Purchased Assets could be compelled, in a legal or equitable

16  proceeding, to accept a money satisfaction of its interest. Since the result could be accomplished

17  under the Uniform Commercial Code it can be accomplished under §363.   Under these

18  circumstances, the sales should be approved under § 363(f)(5) of the Bankruptcy Code.

19  C.     The Debtor Requests the Court to Waive the 14-Day Waiting Period Set Forth in

20         Bankruptcy Rule 6004(h).

21         Bankruptcy Rule 6004(h) provides, among other things, that an order authorizing the use,

22  sale or lease of property is stayed until the expiration of 14 days after entry of the Court order,

23  unless the Court orders otherwise.

24         In order to facilitate the most expeditious sale closing possible given all of the time

25  exigencies in this case, the Debtor requests that the Approval Order approving this transaction be

26  effective immediately upon entry by providing that the 14-day waiting period of Bankruptcy

27  Rule 6004(h) is waived.   This will enable the Debtor to consummate its sale in the most

28

35

1   expeditious manner possible.  The Agreement requires that the Approval Order be entered by
2   September 17, 2010, and that the Closing Date occur within five (5) business days of the entry of
3   the Approval Order.

VIII.

## THE CONSULTING SERVICES ASPECT OF THE AGREEMENT IS A WISE EXERCISE
## OF THE DEBTOR'S BUSINESS JUDGMENT AND SHOULD BE APPROVED

Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  To approve a use, sale or lease of property other than in the ordinary course of business, the court must find "some articulated business justification."  See, e.g., In re Martin (Myers v. Martin), 91 F.3d 389, 395 (3d Cir. 1996) citing In re Schipper (Fulton State Bank v. Schipper), 933 F.2d 513, 515 (7th Cir. 1991); Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of Lionel Corp. and requiring good faith); In re Delaware and Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the Abbotts Dairies decision).

The Agreement to provide consulting services to Kith Consumer is another significant benefit to the Debtor under the Agreement, and a very significant element of consideration for the sale of the Purchased Assets.  The Debtor no longer has the license to use the trademark with which it achieved prior acclaim and success.  It retains the contacts and expertise developed during its tenure with that brand, however, and wishes to utilize that to continue to benefit from the brand.  By agreeing with Kith Consumer to serve as a consultant in exchange for a percentage of sales of Apex Digital products to the Debtor's existing customers and those additional customers procured by the Debtor, the Debtor has created a way to produce income in the future from its past association with the trademark.  The Debtor projects that it may receive approximately $549,000 from the consulting services through then end of 2010.

In negotiating the Agreement, the Debtor's management took into account the

36

1  commissions which would be needed to cover the expenses associated with providing the

2  consulting services. Based on the type of customer and the Debtor's existing customer contacts

3  and relationships, the Debtor anticipates that it will receive significant commissions for a period

4  of years as long as this arrangement continues, providing the Debtor with a significant revenue

5  stream and net profits from the consulting services.

6      The Debtor developed its customer relationships over the past decade, and has a proven

7  record of product development and sales during that time. It knows the market well. The

8  potential benefits from the consulting services aspect of the Agreement, and the benefits from the

9  Agreement as a whole, clearly justify the Debtor's business judgment. Approval of the

10  consulting agreement is clearly in the best interest of the Debtor and creditors.

11                                                    IX.

12                    COMPROMISE OF CONTROVERSY SHOULD BE APPROVED

13      Bankruptcy Rule 9019(a) provides that:

14          On motion by the [debtor in possession] and after notice and
            hearing, the court may approve a compromise or settlement.
15          Notice shall be given to creditors, the United States trustee, the
            debtor and indenture trustees as provided in [Bankruptcy Rule]
16          2002 and to any other entity as the court may direct.

17  Fed. R. Bankr. P. 9019(a).

18
        The Court of Appeals for the Ninth Circuit has long recognized that "[t]he bankruptcy
19
    court has great latitude in approving compromise agreements." Woodson v. Fireman's Fund Ins.
20
    Co. (In re Woodson), 839 F.2d 610, 620 (9th Cir. 1988). "The purpose of a compromise
21
    agreement is to allow the [debtor in possession] and the creditors to avoid the expenses and
22
    burdens associated with litigating sharply contested and dubious claims." Martin v. Kane (In re
23
    A & C Properties), 784 F.2d 1377, 1380-81 (9th Cir. 1986), cert. denied 479 U.S. 854 (1986).
24
    Accordingly, in approving a settlement agreement, the Bankruptcy Court need not conduct an
25
    exhaustive investigation of the claims sought to be compromised. See United States v. Alaska
26
    National Bank (In re Walsh Constr., Inc.), 669 F.2d 1325, 1328 (9th Cir. 1982). Rather, it is
27
    sufficient that the Bankruptcy Court find that the settlement was negotiated in good faith and is
28

                                                    37

1   reasonable, fair, and equitable. See In re A & C Properties, supra, 784 F.2d at 1381.

2     The Court of Appeals for the Ninth Circuit has identified the following factors for

3   consideration in determining whether a proposed settlement agreement is reasonable, fair, and

4   equitable:

5      (a) the probability of success in the litigation;

6      (b) the difficulties, if any, to be encountered in the matter of collection;

7      (c) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and

8
9      (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

10   In re A & C Properties, supra, 784 F.2d at 1381 (the "A & C Factors").

11     Consideration of these factors does not require the Bankruptcy Court to determine

12   whether a settlement presented is the best one that could possibly have been achieved. Rather,

13   the Bankruptcy Court need only canvass the issues to determine whether the settlement falls

14   "below the lowest point in the zone of reasonableness." Newman v. Stein, 464 F.2d 689, 698 (2d

15   Cir. 1972) (emphasis added), cert. denied sub nom. Benson v. Newman, 409 U.S. 1039 (1972);

16   see also Anaconda-Ericsson Inc. v. Hessen (In re Teltronics Services, Inc.), 762 F.2d 185, 189

17   (2d Cir. 1985); Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983), cert.

18   denied 464 U.S. 822 (1983). Finally, although the Bankruptcy Court should give deference to

19   the reasonable views of creditors, "objections do not rule.   It is well established that

20   compromises are favored in bankruptcy."   In re Lee Way Holding Co., 120 B.R. 881, 891

21   (Bankr. S.D. Ohio 1990).

22     The Debtor submits that the terms of the compromise, as reflected in the Agreement, are

23   fair, reasonable, and in the best interests of its creditors and the estate. In the present case, the

24   Debtor was faced with a difficult situation due to the termination of its trade name license.

25   Coupled with the contested and uncontested liabilities which had accumulated, the termination

26   left the Debtor with a business too small to service its secured debt, and no sure way to realize

27   value from its Television Inventory. The settlement with KEL allows the Debtor to realize value

28

38

1  from its assets in the form of significant reduction in secured indebtedness and future income to
2  provide for settlement of its debt.

3          As a part of the settlement, Debtor has agreed that $1.5 million of the Residual Claim
4  shall remain subject to KEL's existing security interest and lien, to the same priority, force and
5  effect as KEL's existing lien, and (i) shall be an allowed claim against the Debtor's bankruptcy
6  estate and not subject to objection, avoidance, subordination or other challenge by any entity,
7  and (ii) is secured by a valid, perfected first priority security interest and lien against all of
8  Debtor's assets identified in the Loan Documents, including Debtor's  accounts receivable and
9  inventory, which security interest is not subject to objection, avoidance, subordination or other
10 challenge by any entity.  Given the benefits of the settlement, the fact that most of the Kith Debt
11 is being eliminated as a secured claim, and that the value of the remaining collateral is in excess
12 of the remaining secured debt, this settlement is more than justified.

13     A.    The probability of success in the litigation.

14         At this time, litigation is not an issue.  However, should litigation commence between the
15 Debtor and KEL, it is unlikely that the Debtor would be successful given that it does not dispute
16 the indebtedness or the security interest of KEL in substantially all of its assets, including
17 inventory and receivables.  Moreover, the foreclosure of the Debtor's inventory and accounts
18 receivable would not likely produce the debt reduction provided under the Agreement – and
19 would not provide the benefits of the consulting agreement.

20         The Debtor would have difficulty establishing that it could provide adequate protection of
21 KEL's interest in its collateral.  While the Debtor has obtained KEL's consent to use of cash
22 collateral, such use is permitted on a limited basis and for a limited time period.  Without the
23 Agreement, the Debtor's ability to continue to operate would be in jeopardy.

24     B.    The difficulties, if any, to be encountered in the matter of collection.

25         The Debtor believes this is not a material issue in this case based on the fact that the
26 Debtor is the party primarily obligated under the Loan Documents.  As a result, the Debtor
27 would not have to pursue collection efforts as against KEL.

28

39

1        C.     The complexity of the litigation involved, and the expense, inconvenience, and
2               delay necessarily attending it.

The Debtor submits that this factor overlaps first factor the above and the Debtor incorporates the foregoing discussion herein. Moreover, the primary choice here is between liquidation of assets and loss of business opportunity, or realization of asset value and preservation of an ongoing business pursuant to the Agreement.

        D.     The paramount interest of the creditors and a proper deference to their reasonable
               views in the premises.

The interests of creditors primarily include maximizing the value of the Debtor's estate, and preserving the Debtor's business so as to promote the ability of the Debtor to propose a plan which provides value to creditors. Pursuant to the sale and compromise transaction, the Debtor will benefit from a significant reduction in secured indebtedness and the future revenue stream from the consulting agreement. As a result, the Debtor submits that approval of the compromise, as incorporated in the Agreement, is in the overwhelming best interest of all creditors of the Debtor's estate.

## X.

## CONCLUSION

WHEREFORE, based upon all of the foregoing, the Debtor respectfully requests that the Court:

1.     Approve the Agreement and authorize the Debtor to carry out its terms;

2.     Find that the KEL Debt is a valid secured claim as to the Purchased Assets, and authorize the sale of the Purchased Assets to Kith Consumer, free and clear of any Encumbrance in such Purchased Assets within the meaning of Section 363(f) of the Bankruptcy Code (subject to Permitted Encumbrances), in exchange for the assumption by Kith Consumer of the Debt Assumption (as defined in the Agreement) and other consideration provided under the Agreement;

40

1    3.    Find that the Agreement was negotiated, proposed and entered into by the parties

2    without collusion, in good faith and from arm's-length bargaining positions and that Kith

3    Consumer has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy

4    Code and is a good faith buyer entitled to all of the protections afforded by that Section;

5    4.    Order that the Court shall retain jurisdiction to resolve any controversy or claim

6    arising out of or relating to the Agreement, or the breach thereof;

7    5.    Provide that this Agreement and the transactions contemplated hereby may be

8    specifically enforced against and binding upon, and not subject to rejection or avoidance by, the

9    Debtor or any chapter 7 or chapter 11 trustee of the Debtor;

10    6.    Provide that the terms and provisions of the Agreement and the Order approving

11    the Agreement shall be binding in all respects upon all persons, including, but not limited to, the

12    Debtor and its estates and creditors and all governmental bodies;

13    7.    Waive the 14-day period provided for in the Federal Rule of Bankruptcy

14    Procedure 6004(h).

15    8.    Determine that (i) the Residual Claim is an allowed claim against the Debtor's

16    bankruptcy estate and not subject to objection, avoidance, subordination or other challenge by

17    any entity, and (ii) the Residual Claim is secured by a valid, perfected first priority security

18    interest and lien against all of Borrower's assets identified as collateral in the Loan Documents,

19    including Debtor's accounts receivable and inventory, which security interest is not subject to

20    objection, avoidance, subordination or other challenge by any entity; and

21    ///

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28

41

1          9.          Grant such other and further relief as the Court deems just and proper.

2     Dated:  August 25, 2010                    APEX DIGITAL, INC., a California corporation

3

4                                          By:  _____*/s/ Philip A. Gasteier*_____
5                                                RON BENDER
                                                 PHILIP A. GASTEIER
6                                                JULIET Y. OH
                                                 LEVENE, NEALE, BENDER, YOO
7                                                & BRILL L.L.P.
                                                 Proposed Attorneys for Chapter 11
8                                                Debtor and Debtor in Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| In re: | CHAPTER 11 |
|--------|------------|
| APEX DIGITAL, INC., | CASE NO. 2:10-bk-44406-PC |
| Debtor(s). | |

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067.

A true and correct copy of the foregoing document described as NOTICE OF MOTION AND MOTION FOR ENTRY OF AN ORDER: (A) APPROVING COMPROMISE OF CONTROVERSY BETWEEN DEBTOR AND SECURED CREDITOR; (B) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (C) APPROVING CONSULTING AGREEMENT; AND (D) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On August 25, 2010, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Russell Clementson   russell.clementson@usdoj.gov
- John W Kim    jkim@nossaman.com
- Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com
- Kathy Bazoian Phelps   kphelps@dgdk.com
- George E Schulman   GSchulman@DGDK.Com
- David B Shemano   dshemano@pwkllp.com
- United States Trustee (LA)   ustpregion16.la.ecf@usdoj.gov

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL OR ATTORNEY SERVICE:** On August 25, 2010, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service and/or by attorney service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

*VIA ATTORNEY SERVICE*
Hon. Peter H. Carroll
U. S. Bankruptcy Court/Los Angeles Div.
Edward R. Roybal Fed. Bldg. & Courthouse
255 E. Temple Street, Suite 1539
Los Angeles, CA 90012

> Service information on attached page [ X] **(ALL ENTITIES SERVED VIA UNITED STATES MAIL UNLESS NOTED OTHERWISE**

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 25, 2010 | JOHN BERWICK | |
|-----------------|--------------|--|
| *Date* | *Type Name* | *Signature* |

Debtor
Apex Digital, Inc.
301 Brea Canyon Road
Walnut, CA 91789

Office of the United States Trustee
Attn:  Russell Clementson
725 South Figueroa St., 26th Floor
Los Angeles, CA 90017

MPEG LA, LLC
c/o Michael H. Steinberg, Esq.
Sullivan & Cromwell LLP
1888 Century Park East, Ste. 2100
Los Angeles, California 90067-1725

MPEG LA, LLC
6312 S. Fiddlers Green Circle, Ste. 400E
Greenwood Village, Colorado 80111

Thomson Licensing LLC
P.O. Box 5312
Princeton, New Jersey 08543-5312

Served via Federal Express 2nd Day Delivery
Thompson Multimedia
46 Quai Alphonse Le Gallo
Boulogne
France 92468

Funai Electric Co., LTD.
c/o Wayne Alexander, Esquire
Hogan & Hartson LLP
1999 Avenue of the Stars, Ste. 1400
Los Angeles, California 90067

Served via Federal Express 2nd Day Delivery
Funai Electric Co., LTD.
7-1, 7 Chome, Nagaito
Daita, Osaka 574-0013
Japan

Served via Federal Express 2nd Day Delivery
Koninklijke Philips Electronics N.V.
c/o Philips Intellectual Property and
Standards Legal Dept., Building WAH 2
5600 AE Eindhoven
The Netherlands

Philips Intellectual Property and Standards
345 Scarborough Road
Briarcliff Manor, New York 10510-8001

Koninklijke Philips Electronics N.V.
!251 Avenue of the Americas
New York, New York 10020

Served via Federal Express 2nd Day Delivery
Wi-LAN V-Chip Corp., c/o Gordon Cameron
Blake, Cassels & Graydon LLP
Word Exchange Plaza
20th Fl. 42 O'Conner Street
Ottawa, Ontario K1P 1A4

Served via Federal Express 2nd Day Delivery
Wi-LAN V-Chip Corp.
515 Consumers Road, Suite 210
Toronto, Ontario M2J 4Z2

CIT Group/Commercial Services, Inc.
300 South Grand Avenue
Los Angeles, CA 90071

Kith Electronics Limited
c/o Kathy Bazoian Phelps, Esq.
Danning, Gill, Diamond & Kollitz, LLP
2029 Century Park East, Third Floor
Los Angeles CA 90067

Wells Fargo Trade Capital, LLC
333 South Grand Avenue, Ste. 4150
Los Angeles, CA 90071

Served via Federal Express 2nd Day Delivery
The HongKong and Shanghai Banking
Corporation Limited
8/F HSBC TST Building
82-84 Nathan Road
Tsianshatsu, Kowloon, Hong Kong

Served via Federal Express 2nd Day Delivery
Jiangsu Hongtu High Tech Co., Ltd.
83 Hu Bai Road
Nanijing P.R., Post Code 210009
China

Jiangsu Hongtu High Tech Co., Ltd.
c/o Alan S. Gutman, Esq.
9401 Wilshire Boulevard #575
Beverly Hills, California 90212

Served via Federal Express 2nd Day Delivery
Sichuan Changhong Electric Co. Ltd.
35 East Mianxing Road, High Tech Park
Mianyang Sichuan Province
China

Vizio, Inc.
39 Tesla
Irvine CA 92618

Oracle Corporation
500 Oracle Parkway
Redwood City, California 94065

Discovision Associates
2265 E. 220th Street
Long Beach, California 90810

Digital Content Protection, LLC
3855 SW 153rd Drive
Beaverton, OR 97006

Dolby Laboratories, Inc.
3601 West Alameda Avenue
Burbank, CA 91505-5300

Hitachi America, Ltd.
50 Prospect Avenue
Tarrytown, NY10591